UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------x

CAROL M. MOTTOLA                              :

           Plaintiff,                   :

                         :

     -against-                       :            CV

CRAVATH, SWAINE & MOORE LLP,            :

ROSALIA A. FAZZONE; FAZZONE LAW,      :

ESTATE OF LOUIS MARK DENEGRE          :      COMPLAINT

SUSAN FABIANI, LINDA FABIANI,           :      FOR DAMAGES AND

JACQUELINE FABIANI, GARY STANCO,     :     INJUNCTIVE AND OTHER

PAGET STANCO, JAMES E. TOLAN           :      RELIEF

------------------------------------x

Carol M. Mottola
Pro-Se
PO Box 194
Bronxville, NY 10708
cmm4279@gmail.com
(914) 727- 9657

Plaintiff alleges as follows:

Plaintiff Carol M. Mottola (C. Mottola) brings this action pursuant to the provisions of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961 et. Seq. proceeding as a Pro Se Litigant (28 U.S.C §1654).

Procedural Background, Prior Slander and Emotional Distress Complaint

On May 1, 2012, Plaintiff filed a slander and emotional distress complaint, (the "2012 Complaint") jurisdictionally based on diversity of citizenship, (28 U.S.C. § 1332) against Connecticut residents Diana Rita DeNegre and Louis Mark DeNegre (Case 1:12-c-03465-LAP) both now deceased. ( And on that day, May 1, 2012,  Plaintiff paid the filing fee.)

Plaintiff, knowing of  the DeNegres' covert habits, audaciousness, among other propensities, and the outcome of the 2012 Complaint must at least consider the possibility that the DeNegres and perhaps others, had improper contact with and influence on the Court. Plaintiff does not of course know whether the Court's IFP designation (despite the timely payment of the filing fee), and *sua sponte* dismissal were influenced by defendants. Plaintiff in good faith filed an appeal however, the Court of Appeals affirmed the District Court's decision.

Traumatic Childhood Crime

All the foregoing said, memory of a traumatic childhood event (crime) set forth more fully below was suppressed in 2012. Defendants' recasting of the attempted crime contributed to the suppression and caused other psychological suffering such as a frequent, nearly intolerable cognitive dissonance.

Deception, Concealment

Plaintiff believes she has sufficient facts to bring a RICO complaint although to this day, there is concealment.

Defendants DeNegre and others (relatives) deceived and concealed  but to stave off a lawsuit and preserve in their criminal minds a statute of limitations defense, they had a modus operandi, among many others, by which incomplete out of sequence clues were foisted on the Plaintiff and were more confusing, and injurious than illuminating i.e., constituted additional torts and crimes, and compounded prior wrongdoing.

A  persistent and outrageous modus operandi was the use of the effects of crime–both the immediate (e.g., escape and fear) and the lingering, against the Plaintiff, inflicting, as said, more harm, as set forth more fully below.

Plaintiff wrote in her appellate brief that she could find some humor in the past. Plaintiff would not write such a sentence today; it was and is some evidence of the harm done, the gaps in plaintiff's memory and information.

Plaintiff believes that M. DeNegre, an M.D., a charlatan, knew the kidnapping attempt was unlikely to succeed but he encouraged it with the knowledge and intent that the attempt would harm (traumatize) the Plaintiff.

 In an extortionate maneuver, defendants sought to put the plaintiff in a desperate  position.

 RICO Defendants DeNegre, Fazzone, and J. Fabiani, L. Fabiani and S. Fabiani ("J.L. and S. Fabiani") present themselves as having the inside truth on the plaintiff, casting her as a villain. The DeNegres (and Fazzones and defendants J., L., and S. Fabiani) made aggressive allegations set forth more fully below, to intimidate, shift the burden, put their victim, Plaintiff, on the defensive. Defendants criminally and tortiously victimized Plaintiff since she was a child.

DeNegre's unlawful end was for the plaintiff to abandon her mother. DeNegre directed a  kidnapping conspiracy since approximately 1967.

Plaintiff believes at least one of his motives was a statement plaintiff's mother made in the 1950's set forth below that just did not sit right with Rita Cozzi DeNegre.

Defendant Cravath, Swaine & Moore ("Cravath")

Plaintiff contends as set forth fully herein, that Cravath is responsible for, is the primary cause of the burden on the judicial system in this matter ergo, Plaintiff, though obviously of far less status, implores the Cravath firm to voluntarily, upon email service of the complaint, pay the filing and administrative fees.

As set forth more fully below, Defendant Cravath, primarily through the then Supervisor of Paralegals subjected Plaintiff to unlawful intimidation, trickery, among other communication and conduct intended to induce Plaintiff to quit (constructively discharge) as set forth more fully below. Defendants concealed their intent and wrongdoing thus, Plaintiff did not know then, or in 2012, that the employment was doomed to fail from the outset due largely to the unseen unlawful hands of a RICO Enterprise, that M. DeNegre led and Cravath actively, unlawfully (though with a generally subdued subtle cover–artifice) participated in as set forth more fully below. Indeed, Plaintiff to this day has difficulty absorbing the lengths to which the Cravath firm went to injure.

Attempted Kidnapping: Recast by Defendants, Memory of Suppressed

Astoundingly, and not realized by the Plaintiff until quite recently, defendants in their unlawful contrariness and artificiality to support, be an advocate for a kidnapper, outrageously categorized the attempts as invitations  bolstering the egos of the would-be abductors and confusing and frightening the victim and her mother, as set forth more fully below. (The recasting as "invitation" was a desperate, wickedly perverse unlawful defense. It is also similar to the speaking of a dialect, a characteristic of many Enterprises, gangs, and similar groups.) Not long after the attempts, they continued a criminal conspiracy, a pressure and manipulation

campaign including, but most certainly not limited to, ostracizing the Plaintiff as set forth more fully below.

Defendants, particularly the now deceased M. DeNegre, R. Fazzone and others using a method similar to gaslighting, sought to completely deny and radically alter Plaintiff's mind thereby deepening the suppression, among other harmful effects. That is, the DeNegres, Fazzones and other defendants deliberately misinterpreted an ***unequivocal flight response to an attempted kidnapping,*** re-victimizing by (among other tactics) as said above, recasting (defending) the attempts as invitations. The truth is long before, during and after the attempt, etiquette was disregarded by M. DeNegre and his co-conspirators.

Heartless, soulless kidnappers at their core, Defendants DeNegre and R. Fazzone actually exploited plaintiff's flight. Covertly, they assassinated Plaintiff's character as they went on the offense to defend and persist in their heinous plans and acts. That is, based upon the clues Plaintiff has in recent months become certain that defendant R. Fazzone and the DeNegres said, over and over again that Plaintiff  "ran" because she was a coward and status conscious. And they inferred other negative personality and character traits from Plaintiff's fear and flight response.

> "Fight-or-flight response, response to an acute threat to survival that is marked by physical changes, including nervous and endocrine changes, that prepare a human . . . to react or to retreat. The functions of this response were first described in the early 1900s by American neurologist and physiologist Walter Bradford Cannon, who also coined the phrase."

Prior to the attempt Plaintiff's mother had not acquiesced; any attempt to lure was kidnapping. And Plaintiff's reaction (fear, flight) placed their conduct in the failed attempted kidnapping category. Thereafter, they came up with an equally unlawful attempted defense and

offense re-victimizing the victim and her mother, A.F. Mottola who had *to bear the burden of coping with the consequences of their long running criminal and tortious conduct.*

An angry, bold,, feud driven liar began the criminal conspiracy to kidnap with two short sentences regarding the Plaintiff: "She's the same. She thinks she's better." The first sentence is the verbal equivalent of abduction, The second, sentence,  frightening mockery, reveals the kidnappers intent and was the equivalent of placing tape on the Plaintiff's mouth.

Defendants operate outside legal boundaries. Defendant Cravath apparently ratified all the criminal and tortious conduct committed prior to the employment, and deliberately inflicted by predicate acts and overt acts a significant if not fatal career blow to the Plaintiff in and beyond their offices pursuant to long term conspiracies set forth more fully below.

Plaintiff contemplated a lawsuit shortly after employment termination but was not sure what category the lawsuit would fall into. There had not been any slurs, no obvious ethnic, gender based discriminatory conduct. Plaintiff was, if not traumatized, flummoxed by deception, concealment, unlawful intimidation set forth more fully below.

Plaintiff's memory of the traumatic attempt to lure (kidnap) into an automobile, was suppressed, until the Plaintiff drafted this complaint having first realized a key, threshold fact— still concealed–that R. Fazzone's association with co-defendant Cravath, under the guise of employment, was not only not a coincidence, but was instead, as more fully set forth below, the hidden force behind the terminated employment and subsequent torts and crimes.

With all that Plaintiff is convinced of now, Plaintiff believes arrest of the Supervisor for her entirely unlawful intimidating conduct would have been appropriate.

Plaintiff's general feeling of having been nearly traumatized, victimized  was expressed in a nearly cathartic manner to the DeNegres and RICO defendant Rosalia A. Fazzone who said

and did nothing to dispel Plaintiff's erroneous belief or assumption that the employment was not

in any way influenced by her and the DeNegres and Co-RICO defendants J., L., and S. Fabiani.

Instead, to deceive, to mislead, among other criminal and tortious aims, R. Fazzone said "she did

the same thing to me."  R. Fazzone knew and concealed that Plaintiff had been treated very

deliberately, very differently as set forth more fully below.

        M. DeNegre Leader of Association-in-Fact Enterprise (not a mere network, the term used
in the 2012 Complaint)

        M. DeNegre was the leader of an Association-in-Fact Enterprise as the term is defined

under 18 USC § 1961(4). See *Boyle v. United States* 556 U.S. 938, 948; 129 S. Ct. 2237, 2245

("As we said in *Turkette* an association-in-fact enterprise is simply a continuing unit that

functions with a common purpose; see also  *Bridge v. Phoenix Bond & Indem. Co*., 553 U.S. 639,

657-661, 128 S. Ct. 2131. The common purpose in a very long-term conspiracy was initially

kidnapping and subsequently defrauding and extorting as set forth more fully below.

Continuation of Association-in-Fact Enterprise and Unlawful Objectives as to Plaintiff

        Replacing, continuing the unlawful deceased M. DeNegre are the following individuals,

daughter Diana DeNegre (Executrix of the Estate of Louis Mark DeNegre), son Gerard DeNegre,

and Gary P. Stanco, among others. Moreover, RICO defendant Cravath is a member, though

Plaintiff assumes in a more passive role after their (concealed) aggressive, active role to

deliberately injure the Plaintiff, deprive and damage Plaintiff and her property as set forth more

fully below.

## SUBJECT MATTER JURISDICTION

        This action is brought pursuant to the provisions of the Racketeer Influenced and Corrupt

Organizations Act (RICO), 18 U.S.C. § 1961 et. Seq. This court has subject matter jurisdiction

under 28 U.S.C.§ 1331 and 18 U.S.C. § 1964 (a) and (c). This district court also has

supplemental jurisdiction (28 U.S.C. § 1367) over (breech of covenant of good faith-bad faith offer of employment claims ), interference with employment, unjust enrichment and defamation claims arising from New York State law that are related to claims within the Court's original jurisdiction such that they form part of the same case or controversy under Article III of the United States Constitution.

## VENUE

Venue in this district is proper under: 28 U.S.C. § 1391(b)(1) (defendant Cravath, a partnership, has its principal place of business in the district.); 28 U.S.C. § 1391(b )(2) (a substantial number of the events and omissions giving rise to this action occurred in this District);  and also under 18 U.S.C.§ 1965.

## PERSONAL JURISDICTION

Under 18 U.S.C § 1965, Personal Jurisdiction is proper over defendant, Cravath, Swaine & Moore ("Cravath"), which has an office, an agent and transacts its affairs in the district.

Cravath, as set forth in further detail below, actively participated in a criminal and tortious conspiracy against the Plaintiff with the DeNegres (Estate of Louis Mark DeNegre), defendant Rosalia Fazzone (R. Fazzone) and others to cause, and did cause, injuries to the Plaintiff, a New York resident; the injuries arose from predicate acts of racketeering. Cravath participated in the Enterprise, engaging in unlawful conduct to induce the plaintiff to quit (constructive discharge) and to cause plaintiff to suffer injuries, a disruptive career (and life) setback from which she would never recover.  And Cravath's participation in the conspiracy (and the active concealment) continued after the constructive discharge. For C. Mottola's claims for violations of 18 U.S.C. § 1962, exercise of jurisdiction over Cravath is proper pursuant to 18 U.S.C. § 1965(a).

Defendant R. Fazzone currently resides in the state of Colorado. Personal Jurisdiction over defendant Cravath is present through traditional means as set forth above accordingly, the nationwide service of process provision of 18 U.S.C. § 1965(b) applies. *PT United Can Co. Ltd. v. Crown Cork & Seal Co., Inc*., 138 F.3d 65, 71 (2d Cir.1998); the ends of justice so require. The case can and should be brought in this district.

Although the Cravath firm had duties (as lawyers and as an employer) and was in the best position to control, indeed halt an Association-in Fact Enterprise dedicated to injuring (and benefiting, profiting therefrom) the Plaintiff rather than joining, conspiring, aiding, inflicting substantial damage to the Plaintiff, her property and future career prospects, it would clearly be illogical and contrary to the ends of justice to sever an active, prior wrongdoer who actively concealed and benefited from crime and tortious conduct.

Personal Jurisdiction Based on Minimum Contacts can be Established as to Defendant R. Fazzone

The RICO Statute encompasses the gravamen of Plaintiff's complaint: a long-term conspiracy initially involving kidnapping and subsequently extortion and defrauding. Plaintiff asserts against defendant R. Fazzone, claims of defamation, tortious interference, and unjust enrichment under New York State law. The exercise of personal jurisdiction over defendant R. Fazzone is reasonable and proper under both NY CPLR § 301 and § 302: "Jurisdiction over Persons, Property or Status." and "Personal Jurisdiction by Acts of Non-Domiciliaries." based upon the following:

R. Fazzone resided in the County of New York from 1985 through 1987. During that time period she used Cravath's office and employees to injure the Plaintiff by tortious and criminal words and conduct in furtherance of long-term kidnapping, schemes to defraud and extort.

R. Fazzone purposely availed herself. She transacted business, rented an apartment with a sister, and used transportation in New York City.

R. Fazzone received income as a result of a pattern of racketeering activity, her participation in an Enterprise that engaged in racketeering activity targeting the Plaintiff (and Plaintiff's mother) a New York resident and crime victim in defendant Cravath's New York office (and elsewhere).

Since as early as 1982, Fazzone has had contact with persons in Cravath's New York office that pertain to the Plaintiff for the unlawful purposes set forth in this complaint.

R. Fazzone (and the DeNegres, by an association-in-fact Enterprise) did indeed in 1982 to 1984 devise and execute an unlawful plan with Cravath (which they by necessity actively concealed) to influence the employment, how Plaintiff was treated aiming to irreparably harm the plaintiff by extorting wages and benefits in inducing Plaintiff to quit, diminishing the value of Plaintiff's undergraduate education and attempting to pressure Plaintiff to relinquish her diplomas.

To control the workplace environment as to the plaintiff (unlawful intimidation, disorientation) in furtherance of conspiracies that began with kidnapping attempts followed by conspiracy to deprive the plaintiff of employment (wages and benefits, additional training, law school advice, firm events and activities), any fruits of Plaintiff's endeavors and diplomas, R. Fazzone communicated by wire and in office with Cravath employees including then Supervisor Christine DeFrancesca Luskind.

Thereafter continuing the very long conspiracy, R. Fazzone had contact with individuals in New York to 1) guarantee that plaintiff would not recover from the Cravath fiasco, a brutal disorienting, bewildering trauma and setback and 2) inflict additional harm i.e., mistreatment,

perplexing words and conduct, additional setbacks, and traumas including interference with other employment with the ultimate aim of taking Plaintiff's property to complete the damage done by the Cravath fiasco.

R. Fazzone communicated indirectly with the plaintiff and solicited others to subtly intimidate, harass, and perplex the plaintiff before, during, and after 1987 when her two-year residency in New York and employment at Cravath ended and she left the state and returned to her parents' home in Litchfield County, Connecticut.

R. Fazzone is a fugitive from justice. It is right and proper that she be summoned to appear in a Federal Court located in the Southern District of New York.  As a member of an Enterprise, R. Fazzone deliberately and repeatedly harmed the Plaintiff in the Southern District of New York. R. Fazzone persuaded and manipulated others to engage in conduct to harm the Plaintiff.  R. Fazzone should be eager to appear in court if indeed she has been pursuing justice or a right, both of which she has not.

R. Fazzone continues to support the ultimate original aims of the Louis Mark DeNegre led Enterprise involving kidnapping and defrauding and extortion set forth above and below.

Personal Jurisdiction Based on Minimum Contacts can be Established as to Defendant Estate of Louis Mark DeNegre

 M. DeNegre, a resident of Connecticut, harmed the plaintiff in New York.

This cause of action arises out of unlawful contacts that M. DeNegre had with Plaintiff and other residents of New York in this district. The unlawful contacts include communications by wire for the purpose of deceiving, pressuring, extorting, and defrauding the Plaintiff in furtherance of  a conspiracy to kidnap, attempted kidnapping, conspiracy to extort and attempted extortion among other violations of the law.

M. DeNegre communicated by wire with Cravath employees in its New York office, invited them to a gathering or meeting at his Woodbridge, Connecticut residence (which also served as Enterprise headquarters) where R. Fazzone first became acquainted with Cravath Paralegal Supervisor Luskind who agreed to hire R. Fazzone and harm the Plaintiff.

M. DeNegre communicated by wire and other methods for unlawful purposes, until as late as 2020. Plaintiff believes communication continues, between  Diana DeNegre, Executor of the Estate of Louis Mark DeNegre  Gerard DeNegre, Gary P. Stanco, and Cravath employees for unlawful purposes.

U.S.C. § 1965(b) applies to Connecticut residents J. Fabiani and S.Fabiani:

Exercise of personal jurisdiction by this Court over defendants J. Fabiani and S. Fabiani, residents of Connecticut is right and proper. They resided in New York during many of the events and omissions giving rise to this action. Moreover, 18 U.S.C. (b) applies because at least one defendant satisfies the test for personal jurisdiction . Bringing J. Fabiani and S.Fabiani before the court serves the ends of justice because, simply, briefly stated both were R. Fazzone's source, defendant Cravath's and the DeNegres source of mischaracterizations, defamatory utterances, outrageously bold claims, or assertions that constitute misrepresentations in furtherance of a scheme to defraud and conspiracy to extort. And, directly, they were intimidators of the Plaintiff in the state of New York and indirectly inflicted, fueled the harm to Plaintiff by attending all or most of the gatherings at the DeNegres.


Exercise of personal jurisdiction by this Court over defendant L. Fabiani is proper under 18 U.S.C  § 1965 because L. Fabiani is a resident of New York and transacts business in this district. L. Fabiani was a key figure in the extortion conspiracy as she induced statements at the

direction of M. DeNegre. Moreover, she unlawfully interfered with Plaintiff's employment by mischaracterizing Plaintiff's communications about her employment with Cravath.

Exercise of personal jurisdiction by this Court over defendant G. Stanco is proper under 18 U.S.C § 1965 because G. Stanco, a resident of New York, transacts business in this district and is a beneficiary and promoter of misrepresentations made in furtherance of schemes to defraud the Plaintiff, and extort from the Plaintiff.  And under NY CPLR § 301, jurisdiction over G. Stanco's person, property and status is proper. G. Stanco was unjustly enriched, as a result of Plaintiff's labors, initiative, tuition, in short her endeavors and as a result of  deception and misrepresentations by some of the RICO defendants that led  G. Stanco to have access to the contacts, the connections that were essential to launching his career and his enrichment in the Securities industry.

Exercise of jurisdiction over Paget Stanco (P. Stanco) a resident of the state of New York and beneficiary of schemes to  defraud and extort is proper under both 18 U.S.C § 1965 and NY CPLR § 301. In an indirect taking of Plaintiff's property and in furtherance of conspiracies and schemes set forth herein, Alexandra Von Ferstel, a former Cravath paralegal, supported P. Stanco's  admission to Tufts University, the credential that is the foundation of her career. Plaintiff does not seek compensation from P. Stanco but prays for other relief : a modest donation to a charity that Plaintiff chooses..

## PARTIES AND NON-PARTIES

Adelaide Fabiani Mottola (A.F. Mottola), deceased, April 8, 2020. During childhood, she was treated for scoliosis at the Hospital for Special Surgery. A.F. Mottola was one of Ida Iacapraro's Piano Students as set forth more fully below. On October 3, 1954 she married James R. Mottola, a graduate of the City College of New York which was located near the specialized

school known then as "Music & Art"– a school Plaintiff's mother was admitted to but prevented from attending as set forth more fully below. A.F. Mottola was the mother of the Plaintiff and two sons, Gregory, and Paul.

Among her employers were: Manufacturer's Hanover Trust, SUNY at Purchase, and Fordham University at Rose Hill where she was the Administrative Assistant to the Rev. Richard E. Doyle, S.J., Vice President for Academic Affairs. (An attempted unlawful interference with the application for employment is set forth below.)

As stated on a SUNY Purchase Performance Evaluation: "Mrs. Mottola  sets a high standard for herself." is conscientious as well as poised and humorous. She takes responsibility and handles it well."   . . . with no one in the position of Associate Director, Mrs. Mottola has willingly accepted additional responsibility."

A.F. Mottola was the Executrix for the Estate of Ida Wissman, a friend and neighbor. And in her senior years, the Board of Trustees in the Village of Pelham Manor appointed her to serve as an Election Inspector in Village elections.

A.F. Mottola's hobbies and interests included watching Senate Hearings and following political news. She learned how to prepare chocolate mousse from *Mastering the Art of French Cooking* by Julia Child. She also prepared traditional Neapolitan fare. With daughter Carol (Plaintiff), she enjoyed many lunches at Department store and other restaurants, coffee shops, and occasionally afternoon tea, among other mother daughter shared activities. Upon daughter Carol's request, especially on Christmas evening, she would play Sonatina in G Major, op. 36, No. 5.


INJURED PARTY  (PERSON INJURED IN HER BUSINESS OR PROPERTY BY A VIOLATION OF 18 USCS § 1962)

Plaintiff Carol M. Mottola (C. Mottola), an individual and a daughter of deceased A.F. Mottola, is a person within the meaning of 18 U.S.C. § 1961(3). C. Mottola was a victim of in office crime, constructively discharged by defendant Cravath, Swaine & Moore (Cravath). C. Mottola graduated from The Ursuline School in New Rochelle, NY, New York University, and Fordham Law School. She passed the NYS February 1992 bar examination but has never been a member of the bar. C. Mottola resided in the State of New York during the occurrence of most of the events set forth in this claim and currently resides in the County of Westchester, N.Y.

PARTIES, ENTERPRISE MEMBERS,CO-CONSPIRATORS
PERSONS (INDIVIDUALS AND AN ENTITY) ASSOCIATED- IN- FACT

RICO Defendants

Defendant Cravath, Swaine & Moore LLP (Cravath) is a law partnership organized under the laws of the State of New York with its principle place of business at 825 Eighth Avenue, New York, NY 10019. "Cravath has been known as one of the premier U.S. law firms for two centuries." (LinkedIn) Defendant, by predicate acts of racketeering, to facilitate a long-term criminal conspiracy, constructively discharged Plaintiff C. Mottola.

Defendant Rosalia Fazzone (R. Fazzone) currently residing in Colorado, is a distant relative (a second cousin) of the plaintiff.  She graduated from Choate Rosemary Hall in Wallingford, Connecticut, and Mount Holyoke in South Hadley Massachusetts in 1984. Thereafter, for one year, she resided in North Carolina as a patient/ participant in a weight loss program at Duke University. She began Cravath's two-year paralegal program in the summer of 1985, and completed it in summer, 1987. She received a master's degree from Duke University in 1991, and a Juris Doctor from University of Denver's Sturm College of Law in 1996. She was

employed with several firms in Denver, before establishing an office as set forth below in the following paragraph.

Fazzone Law, L.L.C., at 1753 Lafayette Street 80218 Denver Co., is R. Fazzone's law office. On her and the AVVO website she states: "I graduated from Mount Holyoke with a BA in Latin and English. I then moved to New York City and worked for a large law firm as a paralegal" "I have been practicing law in Colorado since 1996. I fight hard for my clients, and fervently believe in what I do. I have never been a prosecutor and am a defender to my core." Unbeknownst to Plaintiff for many years, R. Fazzone has long been Plaintiff's very odd, very scary, covert malicious persecutor.

Defendant Estate of Louis Mark DeNegre (M. DeNegre) deceased, June 4, 2020. At no time was he plaintiff's legal guardian instead he self appointed to many roles with harmful intent and results. Since the passage of RICO (and prior to) M. DeNegre was a leader within the family and then of an Enterprise as set forth more fully below. He misused his knowledge and status as a licensed physician to injure the plaintiff. The family and Enterprise did not need hitmen, they had M. DeNegre.

Plaintiff's information is that M. DeNegre was recruited by and then graduated from Providence College in 1956; he was President of his class for two consecutive years. As stated in his obituary: "In 1960, he married Diana Rita (Cozzi) DeNegre, . . . (Plaintiff is not using his obituary as a Predicate Act however, the obituary does, arguably at least, constitute wire fraud within the meaning of 18 U.S.C. § 1343.)

In 1960, he graduated from Seton Hall College of Medicine. He was an Intern from July 1, 1960 to July 30, 1961 and a Resident from January 1, 1964 to December 1966 at the Hospital of St. Raphael, New Haven, Connecticut. A Physician/Surgeon license granted on August 24,

1961, expired on October 31, 2016. On December 1, 1968 he was board certified in radiology. (Source: Connecticut Department of Public Health Physician Profiles,) He treated the plaintiff like a radiological image. He had an interest in the misuse (mockery of) other medical specialties, in which he lacked board certification, particularly psychiatry, to harm the Plaintiff and her mother, A.F. Mottola.

In the mid to late 1980's two lawsuits involving failure to diagnose, one for wrongful death, were brought against him. He agreed on advice of counsel to settle but he continued to say:

"There was nothing on the picture."

Thereafter, he was driven out of group practice.  As to the reason, he said, "The premiums went up." He then worked for Blue Cross Blue Shield. R. DeNegre said, "Medicine is a business." (Similarly,  when Phillip Fazzone's partners departed over a compensation dispute and the practice soon closed, R. DeNegre said, "That's like what happened to Mark. Medicine is a business."

During retirement, M. DeNegre volunteered, cooking and providing food at the St. Thomas More Soup Kitchen at Yale University where his daughter subsequently became employed.

Defendant Executrix Diana DeNegre, daughter of M. DeNegre. She is a Staff Affiliate at Yale Medical School. She resides in Connecticut.

RICO Defendant Jacqueline Fabiani (J.Fabiani) She is, in all relevant respects a duplicate of her mother, T. Fabiani:  Relentless in feuding, escalating to crime. At T. Fabiani's direction, as to Plaintiff, she was angrily obsessed, focused only on making certain that Plaintiff did not for one second "think she was better." Her ultimate objective is to dominate, restrain, and hold

the Plaintiff captive. Domination, holding Plaintiff captive is the criminal length to which she believes she has a right to, must go to force Plaintiff to do what she does, teach the Plaintiff, ensure that she is not and does not even appear to think she is better.

Defendant Susan Fabiani: (S. Fabiani) Sister of co-defendant J.Fabiani. All that is stated as to J. Fabiani applies to S. Fabiani: She is in all relevant respects a duplicate of, a conduit for T. Fabiani. She was assigned to be the chief mocker of Plaintiff to teach Plaintiff a lesson (with R. DeNegre's help) punish for "thinking she is better."

Defendant Linda Fabiani (L. Fabiani) Another cousin but not a sister of J. Fabiani and S. Fabiani. Plaintiff does not believe she attended the gatherings at the DeNegres. She was  kept informed and was an active participant in conspiracies against the Plaintiff, particularly the conspiracy to extort. She unlawfully interfered with Plaintiff's employment at the Cravath firm.

Defendant Gary Stanco (G. Stanco) spouse of Paget Stanco, a niece of R. DeNegre and M. DeNegre. He is a beneficiary of Conspiracies against the Plaintiff. G. Stanco's career in the Securities industry was launched by a pivotal connection through conspirator M. McErlean's brother, Thomas McErlean (deceased).

Defendant Paget Stanco (P. Stanco) Daughter of Gary P. Stanco. She is the recipient of an ill-gotten Letter of Recommendation and mentoring to gain admission to Tufts University from a former Cravath Paralegal.


Rita (Cozzi) DeNegre (deceased). (R. DeNegre fumed and became committed to punishing Plaintiff when T. Fabiani said, "She's the same, she thinks she's better." As stated in her obituary which Plaintiff considers to be wire fraud though it is not a Predicate Act, part of Plaintiff's RICO complaint for damages.

"Diana 'Rita' DeNegre, long-time resident of Woodbridge, . . . on Thursday, March 8, 2018 at the age of 81. . . predeceased by her siblings: Adelaide 'Dolly' Cozzi, Ciro Cozzi, Adrian Cozzi, and Hugo Cozzi . . . Rita was born on March 16, 1936 in Bronx, New York to Luigi and Angelina (Bounocore) Cozzi. . . graduated . . . from New Haven State Teacher's College (Southern Connecticut State University). She taught elementary school before "getting married in 1960." (New Haven Register, March 11, 2018).

Based on sporadic clues and known facts, Plaintiff has, particularly since her mother's passing in April of 2020, become convinced of the improbable: Since the early 1950's, R. DeNegre instigated a cruel, covert feud against A.F. Mottola perpetually taking issue (outside her presence, without her knowledge) with her every word. In particular, she inflicted cruel and repeat punishment in the absence of wrongdoing or authority for a summary statement ("I was supposed to go to Music & Art,") set forth more fully below. The targeting of A.F. Mottola was part of R. DeNegre's marriage to M. DeNegre.

According to R. DeNegre (and Plaintiff believes it to be true) it was A. Cozzi (sister Dolly) who initially suggested and encouraged Rita to become a teacher.

Sometime In the 1990's, R. DeNegre was a substitute teacher in the Woodbridge  School District. A student complained about an in-classroom incident. School officials treated it seriously. According to R. DeNegre's own telling of the incident to Plaintiff's mother, she "tapped the student on the head with a soft cover book." R. DeNegre was stunned that the student complained. She said to plaintiff's mother: "And I liked him." R. DeNegre chose to evade by waiving the right to a hearing prior to termination thus she was terminated, not called back and never taught again in any school. (Sadly, predictably she learned nothing.)

The head tapping was (1) a battery: contact without consent (2) one of many incidents in which R. DeNegre misperceived and punished in the absence of any wrongdoing and (3)potentially extortionate.

Nicholas Fabiani  (N. Fabiani) deceased husband of T. Fabiani, father of six children, eldest son of Edward and Pia, brother of Plaintiff's mother, A.F. Mottola. N. Fabiani graduated from Fordham University. He served in World War II. He was an Accountant for the Union where his father Edward was employed as set forth in more detail below. Although he could be personable, upon his marriage to T. Craco Fabiani, he served in a kind of war with her elder relatives, a neighbor, and against Plaintiff and her mother. He and T. Fabiani had similar traits or tendencies. For example, he was quite frustrated, even angry, that brother Edward attained good grades in school without as many study hours.

Conspirator Theresa Fabiani (T. Fabiani) Due to her advanced age, she is not a defendant. N. Fabiani's wife,  Plaintiff's aunt, though she was not content with that role. T. Fabiani is the mother of six children including daughters, RICO defendants Jacqueline (J. Fabiani) and Susan (S. Fabiani). She was not career oriented, had no ambition or hobbies and interests but she was a narcissist deriving satisfaction from deceiving and conspiring against Plaintiff and her mother. Viewed or analyzed in the most sympathetic light, she craved attention and was often the center of it, particularly among the relatives, DeNegres, Fazzones and others. Like R. DeNegre, she instigates and perpetuates feuds or personal battles. M. DeNegre, R. Fazzone and A. Fazzone are among the relatives who, unbeknownst, catered to her need for satisfaction arising from such battles. With regard to the Plaintiff and her mother, T. Fabiani had the requisite *mens rae* for Kidnapping in the First Degree as set forth more fully below.

She achieved a celebrity-like status. Her supporters seem to infer from her lack of ambition  that she is people, relationship, and family oriented. She is motivated by feuds and personal battles.  As said, knowing that Plaintiff's mother was fooled (defrauded) by her own cousins was very satisfying to T. Fabiani (Terry) indeed, is a primary motivator, more or less, her personality.

In the small world, constitution-less state that DeNegre called family all crooked pot holed nightmarish detours lead to T. Fabiani (Terry) the heartless, manipulative, supremely sardonic, narcissist at the center of an artificial family.

T. Fabiani and R. DeNegre had mutually compatible unlawful objectives: both sought to take Plaintiff from A.F. Mottola and if she did not give her up, if Plaintiff could not be lured, they would, as set forth more fully below, essentially, take the Plaintiff's life.

It is not a coincidence that the Fazzones and Cozzis and DeNegres profited from failed kidnapping attempts. They profited also from persistent conspiracy, the deceiving of and stealing from plaintiff and her mother which as said is gratifying to T. Fabiani. In a perverse criminally contrarian contest driven family, T. Fabiani's acquiescence was sought (and given) to elevate a kidnapper over a mother, A.F. Mottola.

Conspirator Adelaide B. Fazzone (A. Fazzone) (Due to her advanced age, she is not a defendant.)  R. Fazzone's mother, one of the eight children of Vincent and Carlotta Buonocore, mother of eight children, cousin of R. Cozzi DeNegre (and Plaintiff's mother, A.F. Mottola.) She resided in Connecticut for most of her life, currently in Vermont. She supported the core kidnapping conspiracy (and sub plots, ancillary extortion conspiracies and schemes) from which this complaint for damages arises. And she of course as said as to other conspirators, concealed her support for the conspiracy.

She was also involved with husband Phillip Fazzone, a medical doctor, in categorizing a home in Roxbury, Connecticut as a farm to unlawfully claim tax deductions. She seemed quite surprised by the IRS audit and there was her trademark subtle mockery and condescension.  R. Fazzone invited Cravath employees (but not the Plaintiff) to the Roxbury residence.

M. DeNegre, RICO Enterprise leader, had many agents acting in concert with him and other Enterprise members in furtherance of the conspiracy to kidnap, the conspiracy to defraud and extort from Plaintiff C. Mottola. Among the most active of the non-party conspirators are the following individuals:


**RICO Conspirator James E. Tolan** a retired attorney, father of Margaret Tolan, long time co-conspirator of M. DeNegre since (unbeknownst to Plaintiff until she drafted this complaint) Plaintiff's family moved to Pelham Manor.  In or about 1967 he became involved with DeNegre in a scheme to extort from the Plaintiff's family the, rights, privileges and benefits of home ownership and tax payment in the County of Westchester and the Village of Pelham Manor. Since 1971, he conspired with DeNegre, Fazzone and others to defraud the Plaintiff of the benefits of attending the Ursuline School.  Sarcasm and mockery are frequently used to accomplish unlawful objectives and defeat his innocent targets. He makes it known that he knows the Kennedys, having been an advance man for Robert Kennedy.  He actively concealed that he sought to, among other unlawful plans and conduct, have a staged event at the DeNegres that, as set forth more fully below, was essentially either an attempt to kidnap or overt act in furtherance of a conspiracy. Tolan apparently thought he was cleverly evading, outsmarting the Penal Code; Plaintiff alleges he violated it and federal statutes as he sought to deceive, move the Plaintiff without the acquiescence of Plaintiff's mother, as set forth more fully below, to another

school and household where defendants J.Fabiani, S. Fabiani and their parents T. Fabiani and N. Fabiani, with the unwavering support of co-conspirators the deceased M. DeNegre and R. DeNegre among others, would permanently restrain the Plaintiff.  And if Plaintiff did not leave the school, he would and did conspire to defraud the Plaintiff. Tolan believes RICO applies only to gangster or mafioso types.

Tolan sought through quite a few people including Robert F. Kennedy Jr. to pressure and persuade Plaintiff that she must (or at least should) attend the same school as her cousins, defendants J. Fabiani and S. Fabiani, because, briefly stated, all the Kennedy cousins attended schools that were very similar to each other.

Class of 1977, The Ursuline School, New Rochelle, NY. Many (if not all) members of the class with varying levels of participation in an M. DeNegre led unlawful effort to invalidate Plaintiff's admission and expel the plaintiff. Among the most active members were and are:

Marie McErlean Hunter (M. McErlean)  She was described in Plaintiff's 2012 complaint as an angry, zealous advocate. M. McErlean likes being a part of and leading conspiracies. She eagerly accepted as true out of court complaints about the Plaintiff and quickly applied it, sprang into action against the Plaintiff, a duly admitted student of the Ursuline School. She was R. DeNegre's alter ego, a conduit for the DeNegres, T. Fabiani and  defendants J. Fabiani, L. Fabiani and S. Fabiani at the Ursuline School. T. Fabiani's criminal obsession with and mockery of the Plaintiff spurred a stage act in Ursulines Senior Talent Show defended and upgraded by the star of her own show, in condescending, scornful tone, as "satire."

**Jean McNamara (J. McNamara)** (a key early figure, then residing in Pelham Manor, attending the parish school, OLPH). Graduated from Georgetown University, her father's alma mater. J. McNamara never invited the Plaintiff to any of her parties *and emphasized it*.

**Margaret "Meg"Tolan (M. Tolan )** graduated from Mount Holyoke College, and Fordham University School of Law, her father's alma mater. Like M. McErlean, she was (and is) conspiratorial and criminally impersonated(s) stereotypical characters such as semi-literate females, to injure the plaintiff.

**Former Cravath Paralegals,** R. Fazzone's Co-Workers during 1985-1987, Subsequently Fordham Law School students and graduates.

**Alexandra von Ferstel  (A. von Ferstel)** A highly skilled impersonator of the intensely angry for no good reason Fazzones,  A. von Ferstel received her bachelor's degree in international relations and German from Tufts University.

**Linda Ashley Lyu (A. Lyu)** Plaintiff does not know Lyu and Lyu does not know the Plaintiff. Lyu's statements in Fordham's cafeteria are set forth below.

**Ralph Taddeo (deceased) R. Taddeo** Plaintiff did not know R. Taddeo and he did not know the Plaintiff. His curious (hostile) statements are set forth below. R. Fazzone spoke of him to suggest the false: that her work experience at Cravath was similar to Plaintiff's.


**Frederick Neustadt:** Legal Writing Professor at Fordham Law School during the relevant time period, 1987-1989. Unbeknownst to Plaintiff, he organized a "class trip" to the DeNegres.

**Rachel Vorspan:** Director of Legal Writing at Fordham Law School during the relevant time period, gave her okay to Neustadt's class trip.

## FACTUAL BACKGROUND, BASIS FOR CLAIMS

**Overview:** As a preliminary matter,  it would never have occurred to Plaintiff that abuse by relatives would or could actually be used by an employer *against an employee,* in this matter, the Plaintiff. It would never have occurred to Plaintiff that it would be necessary to set forth the following (and preceding) family history. It would never have occurred to the Plaintiff that she would or should be in a sense stalked at work by a malicious kidnapping supporting relative, second cousin R. Fazzone.

Cravath's Paralegal Supervisor during the relevant time period had no interest in work; unbeknownst to Plaintiff then, she was obsessed with Plaintiff's relatives and determined to use them, their words and most harmfully, Plaintiff's own unlawfully induced words, against the Plaintiff. Thus one might view the matter at the Family Feud Level but ultimately it did escalate to crime. Moreover, the feud or vendetta or intrafamily contest was instigated and perpetuated by the DeNegres and other relatives, then taken public. Victims C. Mottola, and A.F. Mottola. eschewed feuds, never had the habit, or any interest in or anything to gain from such conflict. Defendants knew Plaintiff's mother and then the Plaintiff were the misfit targets. Defendants knew T. Fabiani had a long prior history of intra family contests, feuds etc.

The obvious and unlawful objective of gatherings hosted by the DeNegres (attended by many, including Cravath employees) was to have an inappropriate utterly unlawful (criminal and tortious) influence on employers and others.

Briefly stated, this is a case about an ill-mannered, addicted to feuding and unfair contests family that excluded, targeted the Plaintiff and spawned ill-gotten gains and an Enterprise as the term is defined in 18 U.S.C § 1961(4).

Defendant R. Fazzone entered Defendant Cravath's office via a crooked, unlawful route, with ill-gotten credentials.

R. Fazzone and other defendants supported luring, moving the Plaintiff to a place where Plaintiff did not want to go, where she would have been restrained (and possibly killed).

R. Fazzone knew that she never knew the Plaintiff. Plaintiff knew little or nothing about R. Fazzone. She simply relied on and enjoyed one-sided reports as did her mother and R .DeNegre. She never considered the obvious: that the one-sided reports were from chronic complainers who calculated that there was never going to be any fact checking.

The DeNegres and Fazzones fueled the one-sided covert complaints. Moreover, by at least one of several contradictory accounts, the chief complainer T. Fabiani (and co-defendants J. Fabiani, S. Fabiani) lived in essentially, a prison, a resentment and anger breeding ground. Thereafter they circulated the reports which was of no real benefit to the complainers but was harmful to the Plaintiff and her immediate family. Defendants, including R. Fazzone, have no interest in truth. They just wanted T. Fabiani to win a personal battle, at all and any cost and they shamelessly profited from it.

 Defendants' aims and intent originated primarily with T. Fabiani's verbal equivalent of abduction, the very possessive and assuming ("She's the same.") coupled with a mocking and threatening statement: ("She thinks she's better.") The intrafamily conspirators escalated to kidnapping not long after, in a kind of unjust, uncalled for, vengeful response to a lawful life event: moving. They further escalated to schemes to defraud and extort (and continued the initial kidnapping conspiracy), in an unjust, unprovoked vengeful response to Plaintiff's independent admission to a school.

**Pre-RICO Enactment Family History**
**Defendant R. Fazzone's Grandparents, Buonocore Winery**

Defendant R. Fazzone's grandparents were Carlotta (born 1893) and Vincent Buonocore (1892), first cousins who sought and were granted permission to marry from the Papal office of the Catholic Church. Carlotta and Vincent had eight children including Restituta B. Genovese and Adelaide,  R. Fazzone's mother.

Vincent founded and then in the mid 1930's, moved a wine import business to New Haven, Connecticut, and the family to North Haven.  Restituta, however, "stayed with other relatives" to finish high school. (Obituary, Restituta Genovese, New Haven Register, 2015) The "other relatives" referred to in the obituary are Angelina Buonocore Cozzi and Luigi Cozzi.

**Cozzis**

Angelina Buonocore Cozzi, (born 1891,two years before Carlotta) and Luigi Cozzi, had five children: Adelaide (Dolly), Ciro, Adrian, Hugo, and Rita. 1940 Census records show that Luigi Cozzi was a  salesman, a trade or business that sons Adrian and Hugo would enter as adults. The Cozzi's lived in the house where all the Buonocore sisters lived from the time they immigrated to the United States until they married and moved.  (In the late 1940's or 1950's, the Cozzi's moved to the Northern Bronx, near other relatives, including plaintiff's grandparents.)

<u>Close relationship with Buonocores</u>

One or more of the Cozzis worked for the winery for some period. And Ciro Cozzi, as the owner of a restaurant, transacted business with them  R. Cozzi resided in the Buonocore's North Haven home while a student at Southern State University.

To state a relevant foundational fact, the Cozzi's credo first uttered (and still believed in) most emphatically by the now deceased Hugo Cozzi."It's not what you know, it's who you

know." (Indeed, the Cozzi's had a condescending, intolerance for plaintiff's grandfather interest in poetry.)

### Roots of Propensity for Intrafamily Contests

First born Angelina and second born Carlotta were competitive as to cooking in the kitchen. Plaintiff's grandmother and another sister, born a few years apart, enjoyed needleworking, and a non-competitive relationship.

<u>R. Fazzone's Grandfather Condescending, Cynical, Suspicious</u>

Plaintiff's grandfather was a translator for an Italian bank in New York and then a stockbroker for some period in the 1920's. At some point prior to the market crash of 1929, he stated to Vincent, an account holder, that the firm was advising that it was time to sell. Vincent replied, "they just want you to sell so they can sell to someone else at a higher price."

(After the stock market crash of 1929, with help from a relative,  plaintiff's grandfather become employed as an accountant for a union. He preferred negotiation over strikes. At the age of eighty he reluctantly retired.)

### Carlotta Buonocore's Tortious and Criminal Conduct; Plaintiff's Grandmother in a state of Fear

Perhaps because she was ten years older and as the winery business grew, Carlotta was presumptuous, domineering, and cruel to Pia. Telephone calls from Carlotta often reduced Pia to tears. When Vincent telephoned plaintiff's grandfather, she would say, to her more trusting husband:

"They only call when they want something."

A remark by defendant R. Fazzone and her mother in the 1980's or 1990's  about plaintiff's grandmother was so reductionist, hostile but uttered with a smile as if it were honest.

Like most Fazzone utterances, it should have been left unsaid. Plaintiff  began to doubt that Pia and Carlotta were sisters.

<u>Plaintiff's Mother a Student of the Piano</u>

Plaintiff's grandmother Pia gave plaintiff's mother, on or about her eighth birthday, a pre-owned baby grand piano. As plaintiff's mother would say appreciatively (which Rita and others likely mocked) "it was a sacrifice." She had weekly piano lessons. The Piano teacher, a Julliard graduate, told plaintiff's mother and grandmother that she could help plaintiff's mother with admission to Julliard. However, the piano teacher's continued mentoring depended on Plaintiff's mother attending  The High School of Music & Art ("Music & Art"), the public specialized high school then located at 443-465 West 135th Street in Manhattan. Plaintiff's mother auditioned and was admitted to Music & Art.

Plaintiff believes Carlotta's cruelty and intimidation impaired plaintiff's grandmother's state of mind and as a result, plaintiff's grandmother panicked and would not allow plaintiff's mother to attend because of the school's location.  Plaintiff's mother, however, undeterred by the location, wanted to attend Music & Art. As plaintiff's mother said, ". . .and it was near Sugar Hill, . . . "You just couldn't get through to her. " The piano teacher's final statement, "Well, there is no point in continuing; that is the only way,"  did not change Plaintiff's grandmother's impaired mind that thought she was being protective but was irreparably harming.

It was a cruel, frustrating, devastating, and disorienting disappointment for Plaintiff's mother, almost impossible to cope with. Plaintiff, though not a psychiatrist, believes that the attendant disorientation and other ill effects led to a disorder similar to dissociative identity disorder (formerly, multiple personalities), though without drug or alcohol abuse.

For R. Cozzi and other relatives, their take or focus was on the humiliation (which they delighted in) the frustration which they, relentlessly cruel and unusual, wickedly, lacking any sensitivity used against plaintiff's mother when she was not present. As set forth more fully below, unbeknownst to Plaintiff until sometime in the 2000's and Plaintiff's mother, R. Cozzi DeNegre, cowardly and cruel, operating covertly to gain from a cruel end provided a cheap form of entertainment saying, "it was all wiped out."

R. DeNegre's Strained Relationship with her mother, Angelina; Possible Link w/R. DeNegre's Early Targeting of Plaintiff's Mother

Plaintiff's mother, in R. DeNegre's presence, said Angelina, (R. DeNegre's mother), was a saint. Rita said only a curious, "Yeah . . ."  Plaintiff was left with the thought that Rita was playing it close to the vest for some reason.

Plaintiff's mother told plaintiff that Angelina was a strict "disciplinarian" . . . Plaintiff's mother had one particularly indelible memory, "she pulled her [Rita's] hair." Plaintiff's mother never used such methods of discipline however, Plaintiff's mother may have thought that Rita, incorrigible, rebellious drove her saintly mother to it.

(Plaintiff's mother was obedient, respectful of her parents which, based on clues from Enterprise member, M. McErlean, R. DeNegre strangely ridiculed and exploited, which perverse McErlean thought was funny.)

Plaintiff infers (does not know as a certain fact) that one of the reasons for Angelina's disciplining of Rita may have been Rita's cruelty toward plaintiff's mother, though Plaintiff's mother was not aware of it. And plaintiff is more or less convinced that Rita, and subsequently spouse, partner in tortious and criminal conspiracies, M. DeNegre, blamed plaintiff's mother for the conflict between Rita and mother, Angelina, and the punishment. (Plaintiff, however, believes that Rita did not value a relationship with her mother.) Further, to compound and

escalate, they voiced to others their self serving but unfounded suspicion that plaintiff's mother: 1) knew she was the reason for the discipline and 2) derived a sadistic satisfaction from the punishment. Unable and/or unwilling to give up her cruelty toward plaintiff's mother as if it were an important cause, Plaintiff believes that Rita drew a line with Angelina –as she would years later, repeatedly with her elder sister "Dolly" who sometimes upon news of Rita's latest inappropriateness (unrelated to plaintiff's mother) was plunged into a state of despair, her head down, as she tried to cope.)

R. Cozzi DeNegre Covertly Learns of Plaintiff's Mother's Statement Re: Thwarted Plans to attend Specialized NYC School

Although no one has ever so stated, based on clues accumulated over the years, Plaintiff believes that in the early to mid 1950's, plaintiff's mother made the following statement to co-workers at Manufacturer's Hanover Trust bank:

"I was supposed to go to Music & Art."

Unbeknownst to Plaintiff's mother, most likely in or around the time of Plaintiff's mother's wedding or bridal shower, which Plaintiff is nearly certain some bank employees attended, R. Cozzi heard or learned of the statement. She and M. DeNegre repeatedly parsed and misused the statement against Plaintiff's mother, outside her presence without her knowledge. Plaintiff contends that it was a kind of taking.

Plaintiff believes that with the help of a mentor, the piano teacher, and matriculating at Music & Art, she would have attained other goals. Certainly, she should at least have attended the school. There was no reason for R. DeNegre to use the statement against Plaintiff's mother as if Plaintiff's mother was a criminal suspect and R. DeNegre a detective. There was no reason to concoct an allegation from Plaintiff's mother's truthful, harmless, and understandable concise statement. R. DeNegre lacked compassion and intelligence. She had a certain kind of harmful

cleverness, wickedness like her sister– traits shared and inherited by defendants such as R. Fazzone.

<u>Plaintiff's Mother the Deceived Outsider in the "Family"</u>

Plaintiff's mother was effectively, for all ill intents and unlawful purposes, ousted from the family since at least the 1950's beginning with R. Cozzi's covert war against her. She and M. DeNegre built up an in-family army of opponents but maintained a friendly enough façade (unless doing so did not serve their aims) when they saw and spoke to her. Plaintiff's mother was the odd one out of a family given to gross insensitivity, mockery, and contests.

M. DeNegre

As set forth above (Parties) Louis Mark DeNegre attended Providence College for four years, graduating in 1956. Classmate Peter Buonocore introduced him to Rita Cozzi, who lived in the Buonocore's North Haven home while she was a student of Education at Southern Connecticut State University. It was pleasant housing, a colonial style home with a porch, a barn on the property, and supportive relatives.

<u>M. DeNegre Announces Re-Election</u>

On September 23, 1953 M. DeNegre, President of his Providence College Freshman class, announced his candidacy for re-election. In relevant part he stated:

> "We gave our class one of the most successful dances
>
> that any Freshman class at P.C. has ever had. And,
>
> contrary to precedent, we didn't lose money
>
> –we made money."

"Marc DeNegre To Seek Reelection" *The Cowl*, September 23, 1953

Plaintiff's Mother Deceived

Plaintiff's mother was deceived into paying to attend the dance.

Post WW II, Brother Nicholas Meets Theresa Cracco then Terminates Prior Relationship

Plaintiff's mother's brother Nicholas returned home from service in World War II, met Theresa Craco (T. Fabiani), and soon thereafter ended a prior relationship.  Nicholas and Terry married and lived in the home of her elder relatives. As said above, there are/were conflicting versions of why or how they decided to remain in that household. One story is that the elder relatives gave an ultimatum: that if they left the house, T. Fabiani would forfeit her inheritance. Another is that it just made practical sense to remain there. T. Fabiani would, as set forth below, mock the elder relatives certain that they derived satisfaction from being in control, that Terry and her family were at their mercy.

Patent Infringement Complaint Against Vincent Buonocore & Sons.

To understand the motives and predispositions of Plaintiff's mother's in family enemies, Plaintiff searched online for information and found a record of an intellectual property matter. A patent infringement complaint against Vincent Buonocore & Sons was settled by a Consent Judgment and Order of Discontinuance on December 27, 1960,

Plaintiff's Birth

On December 28, 1959 plaintiff's mother "gave birth" to the plaintiff and told relatives and others of it. Based upon all that Plaintiff knows at the present time including the personalities, manner of speaking, Plaintiff is convinced that, unbeknownst to plaintiff's mother, Rita Cozzi and Mark DeNegre's, reaction was "Why announce it? . . .Why not hide it ? DeNegre vowed to make plaintiff want to hide, give Plaintiff something to be embarrassed about. He also said to Rita and others in the family, "Well, I'm going to take her life." (Years

later, in response to plaintiff's statement which, though about herself, was clearly work related and intended to be constructive, defendant Cravath's Paralegal Supervisor's response was similar in structure, tone and intent to M. DeNegre's, foregoing statement, "Well, I'm. . ." That is, beneath the thinnest of office appropriate veneers, there was an undercurrent of intimidation, unproductive combativeness, as she led/supervised in the direction of a dead end–clearly emphasizing, to intimidate, that she did not intend to be constructive. Indeed, Plaintiff came to understand the DeNegres and Fazzones and the Cravath Supervisor when she became convinced that R. Fazzone and her employment were linked with Plaintiff's abysmal terminated employment as set forth more fully above and below.)

M. DeNegre, unlike Angelina Cozzi, was not going to ask Rita to choose, was not going to ask or expect her to give up her covert war against the plaintiff's mother. The relentless mockery, taking issue with plaintiff's mother's every word and action,  with as many people as possible escalated when they joined forces in what they regarded as marriage.

No later than the mid 1960's, M. DeNegre and R. DeNegre covertly joined forces with T. Fabiani and spouse N. Fabiani

Regarding T. Fabiani, though Plaintiff does not recall the context, if any, N. Fabiani said to his father:

"Oh, she's the greatest."

Apparently, all the relatives decided to support the foregoing superlative—even if it required disregarding boundaries, legal status, the Penal code.


1960's

One Sided Reports of Conflict Covertly Communicated to Co-Conspirators DeNegres and
Fazzones.

Pre-RICO Enactment History and Patterns, Conspiracy to Kidnap, Attempted Kidnapping in the
First-Degree  NY Penal Law $ 110 ; $ 135.25

During the 1959 to 1966 period, plaintiff's family lived with plaintiff's mother's parents,
near T. and N. Fabiani. Terry's relative was the Monsignor at the local parish and school St.
Clare's, where plaintiff attended school until the middle of second grade.

Unbeknownst to the Plaintiff or her mother the Fazzones were staunch supporters of T.
Fabiani flattering, encouraging and consuming the aforementioned one-sided reports or
complaints of conflict at plaintiff's grandparents house on Sunday and holiday meals.
It has become clear that as part of that support, they apparently expected or assumed Plaintiff's
family would stay in a grandparent's home until death.

The DeNegres, Cozzis and Fazzones catered to Terry's need to be the center of attention
They boosted her ego and sided with her against Plaintiff's mother and Plaintiff,  which was
satisfying to T. Fabiani. It made the Cozzis, DeNegres and Fazzones appear to have heart.  As
has become apparent, the Fazzones and the DeNegres expected Plaintiff's family to refrain from
a wide range of lawful activities.

T. Fabiani Prompts Angry Support by her Statement: "She's the same. She thinks she's better."

Though Plaintiff was not Terry's problem, she must have shared with the DeNegres:
"She's the same. She thinks she's better." Based upon the clues, Plaintiff is certain that R.
DeNegre: replying: "Huh!. . .  She does not exist without them!"  The Fazzones reacted with
similar outrage and support.

R. Fazzone in Cravath's office and elsewhere with malice recycled Terry's words to a more obliterating, malicious version set forth below, to injure the Plaintiff's career, thwart all endeavors.

T. Fabiani, when not in attendance at the Sunday meals, nevertheless, influenced and manipulated behind the scenes and must have been bolstered by the support from DeNegres and Fazzones and other relatives. Plaintiff's mother was beleaguered.

T. Fabiani and others as Plaintiff realized years later after several hospitalizations, had a convoluted take on plaintiff which must have originated in the cowardly, covert T. Fabiani's mind: that plaintiff and her mother were trying to attract attention with clothing only to then think she was better. Thereafter S. Fabiani wore a showy dress and entered her grandmother's house running, smiling, attracting attention to herself to mock and teach plaintiff a lesson. Simultaneous with her entry, Plaintiff briefly had the vague sense that there might be some link with the Plaintiff was a little afraid as there was no reason to make fun of Plaintiff but disagreeing with them was dangerous. Plaintiff did not detect the mockery as lesson until many years later for the simple reason that neither plaintiff nor her mother had ever attempted to attract attention with clothing or behavior.

And in the future, Plaintiff would be similarly mocked and/or punished again by influenced students at The Ursuline School and elsewhere–just for an article of clothing. (Other relatives whose wardrobes were more extensive than the Plaintiff's and lived in suburban homes, were not subjected to allegations and ridicule.)

To recap: T. Fabiani told her daughters that Plaintiff

(1) drew attention to herself, wanted them to look

(2) derived satisfaction when they looked at her but used it against them: "you looked," did not want to admit or did not realize that was the source of Plaintiff's thinking she was better.

(3) needed to be taught/made to realize that if she thought she was better it was because of some attention, some satisfaction she derived from them

<u>Plaintiff's Family Moves: Allegations Ensue</u>

In January of 1967, after looking for a house for approximately one (or two) year(s), plaintiff's family moved to the Pelhams as Plaintiff's mother's other brother and his family had. Although no one has ever so stated, as noted, Plaintiff deduces that as part of their support of T. Fabiani, most of the relatives thought Plaintiff's family should not move. Thus, what most people would assume is a basic right, and a happy development, was challenged.

<u>Menancing Non-Verbal Communication on Last Day at St. Clair's</u>

On or about plaintiff's last day at the parish school, Plaintiff saw J.Fabiani suddenly turn and look at Plaintiff with a not friendly stare. It was difficult then and now to decipher specifically what she was non-verbally communicating, but it was intimidating –very likely Terry's mockery, linked with moving. Eventually there would be compounded suggestions of flaunting to torment them. and the other intimidating conversation stopper: "You knew it bothered us."

As Plaintiff wrote this complaint, she realized that the informal complaining to the DeNegres was likely unrestrained, very intensely expressed to persuade and manipulate, to win a popularity contest, make the Plaintiff and her family disliked outcasts within the family and then beyond. Plaintiff is convinced their reports were made with objectives in mind, hence they

were unconcerned with the truth. T. Fabiani did have a history, a habit of feuding. And then she had an intense compulsion to stop Plaintiff's mother from raising the Plaintiff. The DeNegres shared her propensity for feuding/unfair intrafamily contests taken to the extreme and as said were or feigned outrage when T. Fabiani said that Plaintiff thinks she's better. R. DeNegre's pre-existing targeting, obsessive hatred and focus on Plaintiff's mother coalesced with T.Fabiani's.

Interactions Between Terry and Plaintiff's Mother; Plaintiff's Moral and Emotional Support of Mother

When Terry was in attendance at the Sunday or holiday meals at the grandparents' home, she (and sometimes others) verbally attacked plaintiff's mother and at least once, when plaintiff was approximately five or six years of age, (thus prior to moving to the Pelhams) she quietly, calmly went to her mother's side to be protective, provide emotional support.

During one exchange of words, Plaintiff's mother, calmly, slowly, with emphasis, once said to Terry:

"*Typical . . .Sicilian.*"

Like night follows day, unbeknownst then, T. Fabiani reported to the DeNegres and others who Plaintiff guesses from clues, outside Plaintiff's mother's presence, used the statement against Plaintiff and her mother.

It might not be the best two words ever uttered (Plaintiff would add a word: Mafia) but there was some relevant truth in the two words.

Plaintiff includes the following excerpt from an on-line source written by two journalists because, to state matters very briefly, but more fully below, defendants, including defendant Cravath, in violation of the laws of the United States, treated Plaintiff as if she were a citizen of Sicily.

> ". . . Sicily was invaded, conquered
> and occupied by hostile forces many
> times. . . The family, rather than the
> state, became the focus of Sicilian
> life, and disputes were settled
> through a system in which
> punishment often went beyond the
> limits of the law."

Grabianowski, Ed & Donovan, John. "How the Mafia Works." pp. 10-11 , Originally Published: Mar 8, 2005 Updated: Jul 30, 2021, https://people.howstuffworks.com/mafia.htm last date of access: October 25, 2023.

Terry a little derisively once asked Plaintiff's mother,

"What do you think, because I'm not here I don't know what's going on?" Unbeknownst to Plaintiff and her beleaguered mother, what was going on was largely fueled by T. Fabiani operating behind the scenes, coaching, fueling. As said, Plaintiff's mother and Plaintiff were– as T. Fabiani knew and drew confidence and satisfaction from– outsiders who did not know what was going on with the DeNegres and Fazzones and other relatives. Being in the know was important to T. Fabiani. She knew Plaintiff's mother was being fooled.  She derived satisfaction from knowing that the DeNegres and Fazzones sought to undermine Plaintiff and her mother in any and all endeavors. She and other defendants calculated it would result in Plaintiff being lured to her but if not, Plaintiff would be injured—to punish and prove T. Fabiani should replace Plaintiff's mother.

Conspiracy to Kidnap

Attempted Kidnapping:

Initial Attempt

    Day: Sunday,

    Time Period: In or about 1968-1969.

    (T. Fabiani not present at plaintiff's grandmother's).

Uncle N. Fabiani, and daughter S. Fabiani and one or more of her sisters sought to entice

Plaintiff to live with them. Plaintiff was less than sixteen years of age, indeed approximately

nine or ten years of age. They did not seek Plaintiff's mother's acquiescence. It was a very

intense moment for Plaintiff who looked up to her mother who said, "That's my daughter!"

Plaintiff felt relieved, reassured, secure, and considered the matter closed.

    Had Plaintiff been lured, it would have been by deception and she would most certainly

have been under constant threat restricted, restrained, confined in T. Fabiani's household within

the meaning of N.Y. Penal Code §135.00.

    As would years later, become apparent, they returned home, reported back to T. Fabiani

and, co-conspirators, the DeNegres. They re-affirmed their commitment, elevated a kidnapper,

disregarded a mother.

Second Attempt

    Later that day at dusk, plaintiff was walking down the street alone on her way to or

returning from the corner store as was her usual post dinner routine. Plaintiff noticed a car

moving very slowly. There were several people in the car talking, animated; they were trying to

attract plaintiff's attention and did indeed catch Plaintiff's attention and curiosity. Two of them

pressed their faces against the glass, plaintiff was baffled, perturbed, thought the persistence of

the people perplexing. The slowly moving car continued and then the car unexpectantly stopped, plaintiff saw a leg or arm . . .they opened the rear car door. Plaintiff was immediately frightened and ran. Plaintiff did not have to think about it, dwell on it. With fear and certainty plaintiff ran.

Plaintiff had a sinking feeling and reluctantly realized her uncle, N. Fabiani, was driving the car with his daughters in the back seat. Plaintiff did not want to believe it. Plaintiff's earlier assumptions that the matter was resolved were proved wrong. And a sense of safety and security were gone. Plaintiff was **overwhelmed** and forced to cope alone, without her mother. Plaintiff does not recall the walk to return to her grandparents' home.

Plaintiff's mother surely considered the matter settled, would not have imagined, did not know there was a strange conspiracy among her relatives. As they knew, she was not given to conspiratorial thinking. She might not even believe it. Plaintiff is nearly certain that she did tell her mother of the attempt to lure but said only that "someone"  in a car tried to . . .. (A shell shocked Plaintiff could not utter the words, "I think Uncle N was driving the car.")   Plaintiff's mother asked Plaintiff what she did, Plaintiff said she ran and her mother said, "Good."

Though the attempt failed, some degree of psychological separation of the Plaintiff from her mother was accomplished because Plaintiff could not as said utter the words, " it was Uncle N . . .

Plaintiff does not believe there was room, a bed for the plaintiff in T.Fabiani's household, so it is not certain what they were going to do to or with plaintiff once there if Plaintiff had been deceived, lured into the car.

 Thereafter, Plaintiff had to face her would be captors at weekly Sunday meals at her grandparents, keep up a false front, suppress. (The weekly meals at the grandparents' were a

fixed fact that M. DeNegre sought to build on to destroy, in a word, exploited to confine, for dead end purposes, as did defendant Cravath.)

Plaintiff believes that DeNegre mocked Plaintiff's running away, refused to be bound by the law. cleverly shifting, reversing the burden, criticizing reducing plaintiff's preference for her mother as "just status" based in an unlawful effort to force, to trick Plaintiff into relinquishing legal status. He knew he had a not so little problem: laws against kidnapping.  DeNegre was wrongfully applying what he knew about obtaining consent from his medical training.  Plaintiff believes  DeNegre was fully aware the matter was in the kidnapping attempt category and was even enraged that Plaintiff could not be, was not lured. The main source of his rage was T. Fabiani's assessment/complaint: "She thinks she's better." He knew Plaintiff's mother (with only three children) would not raise Plaintiff as T. Fabiani (mother of six) would. He decided that if Plaintiff was going to be an "exception" and not do what T. Fabiani's six children did, then the Plaintiff would be an exception to whom the law would not apply.

 Unbeknownst to Plaintiff, DeNegre moved on to the punish the victim phase vowing – outside plaintiff's presence but communicated subliminally through his many agents– to make the plaintiff unpopular, even hated for preferring her own mother, being frightened, and running. He sought to make plaintiff feel guilty and hollow for preferring her own mother. He generated allegations, sought to corner the Plaintiff, shift the burden, and pressure Plaintiff to defend her preference. HWith little or no proof, much less authority, he then set out to make a mockery of and punish plaintiff's alleged status-based choice because everyone who went to gatherings at his house, Enterprise Headquarters, votes for Terry. Only in a crime family run by M. Denegre would motherhood be reduced to a contest and a vote in his living room. For the plaintiff it was

kidnapping. He derived satisfaction when guests voted for Terry as he strongly disliked

plaintiff's mother

They could not complete the kidnapping but did attempt it safe in the assumption that there

would be no consequences (arrest and charges) because plaintiff was alone and might be too

traumatized, too young to even mention it or contact law enforcement.

**Long Term Kidnapping Attempt/Conspiracy**

In the crime family's relentless pursuit of its common purpose: to separate the plaintiff from her

mother there would in the future be many overt acts and additional attempts to lure including

indirect pressuring, persuasion, manipulation. The nightmare never ended.


M. DeNegre Infiltrates Summer Pines Day Camp

> Beginning in or around 1964 plaintiff was a camper usually for four to six weeks at

Summer Pines Day Camp in New Rochelle, NY. Plaintiff enjoyed the athletic and other

activities; overall, her experience was positive.  However, Plaintiff has in recent years become

convinced that DeNegre, in an effort to spoil the camp experience, undermine Plaintiff's mother,

and plaintiff's confidence in her, infiltrated and influenced (without paying.) DeNegre

emphasized the negative, sought to not only make plaintiff feel inferior, insecure, out of place,

he sought to induce strong negative emotions, such as anger with the hope that Plaintiff would

hate her mother and favor T. Fabiani. Plaintiff did not realize that a few campers who would

approach and ask Plaintiff how many weeks she was attending, and then say they were attending

for eight weeks, were DeNegre/T. Fabiani agents. M. DeNegre was also the mastermind behind

a cancelled sleep over episode in 1971 set forth more fully below.

DeNegre's Underhanded Campaign in the Pelhams

Plaintiff believes that DeNegre, incensed that Plaintiff's mother moved her to the suburbs, obtained the Pelham telephone book or at least a few names and made as many telephone calls as possible to make the plaintiff the object of hatred, contempt, and ridicule with the ultimate aim of pressuring, inducing, luring Plaintiff to give up her mother and room and move to T. Fabiani's household to be permanently restrained.

**Gatherings at Enterprise Headquarters**

DeNegre and all the relatives including of course, defendant R. Fazzone, kept secret what Plaintiff did not realize even when she filed her 2012 Complaint: that long before her enrollment in the Ursuline School, DeNegre had invited people from Pelham (including the Tolans, the McNamaras, and possibly others, including teachers from OLPH) to his residence (Enterprise Headquarters) in furtherance of several objectives some of which involve a taking of property. They sought to manipulate and pressure Plaintiff's family to sell the house in Pelham, preferably at a loss (plus the realtor's commission) or even abandon it and return to the Bronx, near T. Fabiani. To that end, they sought to make Plaintiff's family unpopular by circulating T. Fabiani's allegations noted above. They believed T. Fabiani, despite her history of chronic feuding with her own relatives, that Plaintiff's family should not have moved because it "bothered" T. Fabiani and other narcissistic ludicrous allegations noted above. (e.g., "They did it to be better" "They're show offs." They taunted") As to the Plaintiff in particular, they circulated T. Fabiani's words of abduction and motive, intent. (She's the same, she thinks she's better.)

**Incidents (Overt Acts) in Furtherance of Kidnapping Conspiracy**

<u>Approximate Date</u>:  On or about the first day of school, January,1967

<u>Location:</u> OLPH in Pelham Manor, NY classroom.

Plaintiff was standing in a line; a student (Carol Cola) without provocation pushed the plaintiff. Unbeknownst then, Plaintiff believes that the incident was planned by DeNegre as a multi-part offense/defense of T. Fabiani and the attempts to lure plaintiff: first at the dining room table and then into their automobile on the street.

While on a school bus in Pelham that transported students to horseback riding, someone who attended one of the public grammar schools glanced at Plaintiff as if to communicate non verbally that she knew of Plaintiff. Plaintiff did not dwell on it but now believes, as with other encounters, that DeNegre, Tolan and McNamara were behind them to make Plaintiff uncomfortable.

In addition to the shove noted above on the first day of school, quite a few students were peculiar, unfriendly. Plaintiff sensed that quite a few disliked Plaintiff but Plaintiff did not know why. However Plaintiff believes some people were not comfortable with DeNegre's campaign, his conspiracy and so were not hostile to Plaintiff and her family and there was even some social activity.

In 1968 DeNegre became board certified in Radiology. His focus was however, as Plaintiff would realize many years later, on using psychiatry to injure, manipulate and treat Plaintiff like a radiological image.

**Angry DeNegre Covertly Encourages Ambush of Plaintiff to Anger and Humiliate with Ultimate Aim of Replacing/Claiming Plaintiff's Motivations and Mother (Justification/ Motive: She (Plaintiff) thinks she's better.**

One Sunday (at the grandparents' home) sometime between 1967 to 1970, there was something of an ambush of the Plaintiff. RICO defendants J. Fabiani, S. Fabiani and L. Fabiani agitated, humiliated, got the better of the Plaintiff, in a word, discombobulated the Plaintiff.

Plaintiff did not know of the secret they had: that all the relatives, particularly M. DeNegre, were supportive of them, opposed to the Plaintiff and her mother.

T. Fabiani, and M. DeNegre with the knowledge and support of the Fazzones were behind the scene. Plaintiff was traumatized. Defendants J. Fabiani, S. Fabiani, and L. Fabiani thought it was funny. And they mimicked Plaintiff's discombobulated state to further escalate and claim that they were victimized by the sight of Plaintiff.

Plaintiff was not the only victim of the ambush. Plaintiff's grandparents were horror struck, very disturbed by the incident in their dining room. (DeNegre calculated this would work to his advantage; that Plaintiff would never be able to put it behind her, live the scene down. further he would use it for profit.)    Plaintiff's grandmother, still disturbed, visibly affected said, "oh . . . they're very jealous." Plaintiff would not choose that word and indeed, her grandmother's words were accompanied by an adverb in acknowledgment of a scary fact: that it was more serious. She recognized what Plaintiff did not want to entirely face up to.

 Plaintiff's best guess is that part of their motivation was to put plaintiff in her place.  And they did not merely put themselves first; their conduct revealed a lack of basic respect, consideration for their grandparents.

As a result of the prior week's incident alone, there was, as time would prove, a permanent weapon pointed at the Plaintiff.

Plaintiff was very careful to not provoke them (Misunderstanding, they mocked and used Plaintiff's resolve to avoid conflict against Plaintiff by telling M. McErlean and others of

Plaintiff's resolve who also mocked it and used it against the Plaintiff.) Seeking to build on the incident, they extracted a bit of an accusation (false) from Plaintiff's passivity: that Plaintiff was "pretending" she had forgotten. They considered the passivity a tactic and they were not going to allow plaintiff to move on and put the incident behind her.

Thereafter Plaintiff now believes T Fabiani told them to pretend to forget.

<u>Reporter, R. DeNegre's sister A. Cozzi (Dolly):</u>

R. DeNegre's sister Dolly was an occasional guest at the Sunday meals after her own parents had passed away in the late 1960's. No doubt she provided "reports" though Plaintiff is all but certain she was not present at the ambush.

Plaintiff's grandmother, not trusting of her relatives (but deceived by her sons, their wives, and grandchildren) said, "Be careful what you say when Dolly is here."


<u>Sleigh Riding at the DeNegres' – Fazzone's Unfriendly</u>

In the late 1960's, the DeNegres hosted a sleigh riding gathering at their home in Woodbridge Connecticut. The Fazzones were in attendance. Plaintiff was not introduced to them. There was little if any interaction but they were unfriendly. Indeed Plaintiff sensed hostility. Plaintiff's recollection is that T. Fabiani and N. Fabiani and their six children were not in attendance. Plaintiff can only guess but believes it likely that their absence was deliberate to conceal the conspiracy.


**Post RICO Enactment Facts**

Post Attempted Kidnapping, Conspiracy

<u>R. Fazzone's mother excludes plaintiff from bridal shower</u>

Sometime during the 1970 to 1973 period, Rosalia Fazzone's mother Adelaide B Fazzone hosted a bridal shower for niece Felicity Genovese (Restituta's daughter). Sent by mail through the United States Postal service to plaintiff's mother, but not to the plaintiff, an item, seemingly an invitation. The omission/exclusion placed the plaintiff and her mother in an awkward position hence, at a minimum it was a breech of etiquette. Plaintiff did not then link the exclusion, consider it punishment for running away. At that point in time memory of the attempted kidnapping was suppressed. However, the exclusion did trigger a sense of dislocation, almost panic.

Plaintiff's mother unaware of a conspiracy to kidnap, was not miffed; she seems to have assumed the exclusion was not deliberate. She also assumed that A. Fazzone, did not expect her to

1) travel from Pelham to Wallingford, Connecticut unaccompanied and

2) attend the bridal shower unaccompanied and

3) exclude her daughter, and so Plaintiff's mother brought Plaintiff with her as her guest. Of course, there were no incidents but also of course Plaintiff felt a bit insecure, disoriented.

<u>Plaintiff excluded from a Halloween Party</u>

In the Pelhams, at school, in or about October of 1970, J. McNamara walked up and down the aisles in a classroom handing invitations to most of the students. By the expression on her face, Plaintiff more or less knew that there was malice behind the exclusion but did not know or guess the origins. Plaintiff did not know that J. McNamara's father was an attorney who had an association with M. DeNegre, M.D., in mock and feud mode, refusing to respect Plaintiff's mother, incensed that Plaintiff, had had a flight response as noted above in the Attempted Kidnapping Paragraphs.

Plaintiff was affected and so told her mother about the in-classroom Halloween party exclusion.  Subsequently, perhaps acting on a mother's instinct, Plaintiff's mother spoke with the McNamara's mother which made matters worse.  Plaintiff had not anticipated that Plaintiff's mother would call (and told her so)  Plaintiff's mother was coping with the effects of DeNegre's influence and plotting.  Unbeknownst, like the Fazzones and other relatives, the McNamara's were staunch supporters of T. Fabiani, a kidnapper, artificially repackaged as an inviter. DeNegre efficiency was undermining, straining the relationship between mother and daughter. And apparently attorney McNamara was following doctor's orders to not merely mock plaintiff for preferring her own mother, but to pressure and punish threatening  plaintiff's sense of security, reducing (to serve his unlawful aims) plaintiff's natural preference to  "just status" and so mock and punish a flight response. DeNegre was angry and nervous after Plaintiff's fear and flight /escape from a kidnapping attempt.

  Plaintiff he thought (and apparently persuaded others at the OLPH school) should have jumped at the "opportunity," the "invitation." Thinking in all the wrong terms, he was enraged that apparently Plaintiff expected that better invitations would come along. Apparently DeNegre did not know anything about neuroscience and consequently failed to understand Plaintiff's flight response.

Plaintiff's uncle E. Fabiani, also a Pelham resident, to defuse or "help" with an embarrassing situation that they unbeknownst to Plaintiff and her mother, largely caused, as extortionists do, told Plaintiff's mother that 1) there was "talk" about the Halloween Party and 2)that McNamara was "a big lawyer in New York." They did not say that M. DeNegre was communicating with, influencing McNamara and others. The plot was concealed. The conspirators knew it was not lawful.

Ursuline School

**The Ursuline School,** New Rochelle, NY (Ursuline)  Ursuline is the oldest Catholic high school in Westchester County. The mission statement is:

> "Guided by our Catholic faith and the spirit of St. Angela Merici, The Ursuline School educates, inspires, and empowers young women to become wise, active, globally-minded leaders by cultivating lifelong learning, spiritual growth, integrity, respect for all and dedication to Serviam – "I will serve."

Among the school's core values:

> Academic Excellence: "Ursuline students . . . possess a strong desire to reach their full potential. Development of the Whole Person: . . . students are encouraged to pursue their passions and interests . . . Our students are teammates and champions, artists and musicians, dancers and singers, leaders and innovators - all poised to share their *unique* gifts with the world. (emphasis added).

In 1971, Plaintiff's application to the Ursuline School in New Rochelle, NY was submitted *to the school.* and *without consulting R.DeNegre (even though she was trained to be a teacher) or any other relative.* It was not really deliberate, and or to offend, it simply never occurred to Plaintiff's mother. Plaintiff's mother did not know about the conspiracy but the mere fact that there was in fact a conspiracy was reason to not seek their advice as one might had the relationship been a good relationship. Moreover, Plaintiff's mother did not want to acknowledge an organized crime like family in which nothing can be done without first seeking their approval.

Plaintiff sat for the entrance examination at the school without encouragement or assistance of any kind from any of the RICO defendants J. Fabiani, L. Fabiani, S. Fabiani, R. Fazzone. The DeNegres, Fazzones and others were not involved in any way.

Plaintiff was happy when the letter of admittance to the seventh-grade class arrived and was looking forward to attending the school and also athletic activities such as horse back riding at a nearby stable.

Plaintiff's Mother announces good news.

At plaintiff's grandparents' home at the next Sunday meal, plaintiff's mother, rather than hide, told the relatives of the school admission. It was not of course to seek permission or start or re-start a T. Fabiani/DeNegre/Cozzi style feud or contest.

(Neither Plaintiff nor her mother knew of a relationship, much less a conspiracy with T. Fabiani.) Plaintiff had some anxiety about how they might react given the history but hoped and sought to elevate the situation to polite and civil. Nevertheless, on that Sunday and several thereafter, and up until the fall when plaintiff enrolled in the Ursuline School, Plaintiff was victimized as follows:

a. J. Fabiani and S. Fabiani kept their heads down. Linda was puzzled and said:

"They [the school] just want your money."

"It's all doctors and lawyers there."

b. Based upon clues and abuse, Plaintiff suspects that, soon thereafter and at gatherings at the DeNegres and whenever the topic arose, without Plaintiff's knowledge, as always, they (perhaps conflating themselves, their personalities with plaintiff's) falsely alleged that plaintiff "slipped in" a hint, non verbally, a link to the ambush set forth above in paragraph ___ ; that the school admission was a delayed retort for the aforementioned dining room ambush that victimized both the Plaintiff and her grandparents. The assertion/allegation that Plaintiff "slipped in" a little hint, reference (apparently to taunt) was as stated not merely false but so far from reality, from Plaintiffs bland personality as to be intimidating.( And intimidation was

always compounded by their tendency to persist.)  The allegation was, plaintiff has deduced,

over the years repeated to as many people as possible including Cravath employees (e.g.,

Alexandra Von Ferstel, Ashley Lu) who worked it into what Plaintiff can only categorize as an

attempted criminal impersonation of some kind, an act intended to injure the Plaintiff in

Fordham Law School's cafeteria. The claim was self serving to the RICO defendants, extremely

denigrating to the plaintiff and so false as to be frightening. Plaintiff's efforts to keep matters

civil were apparently unrealistic, not in their interest, not in furtherance of their conspiracies

(confirming perhaps Plaintiff's anxiety) futile, and backfired.

      d. L. Fabiani, imposed unneeded unrequested help. She suggested that Plaintiff

had not thought things through.  She further suggested that Plaintiff did not want to admit it. She

and they subsequently attempted to prove it with a series of fallacies.

      e. They implied that the mere fact that the application to the school was sometime

after the ambush in plaintiff's grandparents dining room set forth in paragraph meant that it

must have been about them, retaliatory.

      f. At some point, to put an end to the annoying  pressure, Plaintiff calmy,

neutrally,  said, "You're trying to take something away from me."  Soon after, though Plaintff

wanted to put an end to it, S. Fabiani (unbeknownst then, pursuant to her mother's drilling,

brainwashing, training) pointed out to the Plaintiff :

      "That was something."

And then, pointing her finger at the plaintiff Susan made eye contact and shaking her head in an

accusatory way as if Plaintiff would not admit to something said, "Yeah. . .".

      S. Fabiani's observation and pointing it out to Plaintiff were as Plaintiff realized as she

wrote this complaint driven by T. Fabiani's single-minded focus on: She's the same. She thinks

she's better; their belief that they needed to teach the Plaintiff, make her realize that their was truth and value in their fallacy. That is, Fallacy No.1) Plaintiff thought she was better, and Fallacy no. 2) Plaintiff thought she was better because she was deriving something from RICO defendants J. Fabiani, S. Fabiani and L. Fabiani, as set forth above i.e., fallacies concerning Plaintiff's attention seeking with clothes; that it was the attention from J and S. Fabiani that made Plaintiff feel and think she was better but Plaintiff would not admit it.

       g. S. Fabiani and J.Fabiani took back something and covertly reported it as was their habit, back to the DeNegres and the Fazzones. The DeNegres and Fazzones to boost their egos and disregard the Plaintiff whom they hated gave their blind artificial support to them.  The DeNegres put on the "it's the other way around" act and accepted as true the latest fallacy built on the original fallacy.

In short, all that RICO defendants J. Fabiani, L. Fabiani and S. Fabiani did and said to Plaintiff was harmful including the "something" that S. Fabiani pointed out to Plaintiff. The moment S. Fabiani  said "that was something" she more than negated it, wiped it out, crushed it, destroyed it, harmed the Plaintiff in the process.

They disregard anything that has nothing to do with them. That leaves them with nothing to claim except their ambush which as said hurt and harmed not only the Plaintiff, but their sensitive grandparents. And they did not care or even think about it.

During the interactions set forth above, the RICO defendants used intimidation (by eye contact, outnumbering the Plaintiff, subtle mockery) and concealment. They concealed the source of their mysterious intimidating confidence: the fact the DeNegre would throw a party for them, support them, sell something fraudulent at the gatherings.

Plaintiff must have detected some mockery and condescension; however it was not until the plaintiff wrote this complaint that she fully deciphered and confronted the depth and extent of it. They subtly mocked the plaintiff attempting if not forcing plaintiff to transform a school admission to a personal battle escalating gradually to crime. Personal battles were the habit of T. Fabiani and the Buonocore's (as set forth above). not the plaintiff or her mother. Years later in Cravath's office, employment became an intimidating personal battle with a supervisor who unbeknownst then was influenced by many of the defendants, despite Plaintiff's efforts to focus on work. In retrospect, Plaintiff would say that Luskind's response to the focus on work was an accusation: "You're trying to change the subject." Paralegal Supervisor Luskind non-verbally communicated  utter disdain for the Plaintiff. No human could tolerate it for long.  She was communicating: "Your efforts to be civil, pleasant will not work, are futile. You know I don't like you, you know I don't want you here."  Plaintiff did not know what the cause was; the effect was intimidating and devastating. The cause, RICO defendants J.Fabiani, L. Fabiani, and S.Fabiani and the host of the parties where a less than nothing fraudulent outrageous claim is packaged and sold.

RICO defendants victimized Plaintiff in the above noted interaction in Spring 1971. It was one assault after another including the oft repeated "That was something" a moment which Plaintiff likens to a child molestor threatening their victim, brainwashing, telling the victim that they're doing something nice, valuable for their victim. T. Fabiani had indeed trained S. Fabiani. It was a grab of some kind, like a cannibal's bite. And it was similar to prior intimidating falsehoods –e.g., just for moving, or essentials such as clothing– as set forth, above though Plaintiff did not discern the pattern until she wrote this complaint.

RICO defendant R. Fazzone and the DeNegres were not present during any of the interrogation and accusation sessions set forth in paragraphs 32 to 34. Plaintiff had no reason to think plaintiff's schooling, activities, or interactions with co RICO defendants J. Fabiani, L. Fabiani and S. Fabiani were of any interest or concern to her. RICO defendant R. Fazzone concealed that she and the DeNegres fueled the abusive, tricky pressure and interrogation sessions. R. Fazzone's hostility that ostensibly stemmed from the secret complaining and maligning is odd and suspect. Most of what was said had either not occurred or not in quite the way it was conveyed. R. Fazzone and her conspirator mother, A. Fazzone must have had a pre-existing but baseless hostility and used T. Fabiani's complaints as a cover or excuse.

RICO defendants L. Fabiani, S.Fabiani and J. Fabiani's pressure and harassment persisted and culminated with a hypothetical. Leading up to their question, they initially sought to fool and flatter-- just by asking, granting but then subtly mocking: "Ooh, we have to ask you, you're in the position to make a decision." And then their curious question to take it all away: "What will you do if they . . . [a mysterious insulting scenario, details since forgotten]. Plaintiff was initially genuinely calm and said nothing. In that state of mind, the question which should not have been asked, was not worthy of a reply and plaintiff was comfortable not answering.

> (1)RICO defendant L. Fabiani continued to pressure with
>
> a fixed stare and
>
> the above noted mockery.

A victim of an attempted and ongoing kidnapping conspiracy, Plaintiff became increasingly anxious and gave them the answer they extorted "I'll leave" In a perversion of American law to elevate a Sicilian style kidnaper over a mother, the Cravath firm used the extorted reply of an

eleven year old to elevate and further a scheme over a lawful application, admission to and diploma from a school because M. DeNegre made it the easier and popular thing to do.

Plaintiff did not want them to be free to speak for the plaintiff.

Remaining calm and silent could be construed as an air of superiority which Plaintiff, a crime victim feared would provoke, them.

Plaintiff nonchalantly replied, "I'll leave." That reply was victory to them (and shockingly to co RICO defendant Cravath.) Plaintiff was subjected to questioners (and unbeknownst the support of their concealed conspirators the DeNegres and Fazzones) who sought to defraud and extort in the future. To diffuse a situation, not provoke, a very victimized Plaintiff was induced to not only answer but answer in a nonchalant manner. Contrary to this obvious truth, many years later Cravath and M. DeNegre used the statement against Plaintiff in an unlawful effort to take the matter outside the extortion statutes thereby advancing schemes to defraud and extort by the offensively false low blow namely that Plaintiff "cheapened" her admission to the school and was in a bargaining session or game that plaintiff enjoyed but lost. The foregoing allegation is based on nothing more than a fictional stereotypical character that M. DeNegre came up with as an anticipatory defense-offense.

Plaintiff's capacity to endure the high-pressure session was likely reduced by the trauma of the attempted kidnapping—which M.D. DeNegre likely knew. Plaintiff wondered but had no reason to believe that they knew something about hazing or similar rituals at the school but Plaintiff was a fearful with almost a lump in her throat that if indeed they could somehow persuade students to participate in the ritual just to induce Plaintiff to leave that would put Plaintiff in a very awkward position. Soon, perhaps to escape the pressure and nightmare, it

occurred to plaintiff, and it might have been communicated non verbally, that their point was: "Isn't it stupid to go forward if you're going to leave. Plaintiff more or less just exhaled, tired of the interrogation, which she thought was finally over, that they made their point. RICO defendant L. Fabiani's countenance  however was one of extreme gratification, evil and then she communicated non verbally with a nod and very intense very direct eye contact a rather outrageously intimidating:  "And if you don't leave, you won't use it." Plaintiff assumes there was mockery mixed in.

If there were an agreement by the plaintiff to not use her degrees it would be the first agreement to have extortion or coercion written all over it but Plaintiff not knowing the law of contracts or extortion and having a concern that her questioners might know people at the school, might speak against the plaintiff, certainly did have a moment or more when she sank and felt condemned to a bleak future.  As said, there was the angry nod and intense eye contact that non verbally communicated an outrageous threat/command. They were angrier than Plaintiff ever could have imagined. Their anger was unjustified.

They intended to and had threatened *something* mysterious, if plaintiff went forward and attended the school.

As set forth in plaintiff's 2012 slander and emotional distress complaint, "Before the school year began, [J. Fabiani] Jackie flanked by one or more of her sisters stated:

"You're not going to make any friends there."

 Plaintiff was a bit frightened but did not dwell, wanted to be positive and not believe it. Though as said above, Plaintiff knew nothing about the law of contracts or penal law, recovering after her sinking moments of despair, fear of or actual loss, Plaintiff thought, what they have in mind, what they are doing can't possibly be legal. With that thought, Plaintiff's

anxiety was alleviated and a sanguine outlook substantially restored though as in all interactions they had done some damage.

At OLPH, after three p.m., near the parking lot, a parent said to Plaintiff's mother, "People don't like your daughter," or similar statement. Plaintiff's mother said, "I'm sending her to Ursuline." The parent said, "It's going to be worse there." Plaintiff and her mother did not know why the parent thought it would be worse and did not dwell on what seemed to be a pessimistic threatening outlook.

Summer 1971

M. DeNegre and T. Fabiani Conspiracy to Lure Plaintiff, Turn her against her mother, Punish Plaintiff continues: Withdrawn Invitation of Day Camper

Plaintiff was a camper at the aforementioned Summer Pines Day Camp for part of the Summer in 1971. Another camper invited plaintiff to her home for a sleep over. A day or two later, the invitation was withdrawn because, as the camper said, her mother said the plaintiff wasn't Jewish. Plaintiff did not realize it then but at some point within the last ten or twelve years has become more or less convinced that the DeNegre's had infiltrated the camp and somehow persuaded some to be unfriendly, rejecting.  Recently Plaintiff had an additional realization: the purpose of the invitation withdrawal was to inflict a punishment on the Plaintiff for looking to her mother in response to the first attempt to lure at the dining room table set forth above.

Weeks before Plaintiff's enrollment in the Ursuline School's seventh grade, in mid-summer of 1971, R. DeNegre by telephone made an unsolicited (and unneeded) offer or invitation to have Plaintiff and her younger brother stay at her home for approximately one week in August. As would eventually become apparent, the unsolicited offer was extremely deceptive in furtherance of a long-term felony conspiracy to kidnap and new additional, linked

conspiracy to defraud and extort set forth more fully above and below. With a felons audacious intent, Rita DeNegre slyly, skillfully misled plaintiff's mother.

M. DeNegre Inveigles

When the telephone unexpectedly rang and Plaintiff heard her mother speaking to Rita, Plaintiff was surprised. It is possible that Plaintiff quickly thought "oh no, this is enforcement" As said above, Plaintiff had sensed the hostility of the Fazzones and others at the sleigh riding gathering, had doubts about all of the relatives but there being no reason for such hostility, could not make sense of it. It is possible that it might have quickly occurred to the Plaintiff that the near condemnation was linked with T. Fabiani particularly since A. Cozzi, ("Dolly") had been a guest at the Sunday meals at her grandparents but with incomplete information, indeed concealment and deception, Plaintiff could not make sense of it and thus did not dwell on it.

Rita was deceptive, thus Plaintiff's mother not guilty of any crimes, was not suspicious and even Plaintiff subsequently suspended suspicion.  Indeed, Plaintiff clearly recalls thinking, maybe the relatives in Connecticut like or approve of me more now that I will be a student at Ursuline. At the same time, Plaintiff realized that might not be the best basis for one to like another, particularly relatives. Still, it was preferable to think she was liked rather than hated and for no fair, good reason. Plaintiff, for the most part suspended suspicion.

Plaintiff's mother drove her on interstate highways from the Pelhams, NY to the DeNegre's in Woodbridge, Connecticut.

At the end of the week, Mark DeNegre in a friendly all American dad/avuncular tone and a trace of a grin, said, "Bring your friends here." The general invite triggered a few thoughts or reminders of RICO defendant J. Fabiani's ominous prediction noted above.  DeNegre concealed Plaintiff the full extent of the nightmarish DeNegre-Fazzone involvement. He never, for

example said, "your cousins complain about you and say . . . "  Nor did he say or ask, "Why did you run away?"

DeNegre, an M.D., understood more than most, that the attempt, if Plaintiff could not be lured, and Plaintiff believes he, more than N. Fabiani and T. Fabiani, knew the odds of a successful luring were no more than fifty-fifty. And he more than they knew that the attempt would damage the Plaintiff. Thereafter, DeNegre exploited the harmful effects of the trauma of the attempted kidnapping.

<u>Methods of a Racketeer: Pressure, Extortion</u> Lacking authority or factual grounds to nullify the initial letter of admission, he resorted to the high-pressure tactics of an extortionist.  He sought to enforce as a valid contract an unlawfully induced statement.

<u>Doomed from the outset, Agreement with Extortion Written All Over it.</u>

Plaintiff did not know at the time that M. DeNegre and T. Fabiani had coached abusive cousins to extort the statement but he considered the sum total of the verbal and non verbal communications to be an iron clad agreement and Cravath years later stepped in to enforce it.  It was a "contract" with extortion written all over it.  The history, as Cravath surely knew, included previous kidnapping and extortionist tactics that left the plaintiff more likely to be pressured into making a statement in response to a strange hypothetical.

<u>Fall 1971</u>

In the fall of 1971, on the weekend, the DeNegres invited the plaintiff and her mother to their Woodbridge residence. Plaintiff and her mother drove from Pelham, NY to Woodbridge, CT. Before leaving to return home, plaintiff was asked about inviting students and others from the Ursuline School to the DeNegre's home. Plaintiff said she had asked (she had not) and (essentially) that the student declined the invite, could not go. R. DeNegre asked plaintiff,

"What's her name?" Plaintiff with a sincere smile thinking of the funny Marie McErlean with spontaneity and thinking maybe R. DeNegre just wants to know if it is someone she knows, said the name. R. DeNegre asked no further questions. Plaintiff recalls no other conversation. Plaintiff's mother was not happy that Plaintiff had provided the name. The DeNegres were generating conflict as part of their heinous kidnapping conspiracy and the new linked scheme to defraud and extort.

<u>Episodes, Incidents at School</u>

During the fall of 1971,  M. McErlean (and possibly another student)  told Plaintiff about a slumber party at which a tape (pertaining to Plaintiff) was made.  It was obviously similar to and did remind plaintiff of the hypothetical question that L. Fabiani posed as set forth above in paragraph ##

One day Plaintiff's ride home was with her Grandfather, rather than the school bus. Plaintiff was waiting in the vestibule area. McErlean approached and said,

"You can't stay here. We* made a tape."

"We" refers to Kathleen Ward and Alexandra Talbot and possibly others at Ward's home. Plaintiff responded with statements about her grandfather and ancestors. Though Plaintiff did not entirely detect it at the time, McErlean's response was a sarcastic, "That was a really good speech." Plaintiff did not make the connection with the DeNegres. Plaintiff was in an awkward untenable position – punishment for not arguing with RICO defendants J. Fabiani, L. Fabiani, and S. Fabiani– and yet thought it ridiculous that she or anyone would be forced out of a school by tape making at a slumber party.

Sometime between 1971 and 1973, Plaintiff vaguely recalls Marie gesticulating (unexpectedly) in the hallway to apparently express hatred or similar emotions, as if to shew the

plaintiff away. And Plaintiff has some recollection of Marie possibly imitating a frightened person running away.

Marie sometimes "invited" Plaintiff to her home but once there she would advance a hostile or confusing point. For example, she began a game of jacks, quickly grabbed all and said, " all for me, none for you!" She also invited Plaintiff to attend two Broadway shows with tickets provided by her father. Plaintiff now believes Marie was using the trips to advance M.DeNegre and T.Fabiani's unlawful agendas.

Plaintiff had (or at least thought) social activity with Alexandra Talbot, another student even though she too had attended the odd slumber party where a tape was supposedly made. There were sleep overs, tennis at the Ursuline School court, enjoyable trips to NYC and travel to Florida with her mother.

"Invitations" from M. Tolan

Sometime between 1971 and 1973, M. Tolan invited the Plaintiff to her home for a meal. She also invited Plaintiff to the Country Club in town. Plaintiff recalls that it was pleasant. Plaintiff now believes that there was a plot concocted by her father, former advance man for Robert Kennedy. That is, they thought Plaintiff would feel that she should reciprocate in some way(which in and of itself is reasonable) and that she would by inviting M. Tolan (and perhaps other students) to M. DeNegres where a pre planned staged event designed to steer Plaintiff toward them would unfold as follows: T. Fabiani, J. Fabiani and S.Fabiani would, unexpectedly be present. M. Tolan and others would act surprised. Plaintiff would be surprised—an indicator of guilt to them. They would steer the conversation around to where they lived and attended school and M. Tolan and others would say, "Oh  yeah, …I did not know. .  you should go to school with them. . of course. . . "

Academically, Plaintiff received a subject award in Social Studies.

**Gatherings at Enterprise Headquarters**

Plaintiff now believes that prior to her 1971 enrollment at the Ursuline School, DeNegre had been inviting people from Pelham to his residence (Enterprise Headquarters) in furtherance of several objectives some of which involve a taking of property:

1) Pressure Plaintiff's parents to move back to the Bronx, selling the house in Pelham, preferably at a loss (plus the realtor's commission) or even abandoning it.

2) Indirect luring of the Plaintiff by among other strategies, undermining Plaintiff's mother and anything she did as a parent, making Plaintiff unpopular primarily by circulating T. Fabiani's complaints  mainly, "She thinks she's better."

Autumn of 1971(and thereafter) Ursuline students and Families

Plaintiff does not know how many students attended. McErlean was among the most vocal and active participants. Plaintiff now believes quite a few students carried out assignments and answered M. DeNegre's leading questions.

DeNegree building on his presidency of the class at Providence college, was at least from time to time the defacto president of the class of 1977 and extended his authority beyond extreme bullying and into academic matters. He sought to empower students to expel the plaintiff. significantly reducing Plaintiff's status as a student. This was a punishment inflicted by DeNegre for remaining with, preferring her own mother, instead of T. Fabiani who did not have legal status as a parent or legal guardian. DeNegre resented Plaintiff's choice and sought to disregard legal status, think of it as superficial, technical. T. Fabiani lacked career or other substantive goals; she channeled her energy into unlawful aims and personal battles.

R. DeNegre's Campaign Prompted by Plaintiff's Mother's Statement

R. DeNegre assuming a teacher or school official role, continued her campaign against Plaintiff's mother mischaracterizing Plaintiff's mother's statement, "I was supposed to go to Music and Art," with hatred, mockery, angrily, artificially taking it to the next step or level: "She's putting herself in the school."  R. DeNegre's lack of empathy and addiction to intra family competition were the driving forces behind her anger, amoral judgment of Plaintiff's mother's statement. The Cozzis and DeNegres and Fazzones prefer unfair competition, schemes to defraud and extort. As A. Fazzone said in or around the 1990's, "I like the Cozzis."

DeNegre's Efforts to Invalidate Plaintiff's Admission, in Furtherance of a Kidnapping, Scheme to Defraud and Extortion Conspiracy

DeNegre, a charlatan, a radiologist, sought to and did defraud and extort by diminishing Plaintiff's status or standing as a student by several methods including:

a) Unpopularity, unlikability by portraying Plaintiff as

essentially a thief with a superiority complex

a flaunter, a provoker, a taunter

b) A different kind of kidnapping/ identity theft (see visual comparative test below in c)) that serves to place the Plaintiff under a cloud of suspicion, fuse her with RICO defendants J. Fabiani, L. Fabiani, and S. Fabiani pursuant to a kidnapping conspiracy (in addition to the scheme to defraud and extort.).

c) Attempting to overturn the formal admissions process with a substitute admissions test: a visual comparative test in his living room. He asks students and others to take a look at J. Fabiani and S. Fabiani and say if they are the same.  This of course is a test that is not officially approved of by the school nor did Plaintiff have knowledge of it much less consent to the visual comparative living room substitute test. The visual test is an affirmative step in a kidnapping

attempt (even though plaintiff is not present during the comparison.) He seeks to confer artificial status, affirm T. Fabiani's angry, very possessive, i.e., statement of abduction:

"She's the same."

At the gatherings ( based on clues) T. Fabiani and her daughters repeated their groundless self serving complaints about Plaintiff: 1) Plaintiff thinks she's better. (Apparently guests respond in the DeNegres' living room as the Fazzones did: with outrage or similar support.) 2) shortly after telling them about the school, Plaintiff "slipped in" a hint connected with the ambush set forth above 3) Plaintiff "took something" from them 4) Plaintiff promised she would leave if the scenario involving the slumber party did occur.

All complaints about Plaintiff C. Mottola arise from T. Fabiani's two sentences: She's the same. She thinks she's better.

DeNegre's Use of Minors in Furtherance of Conspiracy

One (or more) Ursuline student(s) asked plaintiff if they could borrow an item of clothing for a party she was attending that weekend. Plaintiff perceived a possible snub, but considering the possibility that the host was someone outside the school and that the slight was almost too mean or obvious, lent her the blouse and was pleasant.

During the 1972 to 1973 academic year, Plaintiff sat for the entrance examination, applied to and was admitted to four all girls selective Catholic private secondary schools in Westchester, including the Ursuline School.

May-June End of Eighth Grade: Best Wardrobe

At the end of 8th grade plaintiff was in absentia voted by an unofficial student committee, "Girl with the best wardrobe." Plaintiff was not expecting it. It was not long before Plaintiff privately thought it a dubious distinction. Plaintiff realized, while writing this complaint, that it

was Terry derived mockery, an expression of her hatred and punishment for a) the clothing that plaintiff's mother provided and b) plaintiff's holiday exuberance misconstrued as Plaintiff attracting and enjoying attention from T. Fabiani's daughters.  The mockery had been expressed before through Terry's daughter S. Fabiani as noted in paragraph --- above) though because it was so false, Plaintiff did not realize, or fully realize it, until many years later. Even if there was some truth to it, it might be sad, pathetic not deserving of unkind mockery. Plaintiff is certain T. Fabiani misunderstood to at least some degree.

Publication of Plaintiff's Image without Knowledge or Consent

In approximately April to June of 1973, the photograph that plaintiff preferred and chose from five or six that a studio photographer had taken was not used for the commemorative poster with photographs of each student in the graduating class. Instead, another photograph in which plaintiff appears a bit angry was substituted and published.  When Plaintiff saw the poster with the photograph that she had not chosen, Plaintiff was befuddled.  Plaintiff now assumes the substitution of photographs was accomplished by obtaining the negatives from the photographer. And that it was M. DeNegre led unofficial punishment for not leaving the school after the slumber party and tape making and other unfriendly acts. M. DeNegre had been "punishing" for quite some time, unbeknownst to Plaintiff and her mother.

M. DeNegre Interferes with Plaintiff's Attending Public School

At the end of eight grade and during the early summer, Plaintiff contemplated attending the Pelham  public school beginning in the ninth grade.  Plaintiff recalls someone discouraging the plaintiff from changing schools.  Most memorable was a disparaging statement about another student from OLPH who was going to Pelham Memorial in the fall– that plaintiff wouldn't want to or should not go to school with "people like that." Plaintiff did detect,

recognize the subtle familiar mockery and even some degree of indirect intimidation in the statement. Plaintiff did ultimately eliminate attending the Public School in ninth grade.

Acts by Minor M. McErlean to Drive Plaintiff out of School; Concealment

In September of 1973, in the Cafeteria, M. McErlean, made the following compound hostile statement: "Now that we're in ninth grade, you'll have to make your own friends." She seemed to imply that Plaintiff should not sit at the same large cafeteria table with students she knew. Unbeknownst to Plaintiff, McErlean had been in touch with the DeNegres and agreed to advance a felony conspiracy to kidnap and extort.  Tuition had been paid and Plaintiff did legally have to attend school and so Plaintiff did not leave the cafeteria or the school but clearly McErlean was trying to disorient and force Plaintiff out of the school,

No one said that they knew of DeNegre's behind the scenes role since 1967 at OLPH, that Cola, DiLorenzo, McNamara, M. Tolan and others knew M. DeNegre.

McErlean's sought to accomplish the ultimate aims of the Enterprise: compelling Plaintiff's mother to refrain from continuing to provide schooling at Ursuline, driving Plaintiff out so that Plaintiff would have to leave and attend a school her cousins attended, leave her room in her home and be restrained  in T. Fabiani's household. And if Plaintiff did not leave, all benefits of attending the school would be taken away.

Lab Homework Assignments

In or about October, 1973, The Introductory Physical Sciences teacher announced: Some of you have not been handing in assignments; late assignments will not be accepted." Plaintiff was among those students who had not handed in (lab reports). Plaintiff was flummoxed.. Plaintiff hoped and thought the teacher should accept and review the late lab

reports up until the date of the announcement though of course with a deduction in points due to the lateness.

 Soon after, plaintiff was in the cafeteria working on her late lab reports. Plaintiff was planning (and told Marie) that she was going to complete the lab reports and then show the teacher her book, to show him that she had done the work. Plaintiff did not think the teacher would be deceived i.e., think that plaintiff had completed the assignments and handed in the yellow carbon copy on time.) Indeed, Plaintiff did not spell it out; she assumed it would be obvious to the teacher. Marie angry, uttered a compound allegation/warning: "You can't get away with this." Plaintiff was not attempting to get away with anything. Plaintiff said, "They can't do anything about it." Marie angrily replied, "Well, I will!" Plaintiff disregarded her warning as the teacher would not be deceived and completing the assignments late seemed preferable to doing nothing.

While sitting at the cafeteria table working on the lab reports, several students approached plaintiff as if to be friendly or helpful with homework and put their lab report books on the cafeteria table suggesting/encouraging the plaintiff to use or copy their reports. Plaintiff continued to prepare the late lab reports and used the books that the other students gave to her to prepare the lab reports. Subsequently, another student asked Plaintiff for the yellow carbon copies; Plaintiff gave them to her.

Thereafter, at the end of the lab session, after some hesitation, plaintiff asked the teacher if he had received her lab reports (the yellow carbon copy) and that if not, plaintiff would show him the original in her lab book. The teacher said that he had received them. (Apparently, the other students gave them to him to have certain proof that Plaintiff had not completed her

assignments on time.) Later that day, plaintiff was locked out of the cafeteria where there was a student meeting.

Soon after, a student told plaintiff that she had to go to the principal's office. This was the first and only time in plaintiff's school life that she was sent to the principal's office for any reason. Upon questioning by the principal, plaintiff said that it was all Marie's idea and that plaintiff had just gone along with it. Plaintiff was, however, scared. The Principal looked at the plaintiff and told the plaintiff to not do it again. Plaintiff was given detention after three p.m. for an hour. The discipline was so noted without particulars on plaintiff's record i.e.,  not categorized as academic misconduct presumably because the matter was not purely academic, students (and as Plaintiff realized many years later, possibly M. DeNegre) were involved.

When plaintiff returned to the cafeteria, she had clarity and thought "this is not the right school for me." Plaintiff had been tricked/stopped by other students from doing her own work, and yet was the only student subjected to discipline. The teacher was late in announcing a no "late" assignment rule, voiced no interest in reviewing, correcting the assignments or explaining that there was a good reason for preparing the reports soon after lab.)

After serving the detention, Plaintiff  was waiting for a bus home; a male was standing nearby with a curious expression on his face. Eventually plaintiff noticed that his private parts were exposed. Plaintiff, stunned, and a little frightened, walked away to distance herself from the exposed male. (Plaintiff did not but should have contacted the police to report the violation.) Plaintiff has some recollection of seeing several students near the window in a classroom looking out on North Avenue observing the indecent incident which apparently they had pre-arranged.

Gathering at DeNegres'

On Sunday, at Plaintiff's grandparents' house, Uncle N. Fabiani was present, T. Fabiani and her children were not. Plaintiff's Grandfather asked where they were. N. Fabiani said, "They had something to do." Plaintiff does not think she immediately or even that day, made the link. Like the ambush, it was unexpected, Plaintiff's grandparents were mistreated as well.

The Following Monday when Plaintiff entered the cafeteria at lunch hour, the following statements, among others, were made to Plaintiff by a student, Noreen O'Connor, who was less than sixteen years old:

"Terry's really nice. . . .

    "She's the blacksheep."

"Your relatives really hate you."

"This is a really good school."

"You're really Italian!" . . . "That's good."

Last, and perhaps most important was the student's slightly odd/creepy suggestive countenance that plaintiff now believes was intended to duplicate the compound accusation of S. Fabiani and then J. Fabiani and L. Fabiani that is, that Plaintiff 1) "took something" from them and 2) by her countenance "acknowledged it"—knew what it meant. It is clearer today than it was then that though she did not explicitly so state, the student (Noreen O'Connor) apparently agreed with S. Fabiani et. al (That Plaintiff thought she was better but was guilty of taking something.) The accusation was another instance of T. Fabiani and RICO defendants victimizing, interpreting the Plaintiff to suit their ends, teach Plaintff that if she thinks she is better it is only because of something she takes from, derives from them.

Plaintiff did not at the time but now considers the statement "Terry's really nice" an attempt to lure or overt act. Although at that point, the memory of the on the street attempt to kidnap was suppressed or fragmented in Plaintiff's mind, O'Connor knew Plaintiff ran and that put T. Fabiani and the DeNegres in a position to be accused of attempted kidnapping. O'Connor

sought to as apparently the DeNegres and Fazzones had to use attempted kidnapping to put Plaintiff in Terry's debt: That because "Terry's really nice" Plaintiff should feel lucky, be glad to have been enticed. Statements such as "Terry's really nice," were almost as shattering as the on the street attempt to abduct. T. Fabiani is not really nice. She directed the kidnapping attempt hence Plaintiff refers to her in a summary term: kidnapper.

Plaintiff realized that O'Connor and other students must have been at the DeNegre's on Sunday, with T. Fabiani and her daughters. Plaintiff has some recollection of telling her mother that she thought Terry and others were at Rita's on Sunday. Plaintiff's mother may have called R. DeNegre to inquire but Plaintiff is not certain, does not recall any details.

Plaintiff continued to believe that the school was not the right one and wanted to leave but in an orderly way and so the plan was to finish the semester and then in January, transfer to the public school in the town of Pelham. Subsequently, however, plaintiff attended a formal holiday event and decided for several reasons to remain at Ursuline. Plaintiff worried that the story would follow her and that leaving would be the beginning of a pattern of frequent school changes. In retrospect, remaining at the school was not the best choice for Plaintiff because although DeNegre would no doubt have maligned and influenced at any school that the Plaintiff attended, as a student at a public-school Plaintiff would have a constitutional right to attend.

As DeNegre likely realized, memory of the attempted kidnapping on the street was suppressed. Unbeknownst to Plaintiff then, DeNegre's ultimate aim was to move plaintiff against her will out of any school public or private that Plaintiff and Plaintiff's mother preferred and into T. Fabiani's household, to the schools T. Fabiani's daughters attended. Once there Plaintiff would have been permanently subjugated, permanently punished for thinking for even a second that she was better.

In the months after the IPS Lab Assignment Incident, other statements by students, likely intended to drive Plaintiff out of school:

"We're crucifying you." (Marianne Whittemore)

"You better do what she(McErlean) says—or else. Don't you see what she's like? She wants to take over the world. . . I'm staying out of this."

Although there was some activity that at least at the time seemed social, including visits to N. O'Connor's home and her aunt's, sleepovers at M. Whittemore's, there were the following incidents. M. DeNegre solicited or influenced students in all of the following incidents:

<u>M. McErlean uses Gymnasium to Injure and drive Plaintiff out of Gym Class</u>

In or about 1974 or 1975, during dodge ball in gym class, McErlean crouched, appeared angry, determined, focused on the plaintiff, motioning to other students to give her the ball. She then deliberately threw it at the plaintiff with as much strength and speed as she could muster. McErlean was not sportswoman like; her intent could only have been to injure the plaintiff and induce plaintiff to leave the gym class. Plaintiff did indeed leave the gym and did not attend gym classes for the remainer of that trimester. Plaintiff therefore received an F and had to for the first and last time during her Grade School and Secondary Schooling, attend summer school (for Gym) at Mamaroneck High School.

<u>McErlean Unrestrained, Ill Mannered</u>

McErlean was often completely unrestrained and ill mannered. One day she spoke directly into Plaintiff's ear, "Earth to Carol, Earth to Carol." Another day, shortly after the lab assignment conspiracy, upon seeing the Plaintiff seated in the cafeteria, she slammed her books down on the cafeteria table and ran out. And yet another day, she somewhat threateningly "informed" Plaintiff, "We've got our own little thing going." Plaintiff's best guess was that it referred to

another conspiracy Sometimes she sought to "recruit" in the cafeteria. Following the DeNegres,

Fazzones and Cozzis. McErlean took on an unofficial leadership role based upon T. Fabiani's

accusations and mockery etc. And Plaintiff recalls some signaling (intimidating to Plaintiff)

from M. Tolan to M. McErlean.

<u>Miscellaneous Interactions  Intended to remind Plaintiff of Cousins, defendants J. Fabiani, L.
Fabiani and S. Fabiani</u>

From time to time a student would unexpectedly approach Plaintiff and say, "My father's

a doctor." or "Her father's an accountant." "My cousins attended Ursuline." And there was a

tricky exchange involving vacation homes as if similar to the cousins thinking, one had to own a

vacation home to attend the school.

**Pills Placed in or near Plaintiff's Locker**

During the spring of 1974 or 1975, one or two pills with a note to "Carol" were placed in

or near Plaintiff's locker. The note stated that the pills would help to "get through exams"

Plaintiff did not use illegal drugs. Plaintiff does not recall and does not believe she expressed a

fear of failing exams.

<u>End of Senior Year Overt Acts Involving Deceit, Larceny in Furtherance of Kidnapping,
Scheme to Defraud and Extortion Conspiracies.</u>

Unfriendliness, indeed, hostility was often in the air at Ursuline during senior year.

Plaintiff thought, "I just want to complete the course of study, graduate and move forward." In

approximately April of 1977, several students approached plaintiff in the cafeteria. The students

sought to and did persuade Plaintiff to attend the prom, which Plaintiff was not planning to do.

Among their statements:  "Oh . .you have to go to  the prom. . . It won't be the same without

you."  Plaintiff was not quite on the same wave length. There not being a fact based reason for

their contempt and or lack of respect, Plaintiff was fooled. Plaintiff said she could not think of

anyone to ask. They suggested Allen Flood and said," he really likes you." Flood was a friend of

the McErlean's. Plaintiff asked, "Doesn't he have a girlfriend ?" They replied, "They broke up." Plaintiff thereafter asked Flood to the prom, paid Fifty dollars to the Prom Committee to attend at the Plaza Hotel in NYC. Upon arrival, students at the check in table said that Plaintiff's name was not on the list of prom attendees. Plaintiff was flummoxed and then sat in the bar area with Flood.

After the prom dinner, McErlean unexpectedly walked in with her boyfriend, Steve. She put her arms out to hug the plaintiff. Plaintiff said, "I thought you were mad at me." Soon, plaintiff was deceived into posing for photographs at a table with Flood, McErlean and McHugh and their dates.

Plaintiff was inveigled into traveling in a car driven by Flood and did experience some degree of threat or intimidation when Flood locked the doors and appeared at least somewhat angry or annoyed.

T. Fabiani Mockery Driven Skit in Senior Show

Influenced by Terry's Mockery of Plaintiff, one sided reports and allegations, McErlean and two or three other students did something on stage that was similar to criminal impersonation. She sought to obtain a benefit from the skit, and the full page photo in the yearbook. The impersonation was, unbeknownst to Plaintiff then, based on T. Fabiani's mischaracterization of Plaintiff as an attention seeker among other repulsive personality traits. Her second intent was to injure the plaintiff, to deprive the plaintiff of the earning or market value of plaintiff's Ursuline School education and soon to be awarded diploma.

Publication of Plaintiff's Image Without Consent

In approximately May or June of 1977 there was essentially a repeat of the substitution of eight grade graduation photographs.  The photograph that plaintiff chose was not in the yearbook; Without plaintiff's consent, another photograph was selected from the photographer's

negatives, developed and published in the yearbook. Plaintiff again, because of her innocence, was flummoxed and a bit depressed.

DeNegre asks Students to Make a Prediction to Use Against Plaintiff in an ongoing effort to Deprive, Defraud, make Plaintiff the Object of Ridicule, Derision

Though no one has so stated, during the last year or two Plaintiff has become nearly certain that DeNegre, assuming  a class president role, and turning the school's mission statement on its head and against the plaintiff, near the end of senior year

asked students "Do you respect her ?"  And With a calm exterior, but still angry, combative, to counter Plaintiff's "I'll leave" statement– as if it had been a freely made broken promise and/or a freely made prediction– he asked them to make a prediction as to Plaintiff's likelihood of succeeding.  He planned to use it against the Plaintiff to undermine and artificially prove Plaintiff's mother wrong. His aim was to deprive Plaintiff of the earning value of her earned degrees. Compounding his wrongs, his justification was a kidnapping conspiracy, half baked claims of motivating Plaintiff. Other "justifications" include accusations of retaliation and "taking something." from favored cousins, J. Fabiani, L. Fabiani and S.Fabiani as set forth above.

The accusations arise from the core mocking threat: "She thinks she is better." The threat is the foundation for the intent that drove the kidnapping plot: to stop plaintiff's mother from providing schooling, shelter, clothing for the Plaintiff.

DeNegre's Abuse of the Plaintiff Continues: College Years

Plaintiff attended a local college for a year and then transferred to a university (Marquette) in Milwaukee, Wisconsin where plaintiff was a student for approximately two years. There were occasional unexpected statements that reminded Plaintiff of the people and incidents in the past set forth above.

Assault and Larceny

Two incidents stand out in plaintiff's memory: The first was an assault by a male. The second was the disappearance of Plaintiff's Ursuline School ring. It is likely that Plaintiff removed the ring  and placed it on a night table before going to sleep. When she awoke, the ring was gone. Plaintiff was baffled, did not suspect anyone, was not sure what happened. Plaintiff had been inebriated before falling asleep. Plaintiff considered the ring (mysteriously )lost but at some time in the last few years began to suspect that it was stolen and sent to the DeNegres.

Plaintiff Returns to New York Metropolitan Area to Work, DeNegre Influence Continues

Plaintiff left the Midwest, returned home to Pelham and worked full time for approximately 15 months in a law firm. The DeNegres had an influence that was not constructive but did not result in Plaintiff quitting or  being terminated.

The DeNegres continued to have gatherings at their home, continued the

(1) Comparative Test, asking  people to compare Plaintiff to cousins;

(2) Character Assassination of the Plaintiff to support and defend kidnapping.

(3) Fomenting resentment of Plaintiff. DeNegre knew that it was likely that there would be at least a few people from offices and schools who had not been admitted to their first choice college or professional school. He argued that if they could not attend their first choice school why should the Plaintiff insist on attending a first choice school, Ursuline, rather than the school RICO defendants J. Fabiani, L. Fabiani and S.Fabiani attended.

Resumption of Undergraduate Education at NYU; Cravath Part Time Position Posted in Student Employment Office

Plaintiff applied, was admitted to, and enrolled in New York University; Plaintiff changed her major to Economics. Plaintiff's brother was also an NYU student.

Through the NYU student employment office Plaintiff was hired to work approximately 16 hours per week at an Executive Seach firm.  Unbeknownst then, DeNegre had an influence and so after approximately nine months or a year, Plaintiff, not entirely happy with the employment, sought another position. Plaintiff responded by telephone to a posting for a front desk worker/receptionist, one day per week (Sunday) at Cravath, Swaine & Moore. An interview was scheduled.  Plaintiff arrived for the interview, possibly five or ten minutes early. Plaintiff is uncertain what if anything was being communicated non-verbally by the receptionist at the front desk.

Plaintiff does not recall every detail but believes that the HR interviewer was pleasantly professional when she greeted the Plaintiff. The interview was not stressful, the interviewer was engaging in a professional manner.  After reviewing the basic duties, she said, to paraphrase, that Plaintiff could read at the front desk when it was quiet. She mentioned (in very favorable terms of course) a Partner who was an NYU alum. Plaintiff soon commenced working at Cravath on Sunday and also continued to work at the Executive Search firm as the Cravath employment was for only one day. Plaintiff did not want to be too aggressive and so did not ask if additional hours were possible (so that Plaintiff could resign from the Executive Search firm.)

Plaintiff worked with a Security Guard, greeting and signing in employees answering the telephones and occasionally calling to arrange for car service. During quiet periods, Plaintiff read.

During the first few months, Plaintiff thought Cravath might be a firm where she would work for most if not all of her career, though Plaintiff did not envision herself on a Partnership track. Plaintiff contemplated attending law school in the evening to keep her place in the firm. However, the goal of a long term career at the firm did not last very long.

One Sunday in December, the Security Guard told the Plaintiff that "they had their Christmas Party this week." Plaintiff as a one day per week employee was not sure what to think but did not inquire.

An attorney initiated an office conversation about law school, NYU law school in particular and letters of recommendation. Plaintiff mentioned her concerns about whether her LSAT scores would be high enough for admission to one of the top ranked law schools such as NYU. Plaintiff to this day is not sure what if any hint or message he intended to convey. At that point in time Plaintiff did not know that J. McNamara and M. Tolan had written letters of recommendation in support of R. Fazzone's applications to Mt. Holyoke and Georgetown.

R. Fazzone's and DeNegre's Conspiracy to Extort and Kidnap Continues in Cravath's Offices and Enterprise Headquarters;

No one said that R Fazzone was going to work at the Cravath firm. There were however as Plaintiff vaguely recalls clues or hints thus there was if only briefly the specter of a strange, hostile relative entering the office.

Limited Interactions With Defendant R. Fazzone

Relentless One Sided Covert Reports

Plaintiff has no recollection of ever actually being introduced to R. Fazzone. In approximately 1969 or 1970, she was among the guests at the sleigh riding gathering held at the DeNegres home in Woodbridge, CT which as stated above, plaintiff does not believe T. Fabiani and her daughter's attended. R. Fazzone and siblings were not friendly limiting communication to the non-verbal particularly when plaintiff's mother was not in the room.

The Fazzones kept secret that for years they consumed one sided reports and complaints regarding Plaintiff, her mother and conflict with Terry. (Plaintiff never contacted R. Fazzone or

anyone else to report or complain about Terry and her daughters, though they had been abusing the Plaintiff.

The interactions, disagreements at Plaintiff's  grandparents' were of no relevance to school or work, preferably forgotten. Plaintiff was the always the victim. Unbeknownst, the preferably forgotten was fueled by the DeNegres and Fazzones.

In approximately 1970 or 1971, R. Fazzone was present at the bridal shower that her mother hosted for niece Felicity. As noted, Plaintiff attended as her mother's guest. having not been individually invited. As intended Plaintiff felt insecure, unsure if she was welcome, clueless as to the reason for not being invited.

Impromptu Visit

In the late 1970's or early 1980's, at Dolly Cozzi's persistent suggestion, plaintiff, her mother and Dolly made an impromptu visit to the home the Fazzone's were temporarily renting. Plaintiff's mother was reluctant, almost exiting out of the driveway but Dolly persisted. R.Fazzone's mother did immediately realize that it was Dolly's idea and expressed her frustration or anger toward Dolly.  She regained her composure and nicely explained that she would have liked to have hot dogs for the kids, that she wasn't prepared for guests.

During the short visit, R. Fazzone communicated primarily non-verbally with an extended look and a barely audible snort. Plaintiff understood that it seemed to be a convoluted insinuation of some kind though Plaintiff was clueless as to what even the topic was, much less what if any facts supported the tilt of her head and the expression on her face.  R. Fazzone chose to remain silent (other than the snort) and plaintiff did not interrogate.

At an occasion, R. Fazzone told Plaintiff that she had been admitted to Mount Holyoke and Georgetown and that she would be attending the former. Fazzone became visibly annoyed

simply because Plaintiff civilly wondered why she did not chose Georgetown. She then said that Mt. Holyoke's Classics department was her reason (or primary reason) for choosing the school.

In the early 1980's, at the Fazzone's Roxbury residence, R. Fazzone and most memorably sister Carly's facial expressions were blatantly hostile. Plaintiff regretted going the moment she saw them. Indeed in retrospect the looks seem more menacing. Plaintiff did not know the reason and they did not volunteer it.

R. Fazzone's Malice and Misappropriation:

Role, Participation in a Covert War against the Plaintiff and her Mother;

Benefits  (Letters of Recommendation, Wages and Benefits) Unlawfully Extracted from Plaintiff's Initiative, Labor and Education


During gatherings at the DeNegre's home in Woodbridge CT., building on T.Fabiani's mischaracterizations, R. Fazzone maligned the Plaintiff when she met and interacted with, among many others, the following individuals. Her unlawful aim was: hostile treatment of the Plaintiff, damage to Plaintiff's family's property and reputation.

- Jean McNamara, resident of Pelham Manor, student at OLPH, Ursuline.)

- Margaret Tolan, a resident of (Pelham Manor), a student at Ursuline and subsequently Mount Holyoke.

R .Fazzone never said (and Plaintiff unaware that they had even met, did not guess) that M. Tolan and J. McNamara each wrote a letter of recommendation in support of her application to Mount Holyoke and Georgetown respectively.

- Christine DeFrancesca Luskind, Cravath's Supervisor of Paralegals in 1983, soon after Plaintiff began working in Cravath's New York office. Plaintiff believes R. Fazzone was,

prior to her 1984 graduation from Mt. Holyoke, hired into Cravath's two-year paralegal

program. Her agreed to start date was summer, 1985 as R. Fazzone planned to reside for a year

in North Carolina as a patient/participant in a weight loss program at Duke University.


An "Opening" in the Paralegal Department

Plaintiff has some recollection of, from time to time, while employed in the one-day -per

week front desk job, reminders or hints of relatives, plaintiff's background, and possibly some

pressure or hint that Plaintiff should quit.

In the spring or summer of 1983 (when Plaintiff completed her undergraduate

coursework) an associate mentioned that there was an opening in the Paralegal Department.

Plaintiff sent her resume, as suggested, to Human Resources.

Interviews

Interviews were scheduled on the same day with Human Resources and Luskind, the

Supervisor of Paralegals. The HR Interviewer was pleasantly professional, personable as before,

but Plaintiff sensed something had changed. The HR interviewer emphasized that "it's different

during the week."  Plaintiff thought she was more discouraging and perhaps even

condescending than necessary but as stated, she was generally personable in a professional way

as she had been when Plaintiff first interviewed for the front desk position.

After the interview, two HR people walked Plaintiff over to interview with  Supervisor

Luskind who appeared to have just returned to her office. She was not welcoming, not polite and

so the HR people were reluctant, apologetic saying oh, we came at a bad time or similar words,

though it was a scheduled interview. Luskind had her head down, noticeably avoiding or

refusing any eye contact. Some form of consent, however, to enter her office and interview was given.

Luskind had Plaintiff's resume on her desk and appeared to be perusing it. Eventually she said that the opening was a "floater position. . .they call when they need . . . " She tilted her head slightly; there did seem to be a subtle suggestion or acknowledgment that the Floater position had disadvantages, was a bit lower in status. The salary and other particulars were stated. She also stated that the firm asked for a two-year commitment and the reasons.

The Floater designation was disappointing and not merely because it might be lower status however Plaintiff accepted the position. Plaintiff had not anticipated the two year commitment but understood the firms reasons. Plaintiff adjusted her plans accordingly deciding that outside work hours, she would, during year one, pursue interests such as resuming piano instruction and then during year two, focus on law school admission.

Commencement of Employment; Housing

Plaintiff resided in her parents home and began piano instruction. The topic of housing arose at lunch. Several paralegals resided as Plaintiff recalls in apartments in nearby Brooklyn. Plaintiff said almost sheepishly, "maybe Queens" as a place where she might be able to find a rental that she could afford on her own salary. Plaintiff's Floater designation was mentioned, that Plaintiff accepted the position because it's Cravath.

Assignments Prior to Quitting, Interactions w/Luskind, Brief Non-Verbal Hint of Detrimental "report" from cousin, RICO defendant L. Fabiani

When Plaintiff was in Luskind's office ostensibly to be given assignments  Luskind often had a smirk on her face and did not seem to be entirely focused on work. Indeed, she seemed to be injecting a topic into the office though Plaintiff did not know what it was. Supervisor

Luskind never mentioned R. Fazzone. No one mentioned R. Fazzone or any of Plaintiff's relatives.

Outside office hours, at an occasion Plaintiff briefly interacted with defendant L. Fabiani , whom Plaintiff had not seen in quite some time. Plaintiff mentioned where she was working. a L. Fabiani did not say that she already knew of Plaintiff's employment though in all likelihood she did hence she concealed what she knew about Luskind's hiring of Fazzone.  Soon after, Plaintiff was not expecting it but Luskind's facial expression was of some disapprobation, condescension but no verbal explanation. It occurred to Plaintiff that somehow, she 1) knew of the brief interaction with L. Fabiani and 2) L. Fabiani must have misinterpreted or more likely with a malicious disregard for the truth, willfully gave a distorted version of Plaintiff's brief mention of the employment. Plaintiff had incomplete information, was a little exasperated and worried but did not dwell on it for too long. Supervisor Luskind was non verbal only. Supervisor Luskind should not have relied on, considered direct or indirect reports or complaints from RICO defendant L. Fabiani, one of Plaintiff's long-term tormentors. Indeed, the non-verbal only communication is some acknowledgment that the entire matter had no relevance to the employment and could only undermine work and the Plaintiff.

Plaintiff had two successive work assignments assisting two attorneys. When Luskind gave Plaintiff the third assignment, she said, this one will last "a little longer." that the case could go to trial but would probably be settled. The matter was a part of another paralegal's caseload.

Plaintiff began to work with the other Paralegal who seemed passive, lackadaisical. Plaintiff became concerned.

At some point, Plaintiff asked Supervisor Luskind if there had been a lot of turnover in the floater position.  Luskind was evasive, put her head down, did not really answer. Plaintiff also made a statement about herself, certainly work related, intended to be constructive. Luskind was mildly combative, not constructive (almost chilling) in reply as noted in ¶ 13 above.

Plaintiff spoke with Luskind briefly stating her concerns regarding the other Paralegal. Luskind was not helpful, said nothing to reassure the plaintiff, put Plaintiff at ease, instead she was similarly lackadaisical in attitude.

Plaintiff worried (as Luskind knew and fueled) that as the newer employee and floater she would be blamed for any errors. Plaintiff was left to cope by herself and her imagination filled in gaps and took over. As noted, Plaintiff floated, did not have a caseload. Plaintiff decided that she would assume responsibility for some portion of the documents, finish her portion of the work and then quit. Plaintiff believes that one associate perceived Plaintiff's frustration, that the situation was not tolerable, and sensed Plaintiff was planning to quit.

Plaintiff worked overtime, completed her portion of the work and then placed the work/the documents with an explanatory note on the desk of the attorney on the case. Plaintiff went home to Pelham.

<u>Telephone Call from Supervisor Luskind, Plaintiff Scheduled to Go to Office</u>

After approximately two days, Supervisor Luskind telephoned, which Plaintiff was not really expecting. Despite the above noted disorientation and almost chilling interactions with Luskind, she was professional on the telephone and Plaintiff (foolishly)  had some optimism that the situation could be rectified.

Plaintiff had never had a formal exit interview.  (Luskind, less than laconic for no lawful reason, did not bother to say it was an exit interview.)

During the interview, Plaintiff believes Luskind operated on two tracks or levels, verbal and non verbal, firm official and unofficial.  That is 1)what plaintiff will refer to as official "firm script" or policy, belied by 2) the non verbal, which Plaintiff did not know then, though as said, there were a few sporadic fleeting hints or clues, but believes now was almost entirely influenced by M. DeNegre, R. Fazzone and other relatives.   The firm's "script" recognized the significance of the decision, and practical realities and ramifications of ending an employment, particularly without another employment lined up.

Returning to work seemed to be an option by the firm script but one that did not quite apply given the way the non-verbal contradicted the verbal. Moreover, since the first interview Luskind's dislike of the Plaintiff was palpable, made manifest. Plaintiff had a strong sense that Luskind was disdainful, did not want Plaintiff on her staff.

In retrospect it is clear that Luskind was in command, manipulating the Plaintiff to utter statements, that she Luskind preferred not to. She succeeded in manipulating and enjoyed it, found it amusing that she had the upper hand and Plaintiff was clueless, distraught, almost defensive though a victim. Among Plaintiff's statements:

"People will think I pull stunts just to get my way."

 "I came  to your office and tried to speak with you about [Plaintiff's concerns] and. . .

 "I probably should not have accepted the position. I wasn't comfortable with the floater designation . . . The firm is prestigious but the floater designation could be harmful. I was working here while I attended school and then I am only offered a floater position? I don't even know how I would state my title on future applications.

Aside from titles and status, Plaintiff was not suited to the uncertainty, shiftiness of floating. Plaintiff was more suitably employed with a set caseload and responsibilities.

Plaintiff does not recall the precise sequence but approximately before or after Plaintiff's two statements, Plaintiff absolutely recalls perceiving hostility, intimidation in Luskind's countenance, hostile eye contact, indeed, a threat to fire Plaintiff if Plaintiff did return to work. Plaintiff clearly recalls that as to the option of returning to work, near the end of the exit interview, Plaintiff was if not convinced, at least very fearful (paranoid) that if Plaintiff resumed working, she would soon after be fired; that Luskind wanted to fire Plaintiff and would use the two days of absence and the note (work related) as grounds. Thus, in damage control mode amidst a disaster, certainly not boldness or insubordination,  Plaintiff is reasonably certain that she also asked: "You asked me to come into the office to fire me?!!? "You can't fire me . . . I quit."

 Plaintiff did not really want to leave the firm. Plaintiff dreaded having to seek other employment and having to explain why Cravath did not hire the Plaintiff into a suitable, stable position, even though she had been employed while a student.

Luskind frightened Plaintiff. Luskind as stated was throughout the exit interview alternating, contradicting firm script with intimidating non-verbal, her countenance. And as said, during prior interactions Plaintiff had the sense that she was communicating, "You know I don't like you."

Plaintiff's last words before  exiting the office were "I guess I'll just float right out of here." There was yet another hostile facial expression from Luskind. The end of the employment was an embarrassing failure and yet C. Luskind seemed oddly comfortable. She stood up in dramatic perhaps mocking fashion.

During most interactions with Luskind, beginning with the interview, Luskind was communicating not with Plaintiff but a fictional stereotypical character, one she strongly disliked. (In the early 2000's, Plaintiff had some discussion with M. DeNegre about "Profiling". He said, I believe in profiling. And prior to that, there were indications that he believed in, relied on stereotypes to fill in blanks).

HR and the Supervisor (and others) must have known that on the few occasions when Plaintiff had seen and briefly interacted with R. Fazzone, she was hostile, heavily dependent on non verbal attempts to communicate.

Plaintiff left the office and walked the streets of lower Manhattan, returned home to Pelham depleted, dislodged, disoriented, despondent. In R.DeNegre's terms, much had been "wiped out."

As noted, there was a brief hint of R. Fazzone's hiring but no one at Cravath ever told plaintiff of Ms. Fazzone's hiring. Plaintiff can only speculate as to what the reason was.

A defense was subsumed in the floater title, the inherent contradiction : Floating is disorienting, the "same"/not much different from not being employed. The blame for the employment termination (fiasco) could be shifted to Plaintiff for accepting the floater position. Indeed, Plaintiff had the strong sense (despite some contrary verbal words) of Luskind and Cravath being a very irresponsible employer, one that did not care that the employment ended, was a fiasco, or what might happen when Plaintiff left.

Plaintiff's Brother's Employment at Cravath Client IBM

An additional source of worry when Plaintiff's employment was terminated was her younger brother's employment at Cravath client IBM. He was in his early twenties, at the start of his career. .

<u>Attempts to Influence A.F. Mottola's Employment Opportunities during the Mid 1980's</u>

When A.F. Mottola submitted an application for the position of Administrative Assistant to Rev. Doyle, R. DeNegre's sister Dolly said:

"Why don't you step aside and let the young people take over. That's what I did."

(Dolly accepted a package from TWA and Carl Icahn and retired.)

<u>Post Employment Termination: M. Tolan Runs into Plaintiff on the Street</u>

Plaintiff does not recall whether it was a few months or a year or two after the wrongful constructive discharge from Cravath, but on or near Park Avenue and Fortieth  Street, she unexpectedly encountered M. Tolan. What stands out in Plaintiff's memory is that M. Tolan, with a crinkled facial expression of disapproval said, "Oh, you haven't done much." Plaintiff now believes the encounter was not a coincidence.

<u>Post Employment Termination Communications</u>

Sometime in 1984, Plaintiff heard that R. Fazzone was at Duke in the weight loss program. Plaintiff expressed thoughts or opinion (which Plaintiff regrets) about the one-year hiatus though at the time it was most certainly without cruelty as that is not Plaintiff's nature. R. Fazzone had a strong, disproportionate hostile response which she would subsequently pass along to another Cravath paralegal who then subjected plaintiff to the expression of nearly identical hostility in Fordham Law School's cafeteria. Unbeknownst to plaintiff, R. Fazzone had been maliciously maligning plaintiff, cruelly trying to separate Plaintiff from her mother, conspiring along with M. DeNegre and other relatives for many years.

Plaintiff Informed that "Lia" was "Working at Cravath"

In 1985 or 1986, Plaintiff was told that "Lia's working at Cravath," Traumatized and deprived by the employment fiasco, the intimidation, the loss of employment, training, law school advice, benefits etc., and news of Fazzone being at Duke, Plaintiff had forgotten or doubted the brief in office hint set forth above. Plaintiff did not know or guess then that she had been hired prior to the Duke year, well in advance, asked for and was accommodated with a postponed start date.

Plaintiff's hiring was, in contrast, shabbily, meanly done to guarantee failure, injury though Plaintiff was working at the firm while a student.

Plaintiff Subjected to Hostile Questioning at a Subsequent Employment

Aggressive questioning and defamatory remarks by co-workers after they went to the DeNegre's were set forth in plaintiff's 2012 complaint. Unbeknownst, Supervisor Luskind, R. Fazzone, and Cravath Paralegals had attended yet another gathering at the DeNegres. Supervisor Luskind was apparently quite vocal, following T. Fabiani's example, mocked the Plaintiff particularly Plaintiff's statement "You can't fire me." Luskind took the statement out of context to use it against the Plaintiff.

Concealment, Deception by Fazzone and Others Re: Employment Fiasco|Induced Quitting-Constructive Discharge

Plaintiff's general feeling of having been nearly traumatized, victimized  was expressed in a nearly cathartic manner to R. Fazzone during the few occasions that Plaintiff interacted with her as set forth more fully below. It was not an act. R. Fazzone did nothing to dispel Plaintiff's erroneous belief or assumption that the employment was not in any way influenced by her and others. Moreover, to deceive, to mislead, among other criminal and tortious aims, R. Fazzone

said "she did the same thing to me." suggesting that Plaintiff was being hypersensitive, paranoid. R. Fazzone knew Plaintiff had been treated very deliberately, very differently and she knew why.

Fazzone concealed that

she knew in 1983 that the employment ended disastrously.

she had maligned and conspired with the Supervisor in 1983 and others to induce termination of an unstable employment.

termination was the aim, an extension of, continuation of the original conspiracies begun as early as 1968, if not before.

R. Fazzone and others concealed even knowing of the employment.

In 1987 and thereafter, R. Fazzone spoke as if she did not know of Plaintiff's induced quitting until she worked at Cravath. (Plaintiff was surprised that her quitting was still, more than a year later, a topic of conversation in the office.)  And see below, former Paralegal Ralph Taddeo's similar statements.

R. Fazzone said "Wow" referring to Plaintiff's quitting the job as if Plaintiff were proud and R. Fazzone was showing how impressed she was, as if there were a benefit to the Plaintiff, as if Plaintiff sought to impress. This was yet another recasting of events by and for criminals.

Plaintiff expressed, in a nearly cathartic manner what an intensely awful experience it was with emphasis on the Supervisor. Fazzone knew but kept up a pretense of no prior knowledge much less active involvement.

When Plaintiff saw and spoke with R. Fazzone after her two years as a paralegal ended in 1987, she was more civil than she had been in the past (as noted above.) As if to reassure Plaintiff, she prevented plaintiff from knowing the truth by saying essentially that Plaintiff had not been subjected to different treatment. (e.g.,  "she [the Paralegal Supervisor] said/did the

same thing to me." ) In fact, R. Fazzone's employment was not independent of Plaintiff's employment and that Plaintiff had been treated differently and all knew why: it was unlawful punishment for Plaintiff's not attending the same school that  the school RICO defendants J. Fabiani, L. Fabiani, and S. Fabiani attended.

No one has ever orally or in writing stated that there was a connection between Plaintiff's employment and R. Fazzone's time at Cravath. In fact there most certainly was.

R. Fazzone, in the summer of 1987 at an occasion, prior to plaintiff's enrollment at Fordham, with her sister expressed her opinion that it's not realistic to try to find an apartment in New York without being "subsidized" by parents.

For some unknown reason, Ms. Fazzone spoke of only one paralegal:  Ralph Taddeo though several Cravath Paralegals were going to be first year students at Fordham Law School.

Statements by other former Cravath Paralegals at Fordham

Ralph Taddeo

"That was a big deal.  You showed them!"

"They eliminated the position"

"That girl left, not long after you did."

No one from the firm ever contacted Plaintiff to say they eliminated the floater position and to offer Plaintiff a standard Paralegal position. and no one contacted the Plaintiff to inform her that the other Paralegal who seemed lackadaisical resigned not long after Plaintiff's induced quitting.

Ashley Lyu

One day early in the fall semester of 1987, seemingly out of nowhere, seeming to mock someone, Plaintiff heard a loud voice, "YEAH, John Beerbower!" (The attorney whose desk

Plaintiff left documents/work on.) It was a first-year student, former Cravath Paralegal Linda Ashley Lyu.

Alexandra von Ferstel, during a discussion about a legal writing assignment, made the following suggestion:

"Change the font" or, "Choose a different font."

Sometimes you just have to start from scratch, start over, just throw it away and start fresh.

R. Fazzone's Version of T.Fabiani's Oft Stated Two Sentences

Plaintiff infers from the font and other clues that R. Fazzone, apparently thinking she's clever, in a nearly verbal equivalent of homicide, obliterated by fusion with her variant of T. Fabiani's two sentences (She's the same. She thinks she's better.) and said in Cravath's offices:

"They're the same, she just wants to be a different type."

R. Fazzone is unjust. Her version of T. Fabiani's two sentences was exceedingly hostile, inappropriate in any office.  It constitutes misrepresentation that underlies the schemes.

Plaintiff guesses that R. Fazzone, annoyed and disgusted, minimizing a traumatic incident (insulting the plaintiff, flattering the perpetrators) said in Cravath's offices, "They went to pick her up and she ran away."

News, Updates re: Fazzone's activities, Statements by Fazzone to Plaintiff re: Cravath

During the 1990's R. DeNegre telephoned regarding Ms. Fazzone (and others) providing updates. for example, "Lia's on the Law Review."

Plaintiff learned by on line search, that in 2005 R. Fazzone, represented by counsel, filed a lawsuit against a former employer. Upon the defendant employer's motion, there was a stipulation re: non disclosure.

"Upon a showing of good cause in support of the entry of a protective order to protect the discovery and dissemination of confidential information or information which will improperly annoy, embarrass, or oppress any party, witness or person providing discovery in this case."

Thereafter, Lia practiced with another attorney and then opened her own firm which according to online records, she continues to operate.

In a long running criminal conspiracy, the cruel and unusual induced quitting of the plaintiff from a "Floater" position and the cruel and unusual hiring of R. Fazzone stand out.

The reason for designating plaintiff as a floater, not disclosing contacts with the DeNegres, the Fazzones/the enterprise, not disclosing that the floater position was created specifically for the plaintiff to not only set Plaintiff apart from the Paralegal staff and reduce Plaintiff's status but also to create an intolerable disorientation, to make continued employment impossible, to induce plaintiff to give up, to quit ' in a word to injure.

The motives and the nexus were as said were concealed, not fully realized by the plaintiff until the last nine months or so.

Continuing the aforementioned goals of extortion, and kidnapping euphemistically, outrageously, defensively labeling the original kidnapping attempts as an invitation the Plaintiff rudely superficially rejected, was in fact motivated by hate for the plaintiff's mother, intent to compel plaintiff's mother to refrain from parenting, providing shelter, clothing, schooling, athletic activity.

 Other Statements to Mislead Plaintiff about the causal link between Fazzone's paralegal employment and Plaintiff's Constructive Discharge/Termination/Fiasco

At least once, if not several times, when Plaintiff spoke of Supervisor Luskind to R. Fazzone and the DeNegres, the impact was still evident. No honest, reasonable person would doubt that Plaintiff certainly felt victimized and that the effect lingered.

R. Fazzone and others realized that employment termination is a significant negative event. R. Fazzone recasting of it as impressive ("Wow") is frankly not entirely comprehensible to the plaintiff , the invention of a criminal mind.

L. Mark DeNegre at his Woodbridge Home, amusing himself and others with the ongoing deception of the plaintiff, the continuing effort to lure the plaintiff away from her mother, continued the pretense of not knowing  how Lia Fazzone came to be employed at the Cravath firm. He spoke about a case brought by Allan Dershowitz against Cravath alleging discrimination based on Italian heritage and Catholic faith." Plaintiff did not know anything about the matter until DeNegre mentioned it.  As he told Plaintiff, his subtle tone, expression, suggested that he believed the allegations of bias were true.

R. DeNegre, speaking about the reason or reasons the employment ended said, several times: ". . . it was that girl, it was that girl…"

Phil Fazzone said: "Yeah, they dangle a carrot . . . if . . . we'll make you partner. . . "


Unexpected, Telephone Call from R. Fazzone

R. Fazzone unexpectedly telephoned.  She asked if Plaintiff knew and/or said that Ralph died. (Fazzone likely knew that Plaintiff did not know. Plaintiff was 1) Surprised by his death and 2) Surprised that R. Fazzone knew of it and 3) Telephoned about the death. Plaintiff was unaware that she remained in contact with anyone from Cravath. She asked, "Are you going to the wake."  She made other remarks that will be omitted here . Suffice to say, like so many of her utterances, they were better left unsaid.

On or about October 5, 2023 it occurred to plaintiff that Fazzone during the telephone calls regarding Ralph's death may have been subliminally hinting that plaintiff was "just beating a dead horse."

R. DeNegre's Substitute Teaching Fiasco

It was sometime during this period (1990's)that R. DeNegre's,  presumption of a right to punish other people's children, to find wrongdoing where there is none, was manifested in a Woodbridge classroom as noted above when she tapped a student on the head "with a soft covered book."

M. Cozzi, D. Cozzi and DeNegre use Pressure to Take Plaintiff's Mother's Property during Divorce

When A.F. Mottola was divorcing, to induce Plaintiff's mother to relinquish her property, particularly a home in Pelham, Marie Cozzi told her that she heard Plaintiff's father had "someone."  Dolly Cozzi said:  "You can't compete with that." The DeNegres were relentless in trying to trick and pressure Plaintiff's mother to relinquish her property.

Compound Statements to Impute Guilt, Intimidate, Pressure

Time period: Late 1990's or early 2000's. Telephone call,  R. DeNegre said:  "You know what you've got to do."   Plaintiff had no idea what R. DeNegre was referring to.

Utterances in the Late 1990's to early 2000's related to the original Kidnapping Plot

 Plaintiff was distraught and on the verge of a breakdown  pathetically, in a state of desperation telephoned Rita DeNegre and said, I really think people hate me (or very similar words.)  After a pause, Rita said, "Your mother coddles you."

Though Plaintiff not knowing what she knows now did not infer a specific threat, Plaintiff believes the intent, the implied threat was, "If you do not want to be unpopular, give up your mother and your diplomas for T. Fabiani" This was the threat Plaintiff was living under since the 1960's.

Obliterating, Reductionist Statements Re: Plaintiff's Grandmother (Time Period: Mid to Late 1990's)

When Lia Fazzone and her mother Adelaide spoke of plaintiff's grandmother, Plaintiff sometimes doubted that Pia and Carlotta were sisters. Plaintiff will not repeat their statement here. Plaintiff does not know what if any point they were advancing. As most Fazzone utterances, it was best left unsaid.

Inveigling and then Victimizing Plaintiff's Mother at Lunch Engagements

A. Fazzone victimized Plaintiff's mother. Plaintiff's mother was sometimes unsettled when she would return from lunch appointments. Referring to A. Fazzone, once or twice she was almost distraught and said, "She's so patronizing." Plaintiff's mother felt obliterated much the way R. Fazzone behind Plaintiff's back obliterated Plaintiff by her revision of T. Fabiani's statements in Cravath's offices. R. Fazzone is a fraud.

Upon the death of Plaintiff's father in October of 1997 and disinheritance, as if it were all a joke queried: "Hey Ad, do you think she had a hand in his death?"

Claudia Cozzi, Funeral for Dolly Cozzi, (age seventy eight) September 13, 1997

Claudia Cozzi, communicated by a very deliberate, intimidating, extended stare at Plaintiff while she was in a car on the way to her Aunt Dolly's funeral.

And sometime during this period, C. Cozzi said regarding the Fazzone's: "You'll never be in with them." And A. Fazzone said once as said above: "I like the Cozzi's."

Concealment of the Kidnapping Conspiracy with T. Fabiani (Begun in the 1960's, 1970's) and Related Diploma Extortion Conspiracy Continues in the Late 1990's to early 2000's

Once or twice in the late 1990's or early 2000's when the topic of T. Fabiani and/or her feud with her relatives arose at the DeNegre's residence, Plaintiff's mother said: "They were very nice to me." Plaintiff's Mother with her eyes wide open, with seriousness, also said, "They were very critical of her[Terry]." R. DeNegre said little or nothing; she and all in the "family" continued to conceal.

Unbeknownst to Plaintiff and Plaintiff's mother, T. Fabiani had since at least 1965 the unconditional fervent support of all in the family—particularly that she had six children. Plaintiff's grandmother's expression of worry that six was too many for them apparently also drew the ire of the Fazzones.

Induced Attempted Suicide

Prior to Plaintiff's attempted suicide in February of 2004, DeNegre and members of his Enterprise including long time tormentor R. Fazzone were pressuring Plaintiff to relinquish her diplomas for the ultimate humiliation. As part of the pressure campaign, DeNegre exploited the fact that Plaintiff knew more than her mother as set forth in the 2012 Complaint. Indeed, the frustration of the divide between Plaintiff and her mother that DeNegre and others had been pursuing since the 1960's was becoming psychologically impossible to cope with and was the primary reason if not only reason for Plaintiff's attempted suicide. It bears repeating: Plaintiff clearly recalls that prior to the attempt she was frustrated that she could not convince her mother of her growing and overwhelming suspicions about the DeNegres.

Intimidation of Plaintiff Continues even after Plaintiff's M. DeNegre caused Hospitalization in February 2004

Upon Plaintiff's return home from the hospital, on the telephone another relative said, "Feel better." clearly intended as a taunt, and a repetition of their by now ancient but frighting false allegation set forth repeatedly herein namely that in 1971, when RICO defendants J. Fabiani, L. Fabiani, and S. Fabiani and others were told of the forthcoming school change, Plaintiff slipped in a hint about the ambush. The problem as stated repeatedly herein, was that Plaintiff dropped no such hints let alone a hint to taunt, irk, torment or whatever it is they claim.. Plaintiff experienced another horrible moment.

<u>Hints/Communications from R. DeNegre Re: Plaintiff's Mother's Statement</u>

  Rita's Intention: Intimidation; Turn Plaintiff Against Her Mother

Although not decoded until the last few years, clues delivered by Rita to the Plaintiff in her kitchen during the early 2000's,(slowly, deliberately wiping the counter top and making eye contact with the Plaintiff ) lead Plaintiff to suspect that Rita, said to others at gatherings re: Plaintiff's mother and her aborted plan to attend Music & Art,

  "It was all wiped out. The piano teacher abandoned her. I felt sorry for her. She continued to play."

Unexpected Telephone Calls from Marie Cozzi in Furtherance of Conspiracies to Kidnap, Extort, Defraud

A year or so after plaintiff's mother sold a house having made some improvements and repairs , Cozzi volunteered that she had sold her house  (purchased in or about the 1960's when husband Hugo Cozzi was alive who made repairs and improvements to the house).  She specifically mentioned with emphasis that she did not have to do anything, no repairs, no renovations. She also mentioned a fact that she knew the Plaintiff would recognize as significant but Plaintiff's mother would not. That is, that she sold the house to the Reddingtons.  Several

generations of Reddingtons were alumnae of and donors to the Ursuline School in New Rochelle.

Plaintiff cannot detect exactly what argument M. Cozzi was advancing but assumes it undoubtedly was as always intended to weaken the relationship between Plaintiff and her mother as plaintiff recognizes the Redington name, but Plaintiff's mother did not and Plaintiff had some suspicion about the relatives but Plaintiff's mother did not. The phone call was also likely intended to revive the false accusation that Plaintiff slipped in a hint of the ambush when the RICO defendants were told of the new school Plaintiff had just been admitted to.

Telephone Call Ostensibly Re: Cancer in Remission, in furtherance of long-term kidnapping conspiracy and scheme to defraud**.**

Marie Cozzi, called to say: "The cancer is in complete remission.  I didn't have to have any treatments and I don't have to return for any follow up.  I'm all clear."   Plaintiff's mother did have to have post op treatments and did return for follow up.  Marie Cozzi had a completely different type of cancer that is rarely lethal in women her age.

Unspoken message to Plaintiff: T. Fabiani's: She's the same. she thinks she's different.(mockery of plaintiff for thinking she is completely different).

Unlawful Purposes as to Plaintiff's mother: Undermine Plaintiff's mother's confidence in, trust of Plaintiff as plaintiff had a role in selecting the doctor who treated plaintiff's mother's cancer  ,


The Cravath Connection, Conversion, Misappropriation by Letters of Recommendation of Plaintiff's Property Continues

From online sources, Plaintiff knows Paget Stanco (daughter of Gary P. and  Paget Cozzi Stanco and M. DeNegre's grand niece) was a 2016 Tufts University graduate. Plaintiff believes that sometime between 2005 and 2011, Alexandra Von Ferstel, (not unlike Cravath Supervisor Christine Luskind's recruitment of  R. Fazzone at the DeNegre's) initiated a mentoring of Stanco as a candidate for admission to Tufts and (like M. Tolan and J. McNamara,) offered to write a letter of recommendation.  A.Von Ferstel and defendants Cravath and R. Fazzone

understand the helpfulness, the value of support and the harm in hostility, deceit, opposition. As her grandfather, Hugo Cozzi, said: "It's not what you know, it's who you know."

<u>April 2020, Facebook Posting</u>

R. Fazzone's Facebook Posting in April 2020 upon the death of plaintiff's mother, Adelaide F. Mottola is a violation of  18 U.S.C. § 1343 (wire fraud), an overt act in furtherance of conspiracy to extort and kidnap. Postings by siblings Anthony Fazzone and Carly Fazzone are also a violation of 18 U.S.C. § 1343.

Lia Fazzone

"Paul, I'm so sad to hear this news. I have such wonderful memories of your mother from our childhood.  Much love to you, Carol and Gregory at this sad time. I love this picture of Aunt Adelaide. Her sparkle shines through! Love you.

Phillip Fazzone: Paul I'm so sorry. We all loved your mom very much. I have great memories of us all meeting up for family get togethers. I spoke to my parents this morning and they were deeply saddened to hear the news. We will all be mourning her passing.. .

Carley Fazzone: "I'm so sorry, Paul . . . Sending you and Carol love and prayers.

Christopher A. Cozzi

So sorry to hear, my heart goes out to you and yours.

<u>Street Sightings not Coincidences-the Intimidation Intended to Enforce the Extorted Statement "I'll leave" and Continue the Conspiracy to Kidnap</u>
<u>Time Period: 1980's to 2020</u>

Over the years (as recently as in or about 2020) there were a number of unexpected sightings, run ins in public places  that were very likely not coincidences but coordinated by M. DeNegre (and since his death, by those replacing him) using agents who provide information about Plaintiff's whereabouts and plans.

At the time of the run ins, Plaintiff had more than a hunch that they were not coincidences, which was somewhat intimidating, particularly in the late 1980's and 1990's but

no proof as to who was behind it and what the purpose or message was. Plaintiff sensed that one intermediate aim was to make the victimized Plaintiff appear and feel guilty. In retrospect it is of course fairly certain that the pre-planned street near run-ins were in furtherance of the twin goals of separating the plaintiff from her mother, in furtherance of a conspiracy to kidnap and conspiracy to force the plaintiff to relinquish her degrees.

For example, during the 1985 to 1987 period Plaintiff was taken aback by the sight of Carly Fazzone at a pay telephone very deliberately looking at Plaintiff in New York City.

One particularly significant run-in occurred in the 1980's as noted above not too long after the Cravath fiasco, which Tolan surely knew about. M. Tolan said: "You haven't done much." It is likely that M. Tolan intended to pressure the Plaintiff to relinquish her degrees. Plaintiff did not realize at the time that it was not a coincidence.

Ursuline Reunion 2017

Plaintiff attended an Ursuline Reunion in 2017. M. Tolan and J. McNamara were among the attendees. Plaintiff did not perceive it then or not entirely but now believes that extended eye contact was intended to communicate RICO defendant's S. Fabiani's misperception that Plaintiff acknowledged "it" when J. Fabiani pointed out "that was something" in 1971 thus Plaintiff took something from them. They chose to be non verbal. It is all but certain that there were communications by wire prior to and subsequent to the reunion to discuss and pre-plan the above noted eye contact communications directed at the Plaintiff in the parking lot at the end of the reunion.

The then President of the School, Eileen Davidson, whom Plaintiff had never met, made eye contact with Plaintiff though it was not exactly like the non-verbal communications of M. Tolan and J. McNamara. Plaintiff did not have a good feeling. Plaintiff has no proof but believes that, very likely, the President had had recent contact with M. DeNegre by wire and was

communicating something consistent with or in furtherance of M. DeNegres aims. This was somewhat surprising, unsettling to the Plaintiff because she does not believe there were similar eye contact communications from the Principal during the years Plaintiff was a student at the school. No doubt DeNegre was displeased that Plaintiff attended the reunion and he made false allegations. DeNegre, plaintiff believes, was, simply stated, at best a quack who thought plaintiff deserved to be punished for running, escaping when N. Fabiani in an automobile attempted to kidnap her and would similarly strip the plaintiff of her diploma.

Plaintiff attended the full program of reunion activities, having paid to attend, of course, not just the evening dinner.

Undermining Plaintiff's Relationship with her Brothers in furtherance of Conspiracies to Kidnap, Defraud, Extort

Plaintiff's brothers did not support, but instead criticized the Plaintiff, for filing the 2012 Complaint.

In or around 2020 or 2021, plaintiff's brother Paul said that he attended Rita DeNegre's 2018 funeral. Plaintiff said, "That's disappointing." The DeNegres did not have a good reason to have Paul attend the funeral. Indeed, Plaintiff suspects they have maligned and ridiculed Paul. Paul was one of two students at the OLPH school to be skipped a grade; they delight in the mere thought, that he might look stupid attending R. DeNegre's funeral. That is the judgment in the informal classroom/ forum that M. DeNegre and R. DeNegre oversaw.

Undermining and preventing all relationships was a part of defendants' strategy. Defendants gradually over many years generated issues that contributed to a divide between Plaintiff and her brothers, a kind of cognitive dissonance that was increasingly not tolerable.

RICO VIOLATIONS| RACKETEERING ACTIVITY as defined by 18 USC § 1961

> "RICO is founded on the concept of racketeering activity. The statute
> defines "racketeering activity" to encompass *330 dozens of state and
> federal offenses, known in RICO parlance as predicates. These predicates
> include any act "indictable" under specified federal statutes, §§ 1961(1)
> (B)-(C), (E)-(G), as well as certain crimes "chargeable" under state law, §
> 1961(1)(A), and any offense involving . . . or drug-related activity that is
> "punishable" under federal law, § 1961(1)(D). A predicate offense
> implicates RICO when it is part of a "pattern of racketeering activity"—a
> series **2097 of related predicates that together demonstrate the existence
> or threat of continued criminal activity *RJR Nabisco, Inc. v. Eur. Cmty.*, 579
> U.S. 325, 330, 136 S. Ct. 2090, 2096–97, 195 L. Ed. 2d 476 (2016) citing
> H.J. Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229, 239, 109 S.Ct.
> 2893, 106 L.Ed.2d 195 (1989); see § 1961(5) (specifying that a "pattern of
> racketeering activity" requires at least two predicates committed within 10
> years of each other).

## SKELETAL OUTLINE INTRODUCTION TO RACKETEERING (PREDICATE) ACTS)

CONSPIRACY TO KIDNAP AND INITIAL ATTEMPTS IN OR ABOUT 1968-1970

PREDICATE ACTS–TWO CORE CONSPIRACIES:
CONSPIRACY TO KIDNAP continued after two attempts set forth below and in Factual
Background
CONSPIRACY, SCHEME TO DEFRAUD and CONSPIRACY TO EXTORT
Wrongfully Deprive Plaintiff of benefits of Plaintiff's Schooling beginning with the
Ursuline Schools by uttering falsehoods (misrepresentation), pressure, intimidation and other
methods
Wrongfully Extract (receive, obtain) economic and social benefits from Plaintiff's
Schooling and Employment by uttering falsehoods and other methods.

Falsehoods were initially uttered by J. Fabiani and S. Fabiani then repeated and expanded upon by DeNegres and R. Fazzone.

Some social benefit to J. Fabiani, S. Fabiani;

Substantial social and economic benefits to R. Fazzone, G. Stanco, P. Stanco)

## THE RACKETEERING ACTIVITY – PREDICATE ACTS

Under 18 U.S.C. 1961(1)(A)

<u>Acts or Threats involving Kidnapping chargeable under NY state Law and punishable more than one year</u>

<u>Acts or Threats involving Extortion chargeable under NY state Law and punishable for more than one year</u>

<u>Overt Acts including Violations of State Penal Law (Misdemeanor and Violations) in Furtherance of Dual   Conspiracies</u>

<u>Acts or Threats involving Murder chargeable under NY state Law and punishable for more than one year:</u>

Promoting a Suicide Attempt

Under 18 U.S.C. 1961(1)(B)

<u>Any act indictable under the following provisions of title 18 United States Code:</u>

18 U.S.C. § 1341 (relating to mail fraud)

18 U.S.C. § 1343 (relating to wire fraud)

18 U.S.C. § 1503 (obstruction of justice)

18 U.S.C. § 1512 (relating to tampering with a witness, victim,)

18 U.S.C. § 1544 (misuse of a passport)

18 U.S.C. § 1951 (interference with commerce, robbery, or extortion)

18 U.S.C. § 1952 (travel in aid of racketeering)

18 U.S.C. § 2314 and 2315 (relating to interstate transportation of stolen property)

Chronological Outline of Plaintiff's Action Brought Pursuant to RICO 18 U.S.C. 1961

Predicate Acts of Racketeering| Pattern of Racketeering Activity

Under 18 USCS § 1961(5) "pattern of racketeering activity" requires proof of two such acts, but only one of these must have occurred after effective date of statute; one or more of underlying acts of racketeering activity necessary to comprise pattern could be acts which took place prior to October 15, 1970, date statute went into effect. *United States v. Field,* 432 F. Supp. 55, (S.D.N.Y. 1977), aff'd, 578 F.2d 1371 (2d Cir. 1978).

Kidnapping First Degree, N.Y. Penal Law

Pre RICO enactment, In or about 1968 – 1970,

Conspiracy

Attempts (Two Kidnapping ) plus

Attempted Felony Murder or Depraved Indifference Manslaughter

Post RICO enactment:

Ongoing Conspiracy

Extortion

Extorted Statement:  Spring 1971

Promoting Suicide, Depraved Indifference   Spring 1971

Wire Fraud in Furtherance of Scheme to Defraud, Extortion

18 U.S.C. § 1201 Kidnapping (August 1971)

Overt Acts: Elements of  Kidnapping in the First Degree, Conn. Gen. Stat. §53a-92

Misdemeanors under Conn. Gen. Stat.

Kidnapping Attempts and Overt Acts (Misdemeanors and Violations) in    Furtherance of Persistent, Ongoing  Conspiracy Fall 1971 - 1977

Extortion Conspiracy

Conspiracy Ongoing

Extortion-Larceny Violation of Wisconsin Penal Code Larceny (Ursuline Ring) In or about 1979

Acts Indictable under 18 U.S. Code § 2314    Transportation of stolen goods In or About 1979 Acts Indictable under 18 U.S. Code § 2315 - Sale or receipt of stolen goods
   (Time Period: Ongoing. Believed to be in the Possession of the Estate of Louis Mark DeNegre, Executrix Diana DeNegre)

Acts Indictable Under
   1) Hobbs Act: 18 U.S.C. § 1951 (Interference with commerce, robbery, or
      extortion) September to October 1983
   2) 18 U.S.C. § 1341 (mail fraud)    September, October 1983
   3) 18 U.S.C. § 1343 (wire fraud)    September, October 1983

Homicide -   Promoting Suicide
                  Attempted                    February 2004

Acts Indictable under the following provisions of title 18 of United States Code:

18 U.S.C. § 1959  (Violent crimes in aid of racketeering activity
                        18 U.S.C.A. § 1201 Kidnapping (Summer 1971)
                                  Long Term Conspiracy

18 U.S.C. § 1512 (Tampering with a witness, victim, or informant) (1970-

Hobbs Act: 18 U.S.C. § 1951 (Interference with commerce, robbery, or

     extortion)

18 U.S.C. § 1952 (Interstate travel in aid of racketeering) (In or about 1987-1991)

18 U.S.C. § 1503 (Obstruction of Justice) 2012

18 U.S.C. § 1343 (Wire Fraud) 1970-Present

Pattern of Racketeering Activity

(18 U.S.C. § 1961(5))

Overview: Kidnapping, Extortion, Scheme to Defraud Conspiracies

  Additional related Predicate Acts under RICO and,

  Overt Acts including misdemeanors, violations in furtherance of the two core crimes.

  Wire and Mail Fraud (Scheme to Defraud)


Racketeering Activity (Predicate Acts) Under 18 USCS § 1961(1)(A)


Acts and Threats involving Kidnapping chargeable under State law and punishable by
imprisonment for more than a year


    Acts 1A Conspiracy to Kidnap and 1B, Attempt to Kidnap


    Act 1A Continued (or Second Conspiracy) after failed attempt.


Acts and threats involving Extortion chargeable under State law and punishable by
imprisonment for more than a year and or Acts Indictable 18 USCS § 1951 (Hobbs Act)

   Acts 2A, 2B, and 2C, Conspiracy to, Attempt to Extort, and Extortion (Induced
Relinquishment of Paralegal Employment in Cravath's office.)


    Acts 2A Scheme to Defraud and Conspiracy to Extort (begun in Spring 1971; overt acts
in furtherance from 1971 to approximately 2012) and 2B Attempt to Extort 2C Extortion
(Spring 1971 extorted statement construed as and used against plaintiff as a promise to leave

school if a certain scenario occurred or relinquish diploma and future  employment if
Plaintiff did not so leave;

> Acts and threats involving Dealing in a Controlled Substance or Listed Chemical
> (as defined in section 102 of the Controlled Substances Act [21 USCS § 802]
> chargeable under State law and punishable by imprisonment for more than a year

Extortion and Attempted Extortion in 1983 in Cravath's office–Pursuant to unlawful
interference by M. DeNegre., R. Fazzone  and others, induced relinquishment of employment by
unlawful strategies, pressures and implied threats.

 Racketeering Activity (Predicate Acts) Under 18 USCS § 1961(1)(B):

> Acts indictable under the following provisions of title 18, United States Code:

18 USCS § 1959    Violent crimes in aid of racketeering activity

USC § 1201 Kidnapping

18 U.S.C. § 1951 (Interference with commerce, robbery, or
extortion)

18 U.S.C. § 1341    (Mail fraud)

18 U.S.C. § 1343    (Wire fraud)

18 U.S.C. § 1544    (Misuse of a passport)

18 U.S.C. § 1952    (Travel in aid of Racketeering)

18 U.S.C. § 1503    (Obstruction of justice)

18 U.S. Code § 1512 - (Predicate Act Tampering with a witness, victim, or an informant)


Law of Conspiracy

> "The essence of the crime of conspiracy is an agreement to commit an
> unlawful act. Iannelli v. United States, 420 U.S. 770, 777, 95 S.Ct. 1284,
> 1289 (1975). Conspiracy is a separate and distinct crime from the
> substantive crime that is the object of the conspiracy. Callanan v. United
> States, 364 U.S. 587, 593, 81 S.Ct. 321, 325, 5 L.Ed.2d 312 (1961); United
> States v. Clark, 613 F.2d 391, cert. denied, 449 U.S. 820, 101 S.Ct. 78, 66
> L.Ed.2d 22 (1980). The long-accepted general rule is that one who is

personally incapable of *852 committing an offense may be guilty of conspiracy to commit the offense. *United States v. Rabinowich*, 238 U.S. 78, 35 S.Ct. 682 (1915)

New York State concurs with the textbook that the core of conspiracy is an agreement to commit a criminal act accompanied by a specific intent to commit a crime.

§ 135.00 N.Y.Penal Law Definitions in relevant part, *emphasis added*.

1. *"Restrain"* means to restrict a person's movements intentionally and unlawfully in such manner as to interfere substantially with his liberty by moving him from one place to another, or by confining him either in the place where the restriction commences or in a place to which he has been moved, without consent and with knowledge that the restriction is unlawful. A person is so moved or confined *"without consent"* when such is accomplished by (a). . ., *intimidation or deception,* or (b) any means whatever, including acquiescence of the victim, if he is a child *less than sixteen years old . . .* and the *parent,. . . has not acquiesced in the movement or confinement.* 2.*"Abduct"* means to restrain a person with intent to prevent his liberation by either (a) secreting or holding him in a place where he is not likely to be found, or  . . . 3."Relative" means a parent, ancestor, brother, sister, uncle or aunt.

§ 135.25 Kidnapping in the first degree in relevant part

A person is guilty of kidnapping in the first degree when he abducts another person **and** when:
1. His intent is to compel a third person to pay . . . as ransom, or to engage in other particular conduct, or to refrain from engaging in particular conduct; or
2. He restrains the person abducted for a period of more than twelve hours with intent to:
(b) Accomplish or advance the commission of a felony; or
(c) Terrorize him or a third person;

The requisite intent for Kidnapping in the first degree under New York Penal Law namely compelling Plaintiff's mother and Plaintiff to refrain from engaging in particular conduct: clothing the Plaintiff, sending Plaintiff to camp, to school and providing housing for the plaintiff with her own room was present when the conspirators first agreed and committed the early attempts and persisted. Specifically, T. Fabiani's motives, and all conspirators agreed, included

Specific Intent to Kidnap in First Degree (NY Penal Law 135.25) evidenced by

T. Fabiani's

- Animosity toward Plaintiff's mother
- need to win, derive satisfaction from personal battles;
- the ultimate angry win: defeat of Plaintiff's mother and plans and goals with regard to raising Plaintiff.
- resentment of her elder relatives coupled with anger that mother spoke with those relatives
- Focus, Fixation on Plaintiff; Angry Intense Need to take (Kidnap) and Feuding habit; Plaintiff thinks she's better
- Narcissistic Threats and Mockery of Plaintiff and Plaintiff's mother combined with her belief that such threats and mockery would lure by deception i.e., manipulate Plaintiff to realize Terry was right, the better mother.

     Alternative strategy that Plaintiff (whom they imagined was a cold calculator) would abandon her own mother when she realized her own mother was unpopular in the family and among those under their influence;

Instructing daughters to mock Plaintiff for

- wearing the clothes Plaintiff's mother provided. (and allegedly drawing attention to/ seeking looks ). (This is, of course false.) Further they ludicrously alleged that the very reason Plaintiff thought she was better must be the very looks/attention that Plaintiff  sought from T. Fabiani's daughters which is what boosted, inflated Plaintiff's ego, therefore they should mock and further punish the Plaintiff to teach Plaintiff a lesson and make Plaintiff realize that the clothes in fact made Plaintiff look stupid. All of the foregoing is convoluted and false, proof of T. Fabiani's angry state.

- Statements:
  - "She's the same.." (Possessiveness, Verbal expression of, equivalent of Abduction.) She thinks she's better (Mockery.)

 Conspiracy to Commit Kidnapping in the First Degree in violation of N.Y. Penal Law § 105.17 (and lesser included Second and Third degree N.Y. Penal Law §§ 105.15 105.13) Time Period: In or about 1967-1970.

With the requisite intent to commit Kidnapping in the First Degree: to compel plaintiff's mother to "engage in other particular conduct,"(move back to the Bronx, return to the school, St. Clare's, T. Fabiani's children attended) or "refrain from engaging in particular conduct" (moving, and providing, a room/shelter in a home, clothing, schooling and athletic instruction, a few weeks of summer camp.) the conspirators agreed and supported the luring, the kidnapping of Plaintiff

M. DeNegre and the Fazzone family with intent that conduct constituting a class A felony (Kidnapping in the First Degree) be performed, and being over eighteen years of age, agreed with one or more persons (T. and N. Fabiani) during telephonic conversations to cause by emphatically supporting and encouraging the performance of conduct to lure, to abduct the Plaintiff for the purposes of compelling plaintiff's mother to engage in and refrain from the conduct as set forth above.

M. DeNegre and members of the Fazzone family agreed with the knowledge that one or more persons under sixteen years of age (S. Fabiani and J. Fabiani) would engage in luring conduct to attempt to abduct the Plaintiff for the purpose set forth above: compelling plaintiff's mother to engage in and/or refrain from engaging in particular conduct.


**Two Attempts** in or about 1968-1970; Conspiracy, Attempts Persisted in Thereafter as set forth below

With the intent and conduct that meets the elements of the above sections of Kidnapping in the first degree:

T .Fabiani, having directed behind the scene, and N. Fabiani, with daughters who were less than sixteen years old. in the car attempted to abduct (lure by deceptive means and *without the acquiescence of parent A.F. Mottola*) **and**

    **1)** with intent to compel A.F. Mottola to send C. Mottola to the school (and pay the tuition) T. Fabiani's daughters attended (St. Clare's) or,

      to refrain from a) providing shelter, and b)sending C. Mottola to Summer Pines Day Camp, and OLPH school.

**or**

    **2)** *restrain* C. Mottola, (assuming they had succeeded in abducting, they planned to hold her for more than twelve hours and terrorize C. Mottola or A.F. Mottola.

N.Y. Penal Law § 110.00, Attempt to commit a crime, states:

> "A person is guilty of an attempt to commit a crime when, with intent to commit a crime, he engages in conduct which tends to effect the commission of such crime."

In or about 1968-1970

Attempted Kidnapping in the First Degree N.Y. Penal  §§ 20, 110.00, 135.25

    With intent to compel plaintiff's mother to refrain from raising the Plaintiff, providing shelter, clothing, schooling, summer day camp, pursuant to a conspiracy with spouse T. Fabiani, supported, encouraged (via wire communication) by the DeNegres and Fazzones, N. Fabiani engaged in conduct, which tends to effect the commission of the crimes of Kidnapping in the First Degree.

    The affirmative acts–the direct movement required under New York case law to be guilty of attempt–were:  1) placing his children in a car;

        2) driving the car slowly

        3) then stopping the car and

        4) the opening of the car door by the two daughters

 All the foregoing done to attempt to lure.

    N. Fabiani acquired the wherewithal to commit the object crime and made direct movement (driving to locate Plaintiff) toward the criminal objective: lure plaintiff and deliver her to T. Fabiani.

N. Fabiani with daughters (minors) in the car carried their actions forward within dangerous proximity to the criminal end.

**"Dangerous proximity** to the crime "exists when the defendant's acts have set in motion a chain of events that are likely to lead to the completion of the crime unless some external force intervenes."

N. Fabiani was within dangerous proximity, they opened the car door to lure.  The external forces that intervened were Plaintiff's fear and running.

**Attempted Kidnapping in the Second Degree, NY Penal §§ 20, 110.00, 135.20**

**Summary:**

**First Ill Motivated Attempt to Lure Plaintiff Away from Mother Prevented by Plaintiff and Mother**

As set forth above

**Escalation to Second Attempted Kidnapping on the Street**

The affirmative acts constituting attempt were without Plaintiff's parents acquiescence. Defendants knew Plaintiff's mother would never acquiesce. The attempt was a flagrant contravention of Plaintiff's mother's utterance  when Plaintiff looked up to her,: "That's my daughter!" at the dining room table.  (See NY Penal Law Definitions, § 135.00, "Restrain" without consent, child less than sixteen.)

Plaintiff experienced fear and her response was flight.

". . . Flight means your body urges you to run from danger. . . " (What Does Fight, Flight, Freeze, Fawn Mean? Medically Reviewed by Poonam Sachdev, MD on April 28, 2022 Written by Martin Taylor, Webmd website)

This second attempt to lure plaintiff into a car when she was alone was similar to but more  dispiriting, dread inducing than the bloody hand from the grave in a horror movie.

The conspiracy with the DeNegres and the Fazzones was concealed. Their support further emboldened T. Fabiani and N. Fabiani.

DeNegre and others (T. Fabiani, and N. Fabiani and minors under the age of sixteen, S. Fabiani and J. Fabiani) could not complete the kidnapping but did attempt it attempting to lure though Plaintiff had looked to her mother during a prior albeit less aggressive attempt.

Predicate Acts, Threats involving Kidnapping in violation of New York Penal Code –
    Continuation of Conspiracy to Kidnap,
    Continuation of Attempted Kidnaping


PREDICATE ACT

Conspiracy in the First Degree (NY Penal Law § 105.17) :

M. DeNegre T. Fabiani, N. Fabiani and others over the age of 18 including the Fazzones *agreed* with and encouraged one or more persons under sixteen years of age (J. Fabiani and S. Fabiani)) to engage in or cause the performance of conduct constituting Kidnapping in the First Degree a class A-1 felony to wit abducting (luring by deceptive means and without the acquiescence of parent A.F. Mottola) and with intent to compel Plaintiff's mother A.F. Mottola to send C. Mottola to the school (and pay the tuition) her daughters attended (St. Catherine's) or, to refrain from providing clothing, shelter, and refrain from sending C. Mottola to the Ursuline School.

**or**

**2)** *restrain* C. Mottola, having abducted her, for more than twelve hours with intent to terrorize C. Mottola or A.F. Mottola.

<u>Conspiracy to Kidnap Continued with Overt Acts and Additional Attempts</u>

With the intent set forth above, directly and indirectly and with the increased use of co-conspirators and a variety of pressure tactics and strategies, as set forth more fully below and in the Factual background section the conspiracy continued throughout the 1970's, 1980's, 1990's, 2000's coupled with an additional linked conspiracy of extortion that continues to the present day, as set forth more fully below.

Bridal Shower Invitation

The item sent in the mail was in furtherance of a kidnapping plot and was intended to harm the Plaintiff. A. Fazzone was focused on T. Fabiani, whose intent was to compel Plaintiff's mother to refrain from providing shelter in the suburbs and refrain from sending plaintiff to camp, to OLPH and then the Ursuline School.


PREDICATE ACT: CONSPIRACY TO EXTORT, SCHEME TO DEFRAUD

Early Overt Acts in Furtherance of Conspiracy to Extort all Benefits of Plaintiff's Academic Endeavors and related/linked scheme to Defraud

Time Period: Spring 1971
Place: Plaintiff's Grandparents Dining Room

Unbeknownst to Plaintiff and her mother, at the direction of M. DeNegre, continuing a Buonocore/Cozzi habit of intrafamily contests (imposed on the Plaintiff without her awareness to obstruct and compel Plaintiff and her mother) originating with he Cozzi's creed:" It's not what you know, it's who you know," a conspiracy was begun to wrongfully transfer benefits to themselves: Fazzones and the Cozzis while keeping T. Fabiani happy by catering to the satisfaction she derives from feuds, personal battles, humiliating, denigrating, thwarting Plaintiff

and her mother, taking by kidnapping and extortionate statements.   As noted the Fazzone's consider this (and persuade others) to be the equivalent of being big or soft hearted and Plaintiff is portrayed as hard hearted, a taunter, flaunter or some similar set of bad traits because she will not "give them the what they want,"

The conspirators plan was to (mockingly) extort in stages i.e., devalue, deprive and ultimately transfer (obtain unlawfully) career and social benefits of Plaintiff's schooling to the Fazzones and Cozzis.  With an intensity and persistence that was difficult to fathom (and accept as an inescapable reality) and endure, coupled with tricks, traps, concealment, pressure and intimidation  they did so initially as follows:

1) Denigrating plaintiff and her admission to the Ursuline School:

(e.g., Statements: "It's all doctors and lawyers there." "The school just wants your money." "Her mother got it for her.")

2) False and familiar narcissistic allegation: Plaintiff's application to the school was linked with them, motivated by anger, a need to avenge a prior upset, abuses.  (This false allegation serves other purposes:  to threaten and trick plaintiff into "consenting" to being a crime victim– if Plaintiff denies the allegation. This trick, Plaintiff believes was a criminal application of what M. DeNegre learned about consent through his training to become a medical doctor.

3) Implied outrageous threat that plaintiff must have their prior approval, consent to enroll in the school; and

4) Unsolicited offers of advice and protection (similar to classic protection rackets);

6) Plaintiff C. Mottola's was restrained by:

**a)** their exploiting of the situation i.e., difficulty in simply walking out of grandparents dining room; the need to maintain a façade and,

**b)** Deception, intimidation by starring at, harassing, persisting, questioning, posing bizarre hypotheticals, history of abusive behavior toward the plaintiff set forth with more specifics above and below, to pressure plaintiff to relinquish her admission to the seventh grade at the Ursuline School in New Rochelle NY. Their primary motive in stopping Plaintiff is that the school admission goes to the issue of Plaintiff allegedly thinking she is "better, " and allegedly using the school admission to so prove, provoke and or begin a contest or feud though they knew (more than Plaintiff knew) they had for at least five years conspired with the DeNegres and Fazzones, deceiving Plaintiff and their grandparents. As previously stated: the allegation is more confessional; Plaintiff and her mother sought to avoid such contests, had nothing to gain from them and were the outsiders, the targets of a conspiracy, not the provokers—as they knew.

7) Plaintiff was as set forth in more detail above and below, threatened with an order, a mocking "agreement" communicated non verbally: If Plaintiff did not leave the school, she would not/could not use her degrees.

8) Plaintiff's mother was not as cognizant of the confinement that Plaintiff experienced. She could not see the encounter from plaintiff's perspective, as plaintiff was sitting in a chair being questioned and starred at, was unaware of a conspiracy to kidnap and that her own brother, N. Fabiani, drove the car and attempted to abduct her daughter ergo, she did not begin to recognize how plaintiff was being victimized.  Consequently, Plaintiff, age eleven, was deprived of support and protection .

9) Plaintiff's hopes for civility soon proved unrealistic, impossible. In an extortionate pattern, they offered unwanted, unneeded advice and protection, suggesting that plaintiff had not "thought it through." When plaintiff would not "admit" that she had not thought it through, they set out to prove plaintiff had not by asking what plaintiff would do in a mildly intimidating/strange hypothetical scenario involving students at the school the details of which plaintiff does not recall (but did indeed occur as set forth below). Plaintiff did at the time perceive a mix of subtle mockery, insincere flattery. Plaintiff had not forgotten how angry they become at even a perceived hint that plaintiff, as Terry, for all the wrong reasons, brainwashed them, thought she was better.

The defendants knew and Plaintiff deduced that they were not going to stop starring at plaintiff, pressuring, subtly mocking, intimidating, humiliating, threatening the plaintiff. Indeed, in retrospect it is almost more intimidating. (Eventually, years later, Plaintiff realized that at DeNegres direction they were, aggressively reacting and mocking, step by mocking step attempting to undo years of Plaintiff's step by step efforts and her mother's efforts, the entrance examination, the foundation for plaintiff's school admission.)

During the silence when their compound question (the bizarre and somewhat humiliating hypothetical) was pending, Plaintiff was in a compression and threat chamber, weighing a multitude of competing concerns. (The DeNegres and the questioners had no interest in academic or athletic matters. The focus was on using humiliation and similar tactics to put Plaintiff and her admission under at least a cloud of suspicion, invalidate it, force, pressure Plaintiff in a humiliating way out of the school.) The question coupled with facial expressions and the history put plaintiff in an impossible no win position: if not answered the questioners who had long misperceived and threatened plaintiff were free to misinterpret Plaintiff's

countenance and essentially speak for the plaintiff ergo, nonchalantly answering a pre-planned question (similar to their pre-planned ambush which they now outrageously used to take credit for Plaintiff's admission to the school) was preferable, indeed a way to keep control—though in fact it was not. It was a lose lose (extortion) situation though Plaintiff age eleven did not know the word.  Importantly, they initially concealed that it (the question/bizarre hypothetical) was also a threat. As noted above they stared and subjected an outnumbered plaintiff to an intensive blend of mockery/flattery and deception. (Ooh, you're in the position to decide.) In fact, Plaintiff did not want to be in the position of being asked questions, had not anticipated nor invited being so pressured and mocked.

     Plaintiff was less than sixteen years old.

     Plaintiff's parent had not acquiesced in the confinement.

     Plaintiff's mother and Plaintiff were deceived. Among the deceptions: the DeNegres and Fazzones participation in a conspiracy to kidnap.

     To recap:

Plaintiff prior to and concurrent with the answer to the hypothetical, was restrained within the meaning of N.Y.'s Penal Code § 135.00 by a Terry and M. DeNegre designed straightjacket of intimidation (she thinks she's better) their prior abuses, swift intimidating knee jerk reactions and accusations (i.e., "that was something") literal finger pointing, intimidating eye contact and persistence, being outnumbered, and the deception/concealment.. Their intention was to restrict

plaintiff's movements, interfere substantially with plaintiff's liberty in furtherance of their ultimate, similarly unlawful aim– for Plaintiff to relinquish benefits of enrollment in the school.

Plaintiff recalls very clearly becoming anxious and actually feared that her true self, her initial composed self who thought the question was not worth answering, should not be dignified, and also, that the questioners were not deserving of an answer,  might be misconstrued as an air of superiority (which would provoke, anger them) Thus Plaintiff, initially calm, was pressured  by all the above noted factors, to answer the question/hypothetical and say nonchalantly "I'll leave" to escape and defuse a situation. As noted, and as the questioners knew, not answering left the questioners free to interpret, misinterpret plaintiffs silence and demeanor and would also have subjected Plaintiff to ridicule, misperceptions. Plaintiff clearly recalls briefly imagining or anticipating that if she did not answer they were going to say, You're not answering? . . .that it would not end. And it bears repeating that the questioners *knew* and that Plaintiff worried that if she did not answer, they would speak based on their interpretation/misinterpretation of Plaintiff's countenance. That is they they *knew* that Plaintiff was worried about their misinterpretations and exploited that worry to induce an answer

They also knew and mocked and exploited that Plaintiff was not thinking beyond the enrollment in the school; Plaintiff thought that by the bizarre hypothetical they were attempting to stop Plaintiff  from going ahead with the initial enrollment in the Fall and attempting to "prove" that Plaintiff had not considered the bizarre hypothetical therefore that proved their point that Plaintiff had not "thought things through." Plaintiff recalls thinking, "Do they know something about strange initiation rituals at the school." As noted, Plaintiff did detect a

contradictory blend of subtle mockery and attempted flattery as if to say, "OOH, you're in the position to decide, Wow."

As articulated, spelled out, by Plaintiff's earlier statement, "You're trying to take something from me." plaintiff was with the questioning and harassment, nearly in a state of panic and thought not answering was the equivalent of relinquishment thus Plaintiff did say, "I'll leave."

Soon after the utterance, Plaintiff' clearly recalls thinking (perhaps based on L. Fabiani's facial expression): "Isn't it stupid to go ahead with enrolling in the school if you're going to leave for more or less the same reason that you are leaving OLPH." Plaintiff at that point thought they were finally done having made the foregoing point. It was not the first time they "pointed out" how stupid they thought the plaintiff was.

What transpired next was not anticipated. They non verbally communicated a serious and more intimidating and insulting threat as to long term consequences, far more serious than the foregoing "Isn't it stupid to go forward . . . " L. Fabiani communicated a combination order and threat:

"And if you don't (leave) you won't use it."

This apparently was to "prove" (after the fact) that it was indeed stupid to go ahead with enrollment which when Plaintiff realized was their point left Plianitff just wanting to exhale in mild disgust.

Indeed, Plaintiff's statement "You're trying to take something from me." apparently enraged L. Fabiani, J. Fabiani, and S. Fabiani more than they initially revealed, more than Plaintiff realized and they decided to go to the next step and not merely try, but to in fact take.

Plaintiff experienced a bleak fast forward. There was however some recovery or resiliency as Plaintiff at eleven did not want to be terminally hopeless, had done nothing to deserve hopelessness. Moreover, the fact that they seemed to be trying to prove the above noted points left Plaintiff just wanting to as said shake her head and exhale.

Plaintiff never would have imagined or predicted that someday her employer would hold her to the "I'll leave" as if plaintiff were not 1) deceived, not 2)pressured by her abusers and 3)under the age of eighteen among other factors as noted above and below. Plaintiff did not know at the time that M. DeNegre was the mastermind behind the question, that he planned to hold the fact that Plaintiff answered and the answer against Plaintiff as if it ought to be considered a solemn promise, a matter of ethics, keeping one's word. Plaintiff was not worry or anxiety free.   Elements of many crimes were present. Plaintiff was deceived, there was concealment, pressure to answer and Plaintiff did, as the perpetrators intended, experience the fear and the feeling of loss.

Plaintiff's wrongfully induced answer was used against the Plaintiff. Plaintiff surmises that defendant Cravath, to eliminate extortion claims, exceeding mere put down, put a little mosaic together, a collage. That is, they falsely and based upon obviously self serving misrepresentations and interpretations of malicious relatives who had indeed attempted to kidnap the Plaintiff and successfully frightened the Plaintiff, combined with a stereotype, characterized the above extorted statement as a voluntary cheapening by the Plaintiff of her school admission  during a "bargaining session." or playing of a game involving taunting that

plaintiff enjoyed. The foregoing is at best ludicrous. Plaintiff as set forth fully above, under the age of sixteen, was, always the victim. And in this particular session, was in a compression chamber, restrained within the meaning of N.Y.'s Penal Code § 135.00 thus pressured, and tricked into answering in a lose lose situation upon the mere asking of the question as Cravath attorneys must have realized. In particular Plaintiff was forced to be nonchalant so as to not provoke and put an end to the pressure session with its mix of mockery etc as set forth fully above. The consequences of the alternative (silence) set forth above, could be worse thus Plaintiff had no choice hence "I'll leave" was an ***extorted statement.***

Even after they extracted the answer, they persisted. J. Fabiani said,

"You're ***not*** going to make any friends there."

<u>DeNegre's and T. Fabiani's Solicitation and Facilitation of Minors</u>

As set forth, in particular in paragraphs ___ above, T. Fabiani, M. DeNegre and R. DeNegre solicited and facilitated minors J..Fabiani, L. Fabiani, and S.Fabiani to instill, by their words and non verbal communications, in victim C. Mottola fear that if she did not refrain from the lawful conduct of enrolling in the Ursuline School she might experience isolation, bullying, humiliation and that they would 1)render Plaintiff's academic degrees useless 2) force her to falsely confess to motivations linked with them.  Further, as after the first attempt to lure at the dining room table when they victimized Plaintiff on the street when plaintiff was by herself, they, by the deceits and concealment set forth more fully above and below,  they deprived Plaintiff, less than sixteen years of age, of her mother's protection.

In violation of NY Penal Law § 135.60 Coercion in the third degree J.Fabiani, L. Fabiani, and S. Fabiani, less than sixteen years of age, facilitated by M. and R. DeNegre, T. Fabiani and others, compelled or induced C. Mottola, the Plaintiff herein,  by instilling in her a fear that if

she did not leave the Ursuline School and abandon anything that plaintiff's mother supported (indeed, give up her mother and be subjected to their group) they would ruin plaintiff's reputation, expose secrets and publicize asserted facts, true or false tending to subject plaintiff to hatred, contempt or ridicule, engage in other conduct constituting a crime, cause damage to (eviscerate) the market or earning value of plaintiff's degrees.

The reputation ruining secrets they threatened to expose and did expose facilitated by the DeNegres who threw parties for the purpose of ruining plaintiff's reputation, exposing secrets and asserting false facts are:

1) The asserted false fact was that plaintiff, used her admission to the Ursuline School to prove a point, exact revenge for prior abuses, or similar satisfaction or reason. (The assertion is similar to prior false allegations for moving, for holiday exuberance, attention seeking and deriving satisfaction from looks, attention,"clothes etc. ) (And as noted above, DeNegre, misusing his knowledge of the law of obtaining consent  threatened, imposing a dilemma: Plaintiff's denial that the abuse did not motivate constituted consenting to being a crime victim.)

2) M. DeNegre knew the abuse both took its toll on and embarrassed the plaintiff, as intended. He and they revived it realizing it could be used against Plaintiff compounding the harm. It was a little victory for them and they wanted more victories.

3) At reputation (and academic degree) destroying parties with the intent to destroy the future value of Plaintiff's academic degree, that the DeNegres hosted, (and Plaintiff did not attend) T. Fabiani J.Fabiani, and S. Fabiani ,asserted a false fact that tended to and did subject plaintiff to hatred, contempt and ridicule, i.e., that plaintiff "took something" from them and "acknowledged it." They further asserted a true fact: that plaintiff said she would leave if a

certain scenario unfolded. They neglected to state that the statement was extracted unlawfully coupled with the numerous prior frighteningly narcissistic and embarrassing mischaracterizations set forth above e.g. Plainitff's family flaunted moving, moved to torment T. Fabiani and her family.

    4) DeNegre, more of a mocking, sarcastic bully/organized crime leader than a medical doctor would, at just the right time, for maximum impact, in a low key manner, referring to Plaintiff remaining at the school say: "Oh it's her choice." He should have said nothing and limited his practice to his own children.

    M. DeNegre always aimed to take or prevent the life that plaintiff's mother wanted the plaintiff to have to force Plaintiff to give up her mother, home and school for T. Fabiani, who was artificially packaged and promoted at gatherings as a preferable mother, as people and relationship oriented.

    M. DeNegre and R. DeNegre told T. Fabiani, feud, and conspiracy serving untruths at gatherings held at enterprise headquarters (then located at 9 Carriage Drive in Woodbridge Ct.) namely that 1)Plaintiff intended to provoke ("start a fight") and 2) plaintiff did not have to answer the hypothetical question to ludicrously cast Plaintiff as a hateful shallow villain when in fact she was a victim of multiple crimes first and foremost an attempt to lure first at a dining room table and then more traumatically into an automobile.

Violation of 18 U.S.C. § 1201 Kidnapping :

(a)Whoever . . . inveigles . . . and holds for ransom or reward or otherwise any person, when—

(1) the person is willfully transported in interstate . . . commerce, . . . or the offender . . . uses the

mail or any means, facility, or instrumentality of interstate . . . commerce in committing or in furtherance of the commission of the offense;

With the knowledge and support of the Fazzones, the DeNegre's, inveigled, that is, they enticed, by deceitful means (offering "help.") Plaintiff's mother had not complained of being overwhelmed or otherwise indicated that she needed help.  Plaintiff's mother did not know of the DeNegres heinous plans.

 Plaintiff remembered the non-verbal, hostile (or nearly so) Ms. Fazzone and other relatives on the few occasion that plaintiff saw and briefly interacted with them at the DeNegre's home in Woodbridge Ct when Plaintiff's mother was not in the room. Plaintiff certainly had not thought of them when the letter of admittance arrived from the school but the possibility that the relatives might be less hostile while not sought was not unwelcome. Plaintiff did not deserve the hostility. (Incredibly, unbeknownst, not realized until 2023, the hostility was because of Plaintiff's fear and flight response to an attempt to lure.)

In short, Plaintiff and plaintiff's mother were inveigled on the telephone  though each by slightly different mental processes or reasoning, methods of deception and or flattery.) Plaintiff and her mother did not know that the ultimate aim of the enterprise was as always to lure plaintiff away from her mother and to Terry. And the additional, new criminal conspiracy:  to defraud, to extort.

As a direct result of that inveigling on the telephone, plaintiff was willfully transported in interstate commerce, on the Hutchinson River and Merrit Parkway and  I-95  to the DeNegre's residence (Enterprise Headquarters) in Woodbridge Connecticut.

KIDNAPPING FOR RANSOM

Kidnapping which ended only when the ransom was delivered namely that plaintiff herself aid the racketeering, the extortion, the scheme to defraud, by providing the names of or inviting other students from the school that plaintiff enrolled in, and their families to the DeNegre's.

The multiple objectives included

1)Extortion and Scheme to defraud:The expulsion of the plaintiff from The Ursuline School

2)Extortion and Scheme to defraud: Deprive Plaintiff of economic and social benefits of attending the school

2) Extortion and Scheme to defraud Letters of recommendation in support of college applications for defendants and

3) Extortion and Scheme to defraud: Connections, Employment for defendants

<u>Overt Act: Conn Gen Stat, §. 53a-96. Unlawful restraint in the second degree: Class A</u>
<u>misdemeanor.</u>

The facts set forth above in support of Kidnapping in violation of 18 U.S.C.A. § 1201

Kidnapping also constitute a violation of Conn Gen Stat, §. 53a-96. (Footnote: The multiple

charges are more than appropriate, if not lenient in this matter, for the following reasons: The

Cravath firm decided, in concert with -- or, under her advice, though she was not, at the time, an

attorney-- R. Fazzone and the DeNegres, that Plaintiff who was in fact the victim should suffer

multiple punishments for a reply to a strange question as if Plaintiff were the criminal.

Alternatively it seems they recast (mischaracterized) the reply as a blunder made during a

"bargaining session."—at age eleven. Plaintiff further refers the Cravath firm to several leading

Treatises on the Law of Contracts. Moreover and most important is the heinousness of the

conspiracy to  kidnap and the  Violation of 18 U.S.C. § 1201 Kidnapping)

Mark and Rita DeNegre, under Connecticut Law, on or about August of 1971, unlawfully

restrained plaintiff C. Mottola in their Woodbridge home having moved her without consent (that

is, by deception**)** from Plaintiff's home in Pelham Manor, New York to Woodbridge as to

1) their long running plan to separate the plaintiff from her mother (to, briefly stated, displace,

take the plaintiff's life) by compelling plaintiff's mother to refrain from raising the plaintiff,

providing shelter, clothing, schooling, camp etc.)

2) their concealed reason for inviting plaintiff: to have plaintiff bring students and others at her

new school to their home so that they could by lies and other methods subject plaintiff to

contempt and ridicule, to induce her to relinquish her school enrollment or deprive the plaintiff

of all benefits of attending the school and persuading people that they were warning and or

saving them from a mischaracterized villainous Plaintiff to acquire social and economic benefits

for themselves and favored relatives.

**The first element of kidnapping in the first degree, a class A felony under Conn. Gen. Stat. §53a-92, abduction, is present**. The DeNegres restrained plaintiff as defined under the statute by using deception to move the plaintiff to their home and keep her there for one week with intent to prevent plaintiff's liberation by using intimidation. The intimidation was by non-verbal (facial expressions) and verbal (uttering words intended to remind plaintiff of interactions, mostly hostile, with co-conspirators, T. Fabiani, J.Fabiani, L. Fabiani, S. Fabiani).

**A second element is also present** as they were restraining plaintiff with intent to advance the commission of a felony, the original or initial long running conspiracy to kidnap and the attempt in violation of NY Penal Law as set forth above.

During that one week, plaintiff was intimidated by the mercurial Rita DeNegre. R. DeNegre's baseless anger and punishments. Somewhat similarly, years later as a substitute teacher in the Woodbridge School System, she would "tap" a student on the head with a book as a disciplinary method. In all likelihood, the student had not engaged in any misconduct indeed, the student complained. R. DeNegre, however, "waived" her due process rights, and so retained the upper hand.  Though she could not return to the classroom and teach, she chose instead to retain her status by eliminating substantive issues of the student complaint winning by mockery, disarming, ceding the "who is in charge here" role to the student.

**Overt Act in Furtherance of Kidnapping, Defrauding and Extortion Conspiracies: Conn. Gen. Stat. 53a-192. Coercion: Class A misdemeanor or class D felony.**

While concealing their participation in a long running kidnapping and extortion conspiracy they compelled or induced the plaintiff to engage in conduct (*inviting people to their home) which plaintiff had a legal right to abstain from engaging in,* by means of instilling a fear that if the demand was not complied with, the DeNegres would

1) commit any criminal offense; (if threat is to commit a felony, coercion is a class D felony) or

2)accuse any person of a criminal offense; or

3)expose secrets tending to subject any person to hatred, contempt or ridicule.

The DeNegres were smart enough to avoid explicit threats; their intent  however was to conceal.   Given the fact of the long running plan plaintiff had to have perceived, experienced some degree of intimidation and threat. The DeNegres (and defendants R. Fazzone, J. Fabiani and S. Fabiani). could and would embarrass Plaintiff.

Element three (3) is satisfied: Ultimately The DeNegres not only exposed secrets, they made allegations that constituted and led to threats as set forth herein.The DeNegres knew of embarrassing incidents and were (unbeknownst)  behind many of them including the ambush that they were proud of, sought to put plaintiff in her place. The DeNegres made it their racketeering business to know all; everyone reported to them; there must have been an unspoken implied threat to expose secrets tending to subject plaintiff/any person to contempt or ridicule.

To summarize, the conspiracy to kidnap continued with overt acts that constituted other crimes. E.g., N.Y.  PEN §'s 135.65 and 135.60, Coercion in the first degree, a Class E felony and second degree coercion, as set forth above. Moreover, the foregoing overt acts that constituted other crimes were in furtherance of two additional related conspiracies namely 1) a scheme to defraud and 2) conspiracy to extort.

Predicate Act Under 18 USC § 1961 (1) (A)

## Conspiracy (to Extort) in the fourth degree NY Penal Law § 105.10

With intent to extort (Larceny by Extortion NY Penal Law § 155.05 (2)(e)) all value of Plaintiff's Lower School Ursuline Diploma earned and granted in 1973 (and to extort the value,

the benefits of a high school diploma to be awarded in the future), M. DeNegre agreed with one or more persons under sixteen years of age to engage in or cause conduct including:

(a) the making of a tape at a slumber party

(b) voting Plaintiff Girl with the Best Wardrobe (induced by T. Fabiani's mockery)

(c) publishing a graduation photograph without Plaintiff's consent.

and not publishing the photograph Plaintiff's chose and paid for.


T. Fabiani Solicits daughter J. Fabiani, under the age of sixteen to attempt to lure

Conspiracy in the First Degree (NY Penal Law § 105.17) : (In or about October 1973)

M. DeNegre T. Fabiani, N. Fabiani and others over the age of 18 including the Fazzones *agreed* with and encouraged one or more persons under sixteen years of age (J. Fabiani) to engage in or cause the performance of conduct constituting Kidnapping in the First Degree a class A-1 felony to wit attempting to abduct (lure without the acquiescence of parent A.F. Mottola) and with intent to compel Plaintiff's mother A.F. Mottola to send C. Mottola to the school (and pay the tuition) her daughters attended (St. Catherine's) or, to refrain from providing clothing, shelter, and refrain from sending C. Mottola to the Ursuline School.

Conspiracy to Extort under 18 U.S. Code § 1951, Hobbs Act  (In or About May, 1977)

M. DeNegre had his eye on the future as graduation neared.  With intent to extort and defraud, he initiated, induced students in the twelfth grade in 1977 at the Ursuline School to (secretly) vote Plaintiff Least Likely to Succeed. The conspiring, the solicitation, facilitation by M. DeNegre, to secretly vote Plaintiff Least Likely to Succeed constituted Conspiracy to Extort and under the Hobbs Act. (The DeNegre led secret voting also serves an overt act in furtherance of the original long running Conspiracy to Kidnap.)

Attempt to Kidnap or Overt Act in Furtherance (In or About 1975)

<u>Use of a Dog Bank "Gift" to Replace a Ceramic Piggy Bank</u>

Plaintiff's mother gave plaintiff when she was about seven years old, a pink piggy bank, which Plaintiff kept.  A number of years later, J.Fabiani and S.Fabiani "gave" plaintiff a white and black dog bank. An apparent gift was in fact intended to suggest the replacement of  plaintiff's mother.

Overt Act or Attempt: J. Fabiani in or about 1973 asked Plaintiff, "Why don't you go to St. Catherines?" the school she was attending.

Overt Acts in Furtherance of Conspiracies to Defraud, and Extort  (and indirectly continuing, supplementing Original Kidnapping Conspiracy)

<u>Criminal Impersonation</u>

At numerous gatherings in the 1970's (if not earlier) and 1980's (and occasionally/less often in the early 1990's, and in or about spring 2000, RICO defendants J. Fabiani and S. Fabiani committed the offense of Criminal impersonation, a Class A misdemeanor. Their conduct satisfies the elements as they impersonated the plaintiff and did an act in such assumed character with intent to injure plaintiff C. Mottola.

The criminal impersonation or attempted impersonation combined with allegations incites an angry mob eager to injure- and at least a few do by committing misdemeanors (e.g., harassment, trespass) against the Plaintiff all in furtherance of the intertwined conspiracies to kidnap and extort plaintiff's property (employment, diplomas.)

EXTORTION AND DEFRAUDING | MAIL FRAUD (18 U.S.C. § 1341) (WIRE FRAUD 18 U.S.C. § 1343)

During all relevant times, Defendants, together with the conspirators identified in this complaint, conspired with one another and others to convert the property of Plaintiff, in attempts to defraud and to engage in other illegal acts harming Plaintiff.

The fraudulent misrepresentations set forth above constituted a scheme to induce the school and its student body to allow defendants to influence, to have a presence at the school and derive benefits without paying tuition or completing the formal admissions process.

The fraudulent misrepresentations set forth above represented a scheme to defraud the plaintiff of the value of her earned degrees..

Defendants scheme was facilitated by their use of the telephone resulting in wire fraud within the meaning of 18 U.S.C. § 1343 False oral statements regarding Plaintiff (and her mother) were made by the DeNegres and R. Fazzone to essentially illegally divert tuition for their own benefit.

Wire fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(B)

Kidnapping Attempt and Conspiracy Continued

The conspiracy to kidnap was persisted in by importuning the plaintiff and other methods of psychological pressuring as set forth above and below. Importuning was indirect, as when R. Fazzone told the Paralegal Supervisor and many others, that "They're the same; she just wants to be a different type." C. Mottola just wanted to be left alone. Sometimes importuning was direct as in Rita's statement to the Plaintiff, "Your mother coddles you."

Repressed Memory of Attempted Kidnapping, Continuing Threat and Pressures

Plaintiff suppressed memories of the attempt to take her away from her mother and yet did feel the threat at times, the effort to create a gulf between Plaintiff and her mother, the efforts to point out differences between Plaintiff and her mother.

Outside Plaintiff's presence, plaintiff has deduced that the entire family with the gross insensitivity of criminals, unrepentant, exacerbated the crime persisting, assassinating plaintiff's character casting it as a sign of cowardice, ridiculing, punishing plaintiff for "running away."

Plaintiff's mother had not acquiesced. (See NY Penal Law § 135 Definitions of Restrain and Abduct ) In addition and independent of her mother not acquiescing, Plaintiff did not want to go, as was always clear as set forth in more specific detail in paragraph ## As previously said, failure and injury were certain as a result of the attempts.

Predicate Act: Tampering with a witness, victim, or an informant
18 U.S. Code § 1512

See CLAIM against Estate of Louis Mark DeNegre and James E. Tolan below.

Overt Act: Kidnapping Attempts Re-Cast as Invitation Plaintiff Rudely Rejected.

WIRE FRAUD

The RICO defendants and co-conspirators sought to and did persuade others and attempted to brainwash, pressure the plaintiff to consider attempted kidnapping a favor, an invitation.(Indeed, as plaintiff realized long after the fact, R. Fazzone's reason for contacting Plaintiff 1)out of the blue when R. Fazzone was 2) working in Cravath's office in the mid 1980's and 3) inviting Plaintiff to meet for a meal at Mezzaluna—an invitation she later cancelled withdrew in a strange, almost hostile manner, was linked with 1) the kidnapping conspiracy, attempt and 2) the unlawfully induced statement, "I'll leave" [ Ursuline.] Plaintiff did not detect it at the time, but it is clear now that R. Fazzone intended to recast, angrily express, and likely threaten plaintiff: "What happened at the dining room table and on the street wasn't a kidnaping attempt, it was an invitation that you rudely, childishly rejected for superficial reasons." And there were likely other threats compressed in her unsolicited telephone calls: "If you do not abandon your mother and choose T. Fabiani, everyone will (indeed does) hate you." "If you don't consider the attempt on the street an invitation, everyone will hate you." "You were supposed to leave the school, everyone hates you because you took something and acknowledged it." All the foregoing are threats based outrageously on re-casting crime as conferring benefit. (to boost T. Fabiani's ego and satisfy her urge to kidnap and compel Plaintiff's mother to refrain from parenting, compel her to do what T. Fabiani does and/ or terrorize.

Defendant Cravath extorted from the plaintiff a portion of the economic, the earning value of her academic degrees. Moreover, the extortion served a second criminal end as it was in furtherance of a conspiracy to kidnap (a crime of violence under 18 USCA § 1959) that began with an attempt to kidnap in the late 1960's as set forth above. The attempted kidnapping fact

pattern set forth above may not be a classic crime of violence fact pattern to which  USC § 1959 would generally apply however, Plaintiff alleges that 18 USC § 1959 has been violated as there was not only one attempt, but more than one attempt. Moreover, the RICO defendants and co-conspirators continued in the conspiracy by other overt acts to pressure Plaintiff to leave the school, leave a her mother and subsequently having not left the school, increasing the penalty to pressuring Plaintiff to relinquish her property.

<u>Predicate Act: Acts Indictable under 18 U.S. Code § 2315 - Sale or receipt of stolen goods
(Time Period: Ongoing, Currently in the Possession of the Estate of Louis DeNegre, Executrix
Diana DeNegre.)</u>

Whoever receives, possesses, conceals, stores, barters, sells, or disposes of any goods, wares, or merchandise, securities, or money of the value of $5,000 or more, . . . which have crossed a State or United States boundary after being stolen, unlawfully converted, or taken, knowing the same to have been stolen, unlawfully converted, or taken.

<u>Predicate Acts: Extortion Under:</u>

A. NY Penal L § 155.05

B. Under 18 U.S.C.S. § 1951 (Hobbs Act)

§ 155.05 Larceny; defined (in relevant part)

  1. " A  person steals property and commits larceny when, with intent to deprive another of property or to appropriate the same to himself or to a third person, he wrongfully takes, obtains or withholds such property from an owner thereof."
  2. Larceny includes a wrongful taking, obtaining or withholding of another's  property, with the intent prescribed in subdivision one of this section, committed in any of the following ways:
     . . .
   (e) **By extortion**. ( Class E felony, Punishable by one and one half to four years.)
   A person obtains property by extortion when he compels or induces another  person to deliver such property to himself or to a third person by means of instilling in him a fear that, if the  property is not
so delivered, the actor or another will:
        (ii) Cause damage to property; or
        (iii) Engage in other conduct constituting a crime; or
        (iv) Accuse some person of a crime . . . or
        (v) Expose a secret or publicize an asserted fact, whether true or false, tending to subject some person to hatred, contempt or ridicule; or

(ix) Perform any other act which would not in itself materially benefit the actor but which is calculated to harm another person materially with respect to his health, safety, business, calling, career, financial condition, reputation or personal relationships.

Predicate Act: Larceny by Extortion under NY Penal L § 155.05

Plaintiff alleges that as set forth above in the Facts section, in particular Paragraphs -------

Defendant Cravath conspired with the enterprise and by the conduct and words of then

Supervisor C.D. Luskind, violated NY Penal L § 155.05 as she with intent to deprive Plaintiff of

(1) employment, wages and benefits and (2) her diplomas and future use of them and to

appropriate same to a third person (J.Fabiani, L. Fabiani, and S. Fabiani or returning them to the

granting institutions as demanded by J.Fabiani, L. Fabiani, and S. Fabiani) by instilling in

Plaintiff fear that if the diplomas are not so delivered, she (and L. Mark DeNegre) would

damage (devalue) the property (diplomas), publicize asserted facts true or false tending to

subject Plaintiff to hatred, contempt, or ridicule (e.g., Plaintiff "took something" from J.Fabiani,

L. Fabiani, and S. Fabiani, was motivated by them and anger), perform other acts calculated to

harm Plaintiff materially with respect to her health and career.

Although Plaintiff did not know precisely what acts Supervisor Luskind would in the

future commit (and did, e.g., ridiculing, mischaracterizing Plaintiff's statements to adversely

influence future employments) the intimidation by verbal and particularly non-verbal

communication or attempted communication, prior to and during the exit interview, was

palpable and impacted present employment (wages and benefits), future employment and the

value, use of Plaintiff's degrees–precisely what the RICO defendants sought.

Concealed from the Plaintiff were the following facts Supervisor Luskind's hiring of, link

with, conspiracy with, R. Fazzone, M. DeNegre and others. Supervisor Luskind concealed her

future intent: that if Plaintiff did not relinquish not only the employment but her soon to be

awarded baccalaureate degree earned from New York University (and prior undergraduate work)

she would in the future commit additional torts and crimes (and did, e.g., ridiculing,

mischaracterizing Plaintiff's statements to adversely influence future employments. Luskind a

co-conspirator, was committed to the scheme to defraud and conspiracy to extort.

18 U.S.C.S. § 1951 - Interference with commerce (Hobbs Act)

In relevant part:

> (a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both.

> (b) As used in this section—
> (2) The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.
> (3) The term "commerce" means commerce within the District of Columbia, or any Territory or Possession of the United States; all commerce between any point in a State, Territory, Possession, or the District of Columbia and any point outside thereof; all commerce between points within the same State through any place outside such State; and all other commerce over which the United States has jurisdiction.

(a) Cravath by the words and conduct of its then Supervisor of Paralegals, Christine

DeFrancesca Luskind, (C.D. Luskind) in multiple ways and degrees obstructed or affected

commerce by extortion pursuant to a conspiracy with the enterprise.

Plaintiff C. Mottola was a victim of extortion within the meaning of 18 U.S.C.S. §

1951(b)(2) in that C.D. Luskind  induced C.Mottola to relinquish property (two years of salary

and benefits) with Plaintiff C. Mottola's consent by the wrongful use of threats of firing in the

absence of grounds for dismissal, and by the wrongful use of general unspecified fear, by

exceedingly rude conduct prior to and during an office interview, use of non-verbal

communication, her lack of interest in work, and an intimidating countenance prior to and

during the exit interview as set forth in more detail above, in particular paragraphs ___.

2405. Form Indictment -- Interference With Commerce By Extortion Consisting Of Threats, Violence Or Fear (18 U.S.C. 1951)

Based upon 2405, Form Indictment from the U.S. Department of Justice website,Plaintiff alleges

"That at all times material . . .  C. Mottola was engaged in Paralegal Activities, in the legal profession, an industry which affects interstate commerce."

That on various dates between approximately September 1,1983 and approximately October 15, 1983, in the Southern District of New York the defendant acting through its then Supervisor of Paralegals did unlawfully obstruct, delay and affect, and attempt to obstruct, delay and affect, commerce as that term is defined in Title 18, United States code, Section 1951, by extortion, as that term is defined in Title 18, United States Code, Section 1951, in that the defendant Cravath acting through C.D. Luskind, did obtain tangible property (wages and benefits),and further intentionally diminished the value of tangible property (Ursuline diploma) and attempt to transfer tangible property to third parties (C. Mottola's diploma from the Ursuline School and the diploma to be officially conferred in February of 1984 from New York University) or intangible property of C. Mottola with her consent having been induced by the wrongful use of actual and threatened (non-physical)force – maneuvering, pressuring, inducing Plaintiff to quit, physically leave the office). . . and fear, including fear of economic harm, in that Supervisor Luskind's deliberate intimidating non-verbal communications that in and of itself and coupled with all the conduct and words set forth above  such that Plaintiff had to conclude that remaining at the firm would be more harmful than leaving, that if Plaintiff did not quit she would be fired–a termination more damaging than quitting.  As an added threat, lacking grounds for dismissal but on the cusp of the constructive discharge that she had subtly intensely

sought with unlawful intent, she implied non verbally (depravedly) that Plaintiff had quit in anticipation of being fired though she knew there were no grounds.Luskind never did state or warn of any grounds for dismissal, but instilled fear.  In addition to fear of a wrongful firing, there was the factr that the Supervisor with hostility for the Plaintiff would continue to make work difficult if not impossible, continue to communicate her hostility and her desire to see Plaintiff leave the employment if Plaintiff remained at the firm. In short, to make conditions such that no reasonable person would remain in the employment. Plaintiff was wrongfully constructively discharged. Moreover, though Plaintiff did not know it at the time, the wrongful discharge was coupled with longer term, ultimate threats concerning Plaintiff's diplomas as stated above.

Racketeering (Predicate Act): Acts and threats involving Extortion under 18 U.S.C. 1951 (Hobbs Act)  and conspiracy to kidnap and conspiracy to extort, among other crimes within the required time period.

> "Obtaining" requirement of extortion under New York law entailed both a deprivation and acquisition of property. See United States v. Enmons, 410 U.S. 396, 406, n. 16, 93 S.Ct. 1007, 35 L.Ed.2d 379 (1973) Most importantly, we have construed the extortion provision of the Hobbs Act at issue in these cases to require not only the deprivation but also the acquisition of property. See, e.g., Enmons, supra, at 400, 93 S.Ct. 1007. *SCHEIDLER v. NATIONAL ORGANIZATION FOR WOMEN, INC.,* 123 S.Ct. 1057

Defendants sought to convert plaintiff's academic degrees into little more than what is handed out by diploma mills while transferring or siphoning the benefits of contacts to R. Fazzone, her father and Mr. Stanco and his daughter.  Moreover defendants adding injury to injury, wrong to wrong, as directed by DeNegre asserted that plaintiff agreed to be defrauded.. that plaintiff agreed to not use her degrees. (If Plaintiff did so agree, it would have void written

all over it.)  Defendants used trickery and pressure to extort a statement with the intent to use it against the plaintiff and for themselves and did so acquiring valuable letters of recommendation and employment.

During all relevant times, Defendants, together with the conspirators identified in this complaint, conspired with one another and others to convert the property of Plaintiff, to defraud, and to engage in other illegal acts to injure Plaintiff.


**Predicate Act| Racketeering Activity: Mail Fraud**


18 U.S.C. Section 1341—Elements of Mail Fraud

> "There are two elements in mail fraud: (1) having devised or intending to devise a scheme to defraud (or to perform specified fraudulent acts), and (2) use of the mail for the purpose of executing, or attempting to execute, the scheme (or specified fraudulent acts)." Schmuck v. United States, 489 U.S. 705, 721 n. 10 (1989);

From Justice.gov :

> "[T]he words 'to defraud' in the mail fraud statute have the 'common understanding' of '"wrongdoing one in his property rights by dishonest methods or schemes," and "usually signify the deprivation of something of value by trick, chicane, or overreaching." *Carpenter*, 484 U.S. at 27 (quoting *McNally v. United States*, 483 U.S. 350, 358 (1987) (quoting Hammerschmidt v. United States, 265 U.S. 182, 188 (1924)).

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, . . ., places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both.

Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(B).

The mail fraud satisfies the requirements for a RICO predicate act

Mail fraud impacts interstate commerce.

Defendants Estate of Louis DeNegre schemes to defraud, conspiracy to extort were facilitated by their use of the United States Mail, in the sending from the year 1970 through 2012 of cards, notes and invitations to plaintiff and her mother to deceive and most important, to further their schemes and retain all ill-gotten wages, benefits, letters of recommendation among others, resulting in mail fraud within the meaning of 18 U.S.C. § 1341.

Defendant Cravath's sending through the US postal system 1) a letter purporting to be an offer of employment constituted mail fraud and 2) a letter confirming the end of plaintiff's employment and the standard, we wish you well constituted mail fraud. Cravath did not wish the Plaintiff well. Cravath sought to and did injure the Plaintiff and intended to and did further injure the Plaintiff after the termination, constructive discharge.

The very purpose of the induced quitting and methods as set forth above was to inflict harm, to inflict a career setback from which she would never recover.

Defendant Cravath utilized the U.S. mail in hiring R. Fazzone, a key act in the scheme to damage the Plaintiff's property (diplomas) and person.

Defendant Cravath utilized the U.S. Mail sending in bad faith an offer of employment to the plaintiff. The offer was in bad faith as there was a plot to induce Plaintiff to leave the office, to unlawfully relinquish wages and benefits and to damage the Baccalaureate Degree to be

awarded in February 1984, the next Commencement at New York University, to Plaintiff having

completed the course of study. Thereafter wages and benefits were transferred to RICO

defendant R. Fazzone.


18 U.S.C.A. § 1343

§ 1343. Fraud by wire, radio, or television

1343—Elements of Wire Fraud.

> The elements of wire fraud under Section 1343 directly parallel those of the mail
> fraud statute, but require the use of an interstate telephone call or electronic
> communication made in furtherance of the scheme.

18 U.S. Code § 1343 - <u>Fraud by wire, radio, or television</u>

> Whoever, having devised or intending to devise any scheme or artifice to
> defraud, or for obtaining money or property by means of false or fraudulent
> pretenses, representations, or promises, transmits or causes to be transmitted by
> means of wire, radio, or television communication in interstate or foreign
> commerce, any writings, signs, signals, pictures, . . .


A DeNegre led enterprise having devised a scheme to defraud by 1) means of false

pretenses and representations to Plaintiff's mother and the Plaintiff and 2) misrepresentations

about the Plaintiff that tend to and did subject Plaintiff to contempt and ridicule and wrongfully

inspire trust and confidence in the defendants thereby leading to the obtaining of salaries and

bonuses for Mr. Stanco and Ms. Fazzone transmitted or caused to be transmitted by means of

wire communication in interstate commerce for the purpose of executing such scheme.


Defendants sought to convert plaintiff's academic degrees into little more than what is

handed out by diploma mills but not wanting to waste their criminal efforts, thought nothing of

extracting substantial benefits to R. Fazzone, her father and Mr. Stanco and his daughter P.

Stanco. Indeed, they had in mind extraction of benefits from at least 1971 when Plaintiff enrolled

at the Ursuline School. Moreover, as set forth fully above, Defendants used substantial pressure

to extort a statement. Further, RICO defendants, most harmfully Cravath used the extorted

statement against the plaintiff as if Plaintiff were a criminal defendant. Defendant Cravath knew

that C. Mottola had repeatedly been a crime and tort victim since at least the 1960's.

 fraudulent use of mails and wires in furtherance of scheme to obtain money and property in

 form of job promotions, benefits and other rewards. Yeadon v. New York City Transit Authority,

 719 F. Supp. 204, 1989 U.S. Dist. LEXIS 11114 (S.D.N.Y. 1989)

OVERT ACTS (Trespass) in furtherance of CONSPIRACY TO EXTORT, CONSPIRACY TO
KIDNAP
1986, 1989

Following gatherings at the DeNegres residence (Enterprise headquarters) one or more

paralegals from Cleary, Gottlieb, Steen & Hamilton and students at Fordham Law School

without Plaintiff's consent, entered plaintiff's apartment,  borrowed items of clothing and wore

them at work (eerily similar ear muffs) or school for a few hours.  Plaintiff would see the article

of clothing and it looked familiar. Plaintiff nonplussed wasn't sure it was her clothes she was

seeing much less why and how. Plaintiff still does not grasp what exactly the trespassers intended

to communicate or accomplish but once the link with the DeNegres and T. Fabiani is made there

could only be two ultimate and unlawful aims: the intertwined, conspiracies of kidnapping

followed by schemes to defraud and extort based on misrepresentations, logical fallacies, and

unlawfully induced statements.

Approximate Time Period: 1987-1992

Predicate Act: Violation of 18 U.S.C.A. § 1952 Interstate and foreign travel or transportation in aid of racketeering enterprises

On or about the Fall in the year of 1987 or 1988, Decedents M. DeNegre, R. DeNegre, Dolly traveled interstate (to Colonial Williamsburg, Virginia) with A.F. Mottola and J.R. Mottola.  and on or about the Summer of 1987, in foreign commerce (near Rome and other locations in Italy) with A.F. Mottola,

(2) as part of the ongoing conspiracy to kidnap, attempted kidnapping to wit, attempting to lure or pressure the Plaintiff .

The purpose of the travel was also to keep up a civil friendly façade to cover up the reasons for the employment fiasco in Cravath's office, that the constructive discharge (induced quitting) was a continuation of, in furtherance the initial kidnapping and subsequent scheme to defraud and extortion conspiracies.

Predicate Act: Violation of 18 U.S.C. § 1544, Misuse of passport

During the late 1980's, Decedents A. Cozzi (Dolly), M. DeNegre and R. DeNegre in violation of  U.S.C § 1544,  misused their passports to facilitate the ongoing compound, related predicate acts of  1) attempted kidnapping and 2)  extortion namely pressuring  plaintiff to falsely confess to the vague retaliatory allegations of "taking" "something" from J. Fabiani, L. Fabiani, and S. Fabiani, return her diplomas, and not use any experience, skills or knowledge developed through all endeavors.  Although they were traveling for leisure, touring, and visiting with relatives, it was also for the perpetual purpose of inducing Plaintiff to relinquish her property and luring her away from her mother to T...Fabiani, the mastermind of the kidnapping plot.

Predicate Act: Violation of 18 U.S.C.A. § 1952,  Interstate and foreign travel or transportation in aid of racketeering enterprises.

Plaintiff was in Rome for a week in the summer of 1987 with her mother and Dolly. An elderly relative said to the Plaintiff:

"Be brave, be brave"

Plaintiff was mystified. Plaintiff mentioned the mysterious repeat directive to her mother, A.F. Mottola. The elderly relative was astoundingly and not realized until the last year of so, attempting to, speaking in furtherance of the long-term impossible plan to entice Plaintiff to T. Fabiani.

1990's Overt Acts Pertaining to Obstructing the Due Administration of Justice, Property Rights in the State of New York

There is no  obstruction statute in the State of New York but to be complete in setting forth all relevant facts about the RICO defendants DeNegres and the Fazzones as they are relevant to their long term intent and conspiracies to harm particularly by taking property Plaintiff states the following: M. DeNegre, R. DeNegre and A. Fazzone during the 1992 to 1994 period corruptly by communication influenced, obstructed, impeded or endeavored to influence, obstruct, or impede, the due administration of justice during Plaintiff's parents divorce proceedings.

M. DeNegre and R. DeNegre during the 1997 to 1998 period corruptly by communication influenced, obstructed, impeded or endeavored to influence, obstruct, or impede, the due administration of justice during Plaintiff's father's estate proceedings. A. Fazzone mocked the notion that grounds existed for questioning the validity of the will. R. DeNegre sought to indirectly prevent Plaintiff and her brothers from challenging the will by making statements to Plaintiff's mother.  Plaintiff's father may not have followed medical

advice and likely was taken advantage of (undue influence). The mockery (subtle ) may have

been that will contests in their minds should be limited to multi million dollar estates.

2012

Predicate Act: 18 U.S.C.. § 1503

§ 1503. Influencing . . . an officer . . .  generally

> (a) Whoever …corruptly or by . . .  any threatening letter or communication, influences,
> obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due
> administration of justice, shall be punished as provided in subsection (b)


As said above, given their history it certainly is possible that in 2012, M. DeNegre and

R. DeNegre (Estate of M. DeNegre) and possibly others corruptly by communication

influenced, obstructed, impeded or endeavored to influence, obstruct, or impede, the due

administration of justice.

Moreover, as set forth in a letter to the Court of Appeals, on January 2, 2013, the

DeNegres sought to intimidate by a mysterious telephone call .

There is also the possibility that the Cravath firm contacted and improperly influenced

the court upon learning that Plaintiff had filed a complaint against the DeNegres. Plaintiff seeks

to be thorough in this complaint rather than withholding her suspicions or thoughts until she is

certain and then having to file an additional complaint in the future.

Racketeering (Predicate Act): Wire fraud in violation of 18 U.S.C. § 1343

April 2020

Wire fraud in violation of 18 U.S.C. § 1343. On or about April 10, 2020 Facebook

postings of  defendant R. Fazzone, Anthony Fazzone, and Carly Fazzone regarding Adelaide

Mottola's death on April 8, 2020. Among the unlawful objectives of the Postings are: deception

and intimidation in furtherance of a long term scheme to extort Plaintiff's diplomas.

Time Period: Pre-RICO enactment, 1968-1970

Conspiracy to Commit Felony Murder in the second degree. N.Y. Penal Law § 125.25

   Violation of N.Y. Penal Law §§§ 105.15, 110.00, 125.25,


NY Penal Law § 105.15. Conspiracy in the second degree

> A person is guilty of conspiracy in the second degree when, with intent that conduct constituting a class A felony be performed, he agrees with one or more persons to engage in or cause the performance of such conduct.

 Conspiracy in the second degree is a class B felony. (crime punishable for more than one year)

NY Penal Law § 110.00. Attempt to commit a crime.

> A person is guilty of an attempt to commit a crime when, with intent to commit a crime, he engages in conduct which tends to effect the commission of such crime.

Sometime between 1967 and 1968, Louis Mark DeNegre (defendant Estate of Louis Mark DeNegre), committed the crime of conspiracy in the second degree (N.Y. Penal Law § 105.15), a class B felony, punishable by a term up to twenty-five years, when he with intent that conduct constituting a class A felony (Murder in the Second Degree, N.Y. Penal Law § 125.25) be performed, agreed with one or more persons and caused the performance of such conduct. To wit, he agreed with, encouraged and caused an Uncle to drive, with several of his daughters in the car in an attempt to abduct (kidnap) when Plaintiff was 1) less than eleven years old, 2) walking alone on the sidewalk and 3)evincing a depraved indifference to plaintiff caused the plaintiff to be frightened, creating a grave risk that Plaintiff would in her panicked, frightened state run suddenly, without looking for or seeing moving vehicles, into the street and suffer serious physical injury or possibly die in violation of Penal Law § 110.00 and 125.25, Attempt to Commit Murder in the Second Degree.


Conspiracy to commit Murder in the Second Degree and Murder in the second degree. N.Y. Penal Law § 125.25(1)

A person is guilty of murder in the second degree when:

    **1.** With intent to cause the death of another person, he causes the death of such person.

  Decedent Louis DeNegre, and or those acting in concert with him with intent to cause the death of Adelaide Mottola, plaintiff's mother, did cause her death on April 8, 2020.

Predicate Act: Attempted Murder in the Second Degree, NY Penal Law § 125.25. Murder in the second degree. And Lesser included crime of violence, first-degree manslaughter N.Y. Penal Law § 125.20(1) ("[T]he knowing or intentional causation of bodily injury necessarily involves the use of physical force."); Scott, 990 F.3d at 98–99, 110 (holding that first-degree manslaughter under N.Y. Penal Law § 125.20(1), categorically a crime of violence because it requires intent to cause "serious physical injury" and results in the death of another

§ 110.00. Attempt to commit a crime.

      A person is guilty of an attempt to commit a crime when, with intent to commit a crime, he engages in conduct which tends to effect the commission of such crime.

      Under New York Penal Law § 125.25, the elements of  Murder in the second degree are: 1) intent to cause the death of another person, 2) causing  the death of such person or of a third person; First Degree Manslaughter elements are 1) intent to cause serious physical injury that 2) results in death

    Decedent Louis DeNegre, using his knowledge of psychiatry to harm and manipulate and with intent to cause the death of plaintiff Carol Mottola, using duress and deception, attempted to induce plaintiff to commit suicide in the spring of 1971(and many times thereafter). To that end he used, Linda, Susan, Jane and Jacky to question and pressure the plaintiff to state that she would leave the school if a certain scenario unfolded and with intimidating non-verbal communication, "warned" or threatened plaintiff  that if plaintiff did not leave the school, that she could not, should not "use" her degrees thus her life, any career would be impossible. (This is also the crime of extortion as set forth below.)  DeNegre's intent was to make plaintiff

hopeless, to use lies and pressure to force plaintiff to refrain from lawful conduct i.e school attendance. The most damaging lies were based on DeNegre's repeating the self serving reports of his favored cousins, Linda, Susan, Jane and Jacky shifting the focus, conflating an admission to a school with scenes where the cousins dominated plaintiff by ambushing her having been coached by their mother and the DeNegres.

Over the years, DeNegre's ever growing Enterprise of co conspirators persuaded with lies about the plaintiff and the mere fact that she was an unpopular target of the relatives, particularly the DeNegres as set forth in greater detail in this complaint, added to the pressure.

PREDICATE ACT OF RACKETEERING: PROMOTING A SUICIDE ATTEMPT
(E Felony)
PENAL LAW 120.30
(Committed on or after September 1, 1967)
DeNegre and defendants conscious objective or purpose was to cause the plaintiff to attempt suicide.
1. On or about (*date*), in the County of (*Putnam*), (*specify*) attempted suicide; and 2. That the defendant (*defendant's name*)
intentionally caused or aided him/her to do so.
1*See* Penal Law §15.05(1).

. The long term undermining of plaintiff's relationship with her mother, resulted in an induced suicide attempt in violation of N.Y. Penal Law § 105.15 (Conspiracy in the second degree, a class B felony), N.Y. Penal Law § 110.00, 125.25 N.Y. Penal Law §§ 20.00, 110.00, 125.25(1). attempted murder in the second degree.

As set forth above

"Induced Attempted Suicide

Prior to Plaintiff's attempted suicide in February of 2004, DeNegre and members of his Enterprise including long time tormentor R. Fazzone were pressuring Plaintiff to relinquish her diplomas for the ultimate humiliation. As part of the pressure campaign, DeNegre exploited the fact that Plaintiff knew more than her mother as set forth in the 2012 Complaint. Indeed, the frustration of the divide between Plaintiff and her mother that DeNegre and others had been pursuing since the 1960's was becoming psychologically impossible to cope with and was the primary reason if not only reason for Plaintiff's attempted suicide. "

Intimidation of Plaintiff Continues even after Plaintiff's M. DeNegre caused Hospitalization in February 2004

Upon Plaintiff's return home from the hospital, on the telephone another relative said, "Feel better." clearly intended as a taunt, and a repetition of their by now ancient but frighting false allegation set forth repeatedly herein namely that in 1971, when defendants J. Fabiani, L. Fabiani, and S. Fabiani and others were told of the forthcoming school change, Plaintiff slipped in a hint/wound the communication around to a reference, a hint to the ambush. The problem as stated repeatedly herein, was that Plaintiff dropped no such hints let alone a hint to taunt, irk, torment or whatever it is they claim.. Plaintiff experienced another horrible moment that she cannot forget though it is not regularly at the forefront of Plaintiff's mind.

If DeNegre had a motive, it may very well have been to punish plaintiff's mother for her statement that she was "supposed to go to Music & Art" and fraudulently promoting R. DeNegre, his spouse as someone authorized to monitor, judge and punish plaintiff's mother's statements. Belligerent, comfortable with deadly contests, M. DeNegre sought to prove spouse R. DeNegre's statement  that Plaintiff's mother's piano teacher "abandoned" Plaintiff's mother.

He sought to have Plaintiff "abandon" her mother via suicide if Plaintiff did not abandon her by preferring Terry.

And, when plaintiff returned home from the hospital, Gloria, a relative/ co-conspirator, on the telephone said "Feel better," in a tone that left no doubt that she was making an ominous reference to the allegation that Plaintiff slipped in – to provoke – a reference to the ambush as set forth above when Plaintiff's mother told them of her admission to the Ursuline School. The insincere "feel better" was a gross breach of etiquette, if not crime. Plaintiff could easily have made an additional attempt after the telephone call and comment by Gloria.


Long Term Victimization, Terrorizing Plaintiff's Mother; Overt Acts, Grounds for Alleging Causation of Mother's Death

The harm, including terrorizing Plaintiff's mother and forcing her to cope with the consequences of the RICO defendants is satisfying, funny to the defendants, just punishment in a perverse, aberrant "family" for Plaintiff's mother's not turning Plaintiff over to T. Fabiani.

Beginning with their intent coupled with conduct, the DeNegres, the Fazzones and the enterprise they formed, coordinate and lead, deprived A.F. Mottola and C. Mottola of the resources to pay for the needed level of care and protection and therefore, caused A.F. Mottola's death on April 8, 2020 as set forth more fully in the Predicate Acts (Murder) section of this complaint.

On April 7, 2020, as a person with a "relationship with a member of a protected category" ( mother, Adelaide Mottola), Plaintiff sent via email to the NYS Division of Human Rights, a notarized complaint alleging housing discrimination based on mobility disability.

The Division investigated, issued its Determination and Order, dated January 21, 2021, finding no probable cause to believe Respondents engaged in "the unlawful discriminatory practice complained of."

As plaintiff stated in a January 27, 2021 letter by email to John Herrion of New York State's Division of Human Rights

> "It is a most unfortunate. . . fact that Complainant's mother died from
> COVID-19, and she might not have had apt 3E been made available to us as soon
> as it became available which I believe was as early as February and no later than
> early March."

Notwithstanding the Divisions determination on the mobility discrimination question, Plaintiff was mistreated and Suter's *own words were a basis for Plaintiff's discrimination complaint.* As to the essential question of the availability of apartment 3E, The Determination and Order stated in most relevant part that the tenants in apartment 3E did not vacate the subject property until April of 2020 however, Plaintiff went to the apartment complex in early February of 2020 and could see that *the apartment clearly appeared vacant* and thus took pictures.

Plaintiff believes that La Sala-Suter did willfully refuse to rent to the plaintiff and her disabled mother and did make a statement that certainly could be interpreted as discriminatory.

Not long after the scheduled meeting and tour of an apartment with La Sala Suter, on Wynnwood Road where Plaintiff's mother was renting an apartment, Plaintiff quite unexpectedly saw the real estate agent (in her car) who handled the rental of the Wynnewood Road apartment. Plaintiff had the feeling that it was not a coincidence though she did not know

what was being communicated. There had been similar coincidences in the past as set forth above.

Circumstances, Incidents at Wynnewood Road

Louis Mark DeNegre and/or one or more of his children (Executor Diana DeNegre and/or Gerard DeNegre or other acting in concert with him with intent to harm, (intimidation and pressure) were in contact with residents of plaintiff mother's prior residence. There were a number of mysterious possibly intimidating incidents. For example:

a) Anonymously placed mail addressed to someone other than residents Plaintiff or her mother.

b) Anonymously, someone, hearing Plaintiff's mother's voice in the hallway (approximately one half hour after Plaintiff having given lunch to her mother, left the apartment for a few hours) called the Police resulting in an unnecessary call to 911 and transport by ambulance to the Emergency Room. Plaintiff, when informed was nearly traumatized and for no good reason; as a physician said, "it was a bit of a false alarm;"

The pressure to move that DeNegre and his many agents, members of his enterprise put on the plaintiff and the subsequent refusal by La Sala Suter to rent (the deliberate withholding of an available apartment) placed plaintiff's mother at a foreseeable risk of death.. DeNegre and others wanted Plaintiff's mother to die.

Moreover, the DeNegres, the Fazzones (and others they persuaded with outrageous allegations and stereotyping as entertainment and the lowest method of persuasion, conspired against the plaintiff and her mother for more than sixty years thereby causing plaintiff's housing predicament; Moreover in the months preceding A.F. Mottola's death, he and others conspired to and did in fact prevent the renting of an apartment in furtherance of the long term conspiracy

to a)separate plaintiff from her mother and b) cause the death of plaintiff's mother on April 8, 2020. Plaintiff's mother was more likely to be infected in a nursing facility. Plaintiff's mother was in a nursing facility because of the targeting first of Plaintiff's mother and then of the Plaintiff—targeting which escalated to a long-term pattern of racketeering.  See *People v Kibbe, 35 N.Y.2d 407, 362 N.Y.S.2d 848, 321 N.E.2d 773, 1974 N.Y. LEXIS 1158 (N.Y. 1974)*. To be a sufficiently direct cause of death so as to warrant a conviction of murder . . . it will suffice if it can be said beyond a reasonable doubt that ultimate harm was something which should have been foreseen as being reasonably related to acts of accused. *United States v. Chase, 18 F.3d 1166, 1170–73 (4th Cir. 1994)* (defendant could not be convicted of murder since victim did not die until 16 years after assault and noting *Ball v. United States, 140 U.S. 118, 133, 11 S. Ct. 761, 35 L. Ed. 377 (1891)* ( year-and-a-day rule) *18 F.3d at 1173*.


The intent of the DeNegres, the Fazzones, the Cozzis was, since at least the 1960's continuing to the day of her death, to harm, injure, deprive A.F. Mottola.  Having learned from M. DeNegre over the course of many years, D. DeNegre, G. DeNegre and others associated-in-fact  with intent to cause the ultimate harm and or with a depraved indifference coupled with conduct that   a) Continued to April 2020 including interference with the rental of an apartment, and therefore

b) has a causal link to A.F. Mottola's death.

SUMMARY OF § 1962 from the *RJR Nabisco* case:

> "RICO's § 1962 sets forth four specific prohibitions aimed at different ways in which a pattern of racketeering activity may be used to infiltrate, control, or operate "a[n] enterprise, which is engaged in, or the activities of which affect, interstate or foreign commerce." These prohibitions can be summarized as follows. Section 1962(a) makes it unlawful to invest income derived from a pattern of racketeering activity in an enterprise. Section 1962(b) makes it unlawful to acquire or maintain an interest in an enterprise through a pattern of racketeering activity. Section 1962(c) makes it unlawful for a person employed by or associated with an enterprise to conduct the enterprise's affairs through a pattern of racketeering activity. Finally, § 1962(d) makes it unlawful to conspire to violate any of the other three prohibitions.
>
> *331 Violations of § 1962 are subject to criminal penalties, § 1963(a), and civil proceedings to enforce those prohibitions may be brought by the Attorney General, §§ 1964(a)-(b). Separately, RICO creates a private civil cause of action that allows "[a]ny person injured in his business or property by reason of a violation of section 1962" to sue in federal district court and recover treble damages, costs, and attorney's fees. § 1964(c).2 *RJR Nabisco, Inc. v. Eur. Cmty.*, 579 U.S. 325, 330, 136 S. Ct. 2090, 2096–97(2016)"

CLAIMS FOR RELIEF

(Violations of RICO, 18 U.S.C. § 1962(c)

SUMMARY OF § 1962

*As the U.S. Supreme Court has summarized:*

"RICO's § 1962 sets forth four specific prohibitions aimed at different ways in which a pattern of racketeering activity may be used to infiltrate, control, or operate "a[n] enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce." These prohibitions can be summarized as follows. Section 1962(a) makes it unlawful to invest income derived from a pattern of racketeering activity in an enterprise. Section 1962(b) makes it unlawful to acquire or maintain an interest in an enterprise through a pattern of racketeering activity. Section 1962(c) makes it unlawful for a person employed by or associated with an enterprise to conduct the enterprise's affairs through a pattern of racketeering activity. Finally, § 1962(d) makes it unlawful to conspire to violate any of the other three prohibitions.1
*331 Violations of § 1962 are subject to criminal penalties, … Separately, RICO creates a private civil cause of action that allows "[a]ny person injured in his business or property by reason of a violation of section 1962" to sue in federal district court and recover treble damages, costs, and attorney's fees. § 1964(c)." *RJR Nabisco, Inc. v. Eur. Cmty.*, 579 U.S. 325, 330, 136 S. Ct. 2090, 2096–97 (2016)

<u>Enterprise</u>

18 USCS § 1962(c) demands creation of "enterprise"—a group with a common purpose and course of conduct—and actual commission of pattern of predicate offenses. The common purposes were kidnapping since the 1960's and beginning in 1971, defrauding and extorting.

The "enterprise" exists to lure, to extort, to perpetrate fraud indefinitely  (continuity requirement) that is, until Plaintiff relinquishes diplomas conferred  by the institutions set forth above namely The Ursuline School, New York University and Fordham Law School.

Defendants conducted their racketeering activities through a racketeering enterprise as defined in 18 USC § 1961(5),.  In this action, the Cozzi-DeNegree-Fazzone-Stanco Racketeering Enterprise, an association- in- fact with M. DeNegre (deceased) as the leader during the

commission of most of the criminal and tortious conduct set forth herein.  Nothing is however done without the approval of the Fazzones. Indeed much is done for the Fazzones e.g. recruiting a doctor to join his practice, letters of recommendation and employment for defendant R. Fazzone.  By conspiring to kidnap, extort, uttering misrepresentations about the Plaintiff, R. Fazzone and the Enterprise defrauded the Plaintiff; R. Fazzone by her wrongdoing, her misrepresentations, her conspiring to deprive Plaintiff of her mother unlawfully benefitted from the Plaintiff's schooling and tuition paid for that schooling, Plaintiff's initiative in going to NYU's employment office, applying, and working.


On or about September of 1971, an association-in-fact that meets the requirements for a RICO enterprise within the meaning of 18 U.S.C. § 1961(4), See *Boyle v. United States, 556 U.S. 938, 948-949, 129 S. Ct. 2237, 173 L. Ed. 2d1265 (2009* was formed directed by the late Louis Mark DeNegre. The Enterprise sought to circumvent  the formal admissions and expulsion procedures of the Ursuline School in New Rochelle, NY  and they acquired benefits from the school to which they were not entitled.  They sought to and did divert the benefits of being a student and ultimately a graduate of the school by depriving, defrauding extorting from the Plaintiff any and all benefits of the Ursuline School in New Rochelle, NYand, thereafter subsequent educational endeavors and diplomas earned and granted.

Among the unlawful methods:  Misrepresentations regarding the Plaintiff, and the use of an extorted statement. Misrepresentations were intended to and did defraud as they generated contempt for the Plaintiff and a social or popularity benefit to T. Fabiani, and defendants J. Fabiani, L. Fabiani, S. Fabiani.

They sought to and did utilize the school, to persist in a conspiracy to kidnap by additional attempts and overt acts to lure despite a failed attempt on or about 1968, committed with the requisite intent of Kidnapping in the First Degree under NY Penal Law.

They sought to and did deprive Plaintiff by misrepresentations and then wrongfully convert the school to a place to pursue a scheme to defraud –network without paying tuition, to wrongfully transfer the tuition paid on plaintiff's behalf, to wrongfully acquire social, academic and economic benefits.

The DeNegres and Fazzones by an Enterprise sought to nullify Plaintiff's admission to the school and then sought to expel the plaintiff and then sought to and did discharge plaintiff from employment defrauding plaintiff of the economic (earning)value of her diplomas. Defendants then transferred, converted, siphoned benefits to the Fazzones and Cozzi's.

The misrepresentations set forth above by the DeNegres to the Plaintiff and misrepresentations about the plaintiff comprise a scheme to influence the student body and others to: First: deprive Plaintiff of the full or any benefits of applying to the school, the initial grant of admission, the payment of six years of tuition, attending, completing the course of study, abiding by the school's code of conduct and graduating from the school and derive social benefits and Second, in the future, post graduation benefits for defendants R. Fazzone, G. Stanco and P. Stanco namely:

1) Letters of recommendation for college admission for R. Fazzone

2) Employment with defendant Cravath for R. Fazzone

3) Employment with Donaldson, Lufkin & Jenrette for Gary P. Stanco, husband of Paget Cozzi. Although Stanco was independently admitted to and the holder of a degree in Economics from Villanova University, it was as a result of Plaintiff's test taking and the tuition paid for the

Plaintiff to the Ursuline School that he was introduced to Thomas McErlean, brother of M.

McErlean, who then hired him into Donaldson, Lufkin & Jenrette. Thereafter, he was employed

with McErlean at UBS until approximately 2007.

    4) The physician (Ursuline alumnae's spouse) who joined Phillip Fazzone's medical

practice.

    Defendants racketeering activities thus continued after Plaintiff's graduation from The

Ursuline School, and were conducted through one or more racketeering enterprises as defined in

18 U.S.C. § 1961(5), which continues to the present and includes the Cravath firm, a

partnership, whose period of active, aggressive, participation is the period from 1983-1985

when plaintiff was employed and then 1985-1987 when RICO defendant R. Fazzone was

employed as a paralegal. Cravath continued to support the enterprise in its ultimate goal of

forcing plaintiff to surrender her diplomas– and falsely, by implication, confess to a range of

crimes including student loan fraud. Moreover, Cravath's culpability is confirmed if not

increased by what they did not do after Plaintiff quit.: They did not contact Plaintiff and offer

the Plaintiff a  Paralegal position without the "Floater" designation, label, limitation.  The

floater designation was the primary reason the employment was an abysmal failure, in a word, a

fiasco as intended, as planned. The reason Plaintiff was a "Floater" was to increase the

likelihood of if not guarantee failure. If Plaintiff had persevered (impossible) the employment

would be of little value for future endeavors as a Floater has less responsibility than a standard

Paralegal position with an assigned case load responsibility.

Activities that Affect Interstate Commerce

    The racketeering enterprise was engaged in activities that affected interstate commerce by

the following crimes and overt acts, among many others: 1) the kidnapping for ransom in 1971

2) travel on interstate highways between New York and Connecticut by potential and actual co-

conspirators 3)wire and mail communications in furtherance of all conspiracies: kidnapping, schemes to defraud, conspiracy to extort conspiracy and in particular, communications by wire and mail that led to R. Fazzone's employment with Cravath and the recruiting of a doctor from without the state of Connecticut to join Phil Fazzone's group medical practice.

Pattern of Racketeering Activity

Defendants engaged in a *pattern of racketeering activity,* as defined in 18 U.S.C. § 1961(5), by committing at least two racketeering acts w/in the required time period *one of which occurred after the effective date of this chapter October 15, 1970 the last of which occurred within ten years . . . after the commission of a prior act of racketeering activity:* Extortion, attempted extortion, on or about April of 1971, conspiracy to extort, attempted extortion and extortion; thereafter from September 1971 through 1977 threats, overt acts (misdemeanors (e.g., criminal impersonation and larceny) in furtherance of a conspiracy to kidnap begun in approximately 1967 and the additional conspiracy to extort begun in April 1971. Larceny on or about October of 1978, also in furtherance of the conspiracies to kidnap and extort. Extortion (wages and benefits) and attempted extortion during the 1983 to 1984 time period when plaintiff was a crime victim in the office of Cravath and thereafter by the Supervisor, former Cravath paralegals and the Cravath firm which continued to at least tacitly support the Enterprise and its conspiracies to extort and kidnap**;** (numerous acts and threats involving extortion under 18 U.S.C. 1951 the Hobbs Act and conspiracy to kidnap and conspiracy to extort, among other crimes within the required time period. The racketeering acts [ which serve as a predicate to a RICO violation listed in 18 U.S.C. § 1961(1)] committed by RICO defendants and RICO conspirators consisted of: attempted kidnapping under New York Penal Code § 135.25 as set

forth above; mail fraud within the meaning of 18 U.S.C. § 1341; wire fraud within the meaning of 18 U.S.C. § 1343 ; extortion within the meaning of New York Penal Code § 155.05 (2)(e)  and 18 U.S.C. § 1951 as set forth above )

Defendants engaged in a *pattern of racketeering activity,* as defined in 18 U.S.C. § 1961(5), by committing at least two racketeering acts and conspiring to conceal it from the plaintiff. 1) conspiracy to commit the crimes of attempted kidnap

ping and extortion. 1a) Further, defendants conspired to use the harm, the damage (the sense of feeling doomed from the outset)  2) conspiracy to void or cancel or induce plaintiff to quit employment as a paralegal in defendant Cravath's offices   RICO defendant R. Fazzone and her mother A. Fazzone, the DeNegres, and the Cozzis had supported the attempted kidnapping of the plaintiff, to move Plaintiff against her will and without the acquiescence of Plaintiff's mother. An additional significant fact (minimized by RICO defendants and conspirators, Enterprise members) is that there was a *heroin addict* in the household.

Defendant Cravath in particular deliberately damaged the plaintiff pursuant to a conspiracy, extorting from the plaintiff a portion of the economic, the earning value of her academic degrees. Moreover, the extortion served a second criminal end as it was in *furtherance of a conspiracy to kidnap* (a crime of violence under 18 USCA § 1959) that began with an attempt to kidnap in the 1960's as set forth above.

Defendants long term conspiracy to kidnap constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

Defendants' attempts to kidnap constitute a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

Defendants' overt acts in furtherance of a long-term conspiracy to kidnap constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

Defendants' attempts to extort constitute a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

Defendants' taking of (extorting of) use of Plaintiff's property (extorting) obtaining plaintiff's property (extorting), depriving plaintiff of her property (extorting), use of plaintiff's property constitute a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

Defendants' fraudulent misrepresentations constitute a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

Defendants scheme to defraud and divert economic benefits and other rewards constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

Defendants have conducted and have conspired to conduct the affairs of the RICO enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c), (d).


CLAIM FOR RELIEF
(Violations of RICO, 18 U.S.C. § 1962(a) (c) and (d)
(Against RICO Defendant Cravath)

18 U.S.C. §1962(a) Claims Against defendant Cravath

Plaintiff realleges and incorporates herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

At all relevant times, Plaintiff is a person within the meaning of 18 U.S.C §§ 1961(3) and 1962(c).

At all relevant times, each RICO Defendant is a person within the meaning of 18 U.S.C §§ 1961(3) and 1962(c).

R. Fazzone's employment at Cravath constitutes receiving income derived from a pattern of racketeering acts .She was hired in the course of a pattern of racketeering. Cravath conspired as set forth herein with a RICO Association-in-Fact Enterprise whose aim was to injure Plaintiff and benefit others including R. Fazzone and G. Stanco. Co-defendants J. Fabiani, L. Fabiani, and S. Fabiani supplied raw material: many of the misrepresentations, the lies, the ill intent that fueled the conspiracies.

**1**8 U.S.C. §1962(c )and (d) Claims Against defendant Cravath and RICO Defendant Estate of L. Mark DeNegre

Plaintiff realleges and incorporates herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

At all relevant times, Plaintiff is a person within the meaning of 18 U.S.C §§ 1961(3) and 1962(c).

At all relevant times, each RICO Defendant is a person within the meaning of 18 U.S.C §§ 1961(3) and 1962(c).

Under 18 USCS § 1962(c) it is "unlawful for any person  . . . . *associated* with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce to conduct or *participate,* directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

The Cravath firm, its partners, associates and employees, and in particular the Paralegal Supervisor at the time, Christine Luskind, became **associated** with the Enterprise by, among other things, traveling from New York City to Woodbridge, CT (the DeNegre's home which served as the enterprises headquarters), to be influenced by and then carry out through words and conduct the initial purposes of the Enterprise: to deprive plaintiff of her birth mother, unlawfully move plaintiff pursuant to a conspiracy to kidnap, and the interconnected ultimate aim of depriving plaintiff of the use of her education by causing plaintiff to suffer a career setback, (the induced quitting without an alternative employment), depletion of the earning value of Plaintiff's undergraduate studies.

Cravath employees, including the Paralegal Supervisor, traveled to Roxbury, Ct. (the Fazzone's home (which also served as a farm until the IRS disallowed deductions) during the time defendant Rosalia Fazzone was employed at Cravath). Rosalia Fazzone invited Cravath employees (but not the Plaintiff) to the Roxbury residence.

Subtle, devious, and unlawfully, intentionally intimidating, defendant Cravath, Swaine & Moore ("Cravath") sought to inflict maximum short- and long-term damage to plaintiff's career.

Cravath conspired with the M. DeNegre led Enterprise, whose original aim was as stated, in short to make life impossible for the plaintiff by defrauding, extorting after kidnapping failures. Employment was impossible; defendant, co-conspirator Cravath induced the plaintiff to leave, quit pursuant to an unlawful, concealed from the Plaintiff agreement i.e., conspiracy.

By their solicitous treatment of out of court allegations, support of extortionate demands that Plaintiff surrender her degrees, Cravath supported T. Fabiani's original intent that is, the requisite intent for Kidnapping in the first degree under New York Penal Law, namely to compel Plaintiff's mother to refrain from engaging in parenting the Plaintiff, refrain from moving Plaintiff to Pelham, providing clothing, shelter, camp, athletic instruction, school(OLPH and the Ursuline.) Having attempted but unable to kidnap, the co-conspirators, the RICO defendants then sought to take the earning value of her degrees and even pressure Plaintiff to return her diplomas.

Having, for unlawful purposes, and unbeknownst to Plaintiff at the time, categorized the employment as a family feud matter, Cravath, step by step pushed Plaintiff out on to the street without a job or anything to show or use after more than a year at the firm – precisely what unbeknownst to Plaintiff, M. DeNegre and co-RICO defendants sought..

DeNegre unlawfully sought and Cravath delivered. Moreover, the Cravath Supervisor partook in the maligning and ridiculing of the Plaintiff. And further the Cravath Supervisor provided without Plaintiff's request or consent (similar to the DeNegre's) a negative reference/evaluation by distorting a statement Plaintiff made during the exit interview and using it against her--a familiar Enterprise/DeNegre unlawful tactic: using the harm, the crimes and tortious conduct against the Plaintiff.

<u>Fruits of an Enterprise to R.Fazzone</u>

As said, although it has never been stated orally or in writing to the plaintiff, she is certain that M. Tolan wrote a letter in support of  R. Fazzone's application to Mount Holyoke College. This constitutes some misappropriation of Plaintiff's property to R. Fazzone.

R. Fazzone's hiring as a Paralegal was a fruit of the enterprise and an overt act in furtherance of

1) an ongoing conspiracy to kidnap the plaintiff, force her to reject her mother for T. Fabiani and

2)the scheme to extort and to defraud the plaintiff of the market or earning value of her academic degrees.

<u>Maligning Plaintiff to Appease an Angry Kidnapper, Defraud, Extort</u>

R. Fazzone and her mother need an object of pity (T. Fabiani) and an object of contempt.(Plaintiff) but convince others that they are compassionate and honest to derive benefits they were not entitled to and injure Plaintiff and her mother.

Contrary to the deceptive words of the Fazzones (e.g., "she did the same thing to me") and the DeNegres, C. Luskind and the Cravath firm in a conspiracy with DeNegre and Fazzone, deliberately (RICO's Causation requirement) created an unstable, no visibility environment with

a counter productive condescension, stereotyping/obliteration and unproductive intimidating communications. An intimidating exit interview to ensure plaintiff did not reverse and return/resume work satisfied M. DeNegre and the enterprise's extortionate demands as to Plaintiff education and use of it in a career.

Defendant Cravath at the Enterprises' behest created an intolerable environment in which quitting and trying to contain the damage was, for the Plaintiff, the only option.


Conducted or Participated in the Enterprise as is required for a RICO conviction.

> "A RICO conviction requires the government to prove that the defendant participated or conspired to participate, directly or indirectly, in the conduct of an enterprise through a pattern of racketeering activity. *United States v. Burden* 600 F.3d 204,214 (2d Cir. 2010) citing *United States v. Allen,* 155 F.3d 35, 40 (2d Cir.1998). [T]o be liable for directing the enterprise's affairs [it is sufficient]if one "exercise[s] broad discretion" in carrying out the principal's instructions. *Burden, 600 F.3d at 219* quoting *United States v. Diaz*, 176 F.3d 52, 92 (2d Cir.1999). "

The Cravath firm participated and played a significant part in carrying out M. DeNegre's instructions to disrupt Plaintiff's career progress and Plaintiff's relationship with her mother, in furtherance of long-term conspiracies to defraud and extort, which began with a conspiracy to kidnap. And they exercised broad discretion by committing separate predicate acts of extortion and attempted extortion.

Cravath's participation continued after Plaintiff's induced quitting. Paralegals and Supervisor Luskind attended at least one additional/post constructive discharge gathering at 9 Carriage Drive in Woodbridge CT, ( which like the Fazzones dual farm/residence, was the DeNegres' enterprise headquarters residence). Supervisor Luskind and defendant R. Fazzone, maligned and ridiculed in the pattern of T. Fabiani and attempted to induce another quitting at another firm.

A jury could reasonably infer that both R. Fazzone and Cravath conducted or participated in the affairs of the enterprise. *Burden,* 600 F.3d at 220.

<u>Violation of USC § 1962(c)</u>

Under 18 U.S.C. § 1962(c) it is unlawful for any individual associated with an enterprise to participate in the affairs of the enterprise through the commission of a "pattern of racketeering activity." The Cravath firm through Supervisor Luskind placed plaintiff in a Floater position and used unlawful intimidation to induce Plaintiff to give up employment (wages and benefits). Moreover, though Plaintiff did not quite perceive or decode it then, Supervisor Luskind did intend to imply or hint at an extortionate demand that Plaintiff 1) falsely confess to vague allegations and 2) relinquish her diploma or be subjected to threats and punishment if Plaintiff does use her diplomas, knowledge, acquired, developed skills. .

The Cravath firm, its partners, associates and employees including Christine Luskind, became associated with the Enterprise by, among other activities and conduct, traveling from New York City to Woodbridge, CT (the DeNegre's residence/enterprises headquarters), to be influenced by and then carry out through tortious and criminal conduct the ultimate purposes of the Enterprise: to deprive plaintiff of her birth mother and the interconnected criminal goal of depriving, defrauding plaintiff of the use of her education by causing plaintiff to suffer a career setback (the induced quitting without an alternative employment). The Cravath firm, through its Paralegal Supervisor and Human Resources staff deprived Plaintiff of two years of wages, benefits, training, and other rewards of employment e.g., firm activities such as participation in athletics, and Holiday Party. The abrupt cessation of employment was damaging, diminished the value of Plaintiff's diplomas, as intended. Plaintiff was treated in an apparently thoughtless,

haphazard manner. Plaintiff was treated in actuality in a concealed devious pre-planned manner pursuant to a long-term conspiracy to defraud, to extort.

Cravath, an Enterprise as defined in 18 U.S.C.S. § 1961(4), unlawfully associated with an association-in-fact RICO Enterprise whose activities affected interstate commerce. Cravath participated in the conduct of such enterprise's affairs through a pattern of racketeering activity by predicate acts of conspiracy to extort, extortion (induced termination of employment and unlawful intimidation by Supervisor Luskind as set forth above fully above), and a related prior continuing conspiracy to kidnap.

Violation of USCS § 1962(d)

Cravath conspired to violate provisions of subsections (a), (b), and (c) of 18 U.S.C. Cravath conspired and actively concealed a plan to place Plaintiff in a "Floater"Paralegal position with the aim of inducing Plaintiff to terminate the employment and displace the Plaintiff. After their period of active participation ended in 1987, Cravath continued to provide support to the enterprises' efforts as directed by M. DeNegre that targeted Plaintiff to take, pursuant to the scheme to defraud and conspiracy to extort, Plaintiff's wages, and benefits of subsequent employment, to further reduce and ultimately eliminate the earning value of her property (academic degrees including her Bachelor of Arts and eventual Juris Doctor). Cravath conspired to injure plaintiff's mental health. Enterprise membership grew. People (staff at subsequent employers and students and staff at Fordham Law School) knew about the Cravath floating fiasco, R. Fazzone's involvement and Plaintiff was further stigmatized among other harms as a direct, intended result.

CLAIMS AGAINST RICO DEFENDANT ESTATE OF M. DENEGRE
and RICO DEFENDANT JAMES E. TOLAN
Violations of 18 USC §1962(b) (c) and(d)

Plaintiff realleges and incorporates herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

At all relevant times, C Mottola is a person within the meaning of 18 U.S.C. § 1961(3).

At all relevant times, each RICO Defendant is a person within the meaning of 18 U.S.C §§ 1961(3) and 1962(c).

Under USC §1962(b), Prohibited Activities, it is unlawful for any person through a pattern of racketeering activity . . . to acquire or maintain directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect interstate . . . commerce.

M. DeNegre and R. DeNegre, were persons as the term is defined in 18 USC § 1961(3) as are defendants R. Fazzone, co-conspirators J. Fabiani, L. Fabiani, and S. Fabiani. All of these persons, individually and as represented and led by Louis Mark DeNegre, formed an Association in Fact Enterprise and through a pattern of Racketeering activity (set forth with specificity above) including a Scheme to Defraud Plaintiff, Conspiracy to Kidnap, Attempted Kidnapping, Extortion, Attempted Extortion, acquired or maintained as to the Plaintiff some interest in or control of the Ursuline School, (a *legal entity* therefore an Enterprise within the meaning of 18 U.S.C 1961(4)) located in New Rochelle, New York, particularly the student body.

M. DeNegre, a radiologist, as sociopathic, brutal as any organized crime figure but using indirect methods of manipulation, as said above sought to overturn the formal admissions process with a substitute admissions test in his living room: a visual comparative test. That is, he asked invitees to compare Plaintiff to her would be abductors. This is a test that is not officially

approved of by the school nor did Plaintiff consent to it.  The visual test is an affirmative step in

a  kidnapping attempt (even though plaintiff is not present during the comparison.) He seeks to

affirm T. Fabiani's possessive, presumptuous, statement of abduction

"She's the same."

Plus, the mockery: She thinks she's better.

He further sought, if Plaintiff did not leave the school and attend the school that RICO

defendants attended, Plaintiff would be defrauded.

An M. DeNegre led association-in-fact RICO Enterprise, in violation of 18 U.S. C

1962(b) indirectly maintained control of employment as to Plaintiff in Cravath's New York

office, a partnership, an Enterprise as defined under 18 USCS 1961(4).

All of the foregoing also constitutes a violation of 18 U.S.C. § 1962 (c) and (d). And

Plaintiff incorporates by reference the Claims against R. Fazzone and Cravath that are based on

18 U.S.C. § 1962 (c ) and (d) set forth below.

## CLAIM AGAINST RICO DEFENDANT R. FAZZONE AND ESTATE OF L. MARK DENEGRE

### Violation of 18 U.S.C § 1962(a) and (c) and (d)

C. Mottola realleges and incorporates herein by reference each and every foregoing

paragraph of this Complaint as if set forth in full.

At all relevant times, C Mottola is a person within the meaning of 18 U.S.C. § 1961(3).

At all relevant times, each RICO Defendant is a person within the meaning of 18 U.S.C

§§ 1961(3) and 1962(c).

<u>Violation of 18 U.S.C. §1962(a)</u>

R. Fazzone's employment at Cravath constitutes receiving income derived from a pattern of racketeering acts and a part of such income, benefits, training, and experience was used to gain admission to law school, obtain a license, and the eventual establishment of her Colorado law office.

R. Fazzone conspired to and did violate 18 U.S.C § 1962(a)    Fazzone participated in a pattern of racketeering activity in which she participated as a principal within the meaning of both 18 U.S.C. § 2(a) and 18 U.S.C. § 2(b).    The letter of recommendation that supported her college admission, the wages, benefits, training and experience gained at the Cravath firm were ill gotten, derived from a pattern of racketeering activity and thereafter used to gain admission to law school, obtain a law license, and establish a practice, an enterprise (Fazzone Law) which is engaged in activities which affect interstate commerce.

R. Fazzone aided, abetted, counseled, induced the commission of crimes against plaintiff and thus is a principal, punishable as a principal within the meaning of 18 U.S.C. § 2(a). and,

R. Fazzone willfully caused acts to be done by the paralegal supervisor and paralegals which, if directly performed by her or another would be extortion under the Hobbs Act and thus is a principal/punishable within the meaning of 18 U.S.C. § 2(b).

<u>Violation of 18 U.S.C § 1962(c) and (d)</u>

Plaintiff realleges and incorporates herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

At all relevant times, Plaintiff is a person within the meaning of 18 U.S.C. § 1961(3).

Although prohibited by 18 U.S.C § 1962(c),  R. Fazzone was a supporter of, a co-conspirator in a kidnapping plot, member of an Enterprise whose activities affect interstate commerce. She actively participated in a scheme to defraud Plaintiff of the value of six years of study at and diploma from Ursuline by retelling lies about the plaintiff originating with RICO defendants J. L. and S. Fabiani. and enforcement of an extorted statement, "I'll leave" if certain incidents occurred.

Beginning in the late 1970's having conspired to deprive the Plaintiff she wrongfully extracted benefits: a letter of recommendation from RICO conspirator M. Tolan as a result of her participation in the conduct of such enterprise's affairs through a pattern of racketeering activity.

With intent to defraud, deprive, obtain (coupled with the original kidnapping aim) she maligned Plaintiff and her mother, A.F. Mottola repeating whatever T. Fabiani said as if there were no reason to doubt it, knowing it exacted a high tangible and intangible cost on the Plaintiff and her mother, A.F. Mottola. T. Fabiani never realized or minded that to the Fazzones she is an object of pity that R. Fazzone uses in an artificial show of heart. R. Fazzone knows that taking from and humiliating the plaintiff has been satisfaction for T. Fabiani and J. L and S. Fabiani.  a less than zero payment for the many benefits she extracted from Plaintiff's schooling, initiative, and employment. And she supports more humiliating satisfaction: She wants what co-RICO defendants unlawfully want: For Plaintiff to return her diplomas.

R. Fazzones April 2020 Facebook posting upon the passing of A.F. Mottola, Plaintiff's mother, is convoluted but must be intended to deceive Plaintiff's brother, possibly deceive Plaintiff and by implication conceals her prior conduct as to Plaintiff and her mother.  R. Fazzone

was attempting to be clever. But whether clear or ambiguous, clever or not, any posting at all is in furtherance of long-term objectives to retain what was at least in part obtained as a result of defrauding, extorting and concealing as set forth above. And the deceptiveness is in furtherance of the still unaccomplished objective of the enterprise namely to pressure, induce Plaintiff to relinquish, return her diplomas.

CLAIM FOR RELIEF

Conspiracy to Violate 18 U.S.C. § 1962 (c ) and (d)
(Against RICO Defendants J. Fabiani, L. Fabiani, S.Fabiani)

Plaintiff realleges and incorporates herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

At all relevant times Plaintiff is a person within the meaning of 18 U.S.C. §§ 16

At all relevant times, each RICO Defendant is a person within the meaning of 18 U.S.C §§ 1961(3) and 1962(c).

1962 ( c ) and (d) Claims Against defendants J. Fabiani, L. Fabiani, S.Fabiani

All three, in violation of 1962(d) conspired to violate § 1962and (c). They by acts of racketeering derived some of the social benefit of Plaintiff's schooling, primarily by misrepresentations about  the Plaintiff as set forth above herein. Since the inception and prior to the enactment of the RICO statute misguided they had abused, tricked, ambushed, distressed, and deceived Plaintiff. They provided the out of court accusations and mischaracterizations of the Plaintiff that fueled the racketeering activity. (R. Fazzone repeated the accusations and mischaracterizations to generate contempt and deprive.)  All three concealed, among other matters, that they conspired with M. DeNegre, the Fazzones and other relatives to, briefly stated,

undermine and compel Plaintiff's mother to refrain from parental activities. J Fabiani and S.Fabiani pursued for their mother a kidnapping aim; all three were relentless in pursuing the extortion and the defrauding of the Plaintiff . All three were associated with the association-in-fact enterprise(s) since the inception. With M. DeNegre hiding behind them, they asked questions, elicited the involuntary replies that  were used against the Plaintiff (whom they long victimized as said) as if Plaintiff were the criminal. They conspired with co-defendants and co-conspirators so that having deprived the Plaintiff, benefits could be diverted to defendants R. Fazzone, G. Stanco and P. Stanco who unlawfully derived, benefits of Plaintiff's schooling and employment (letters of recommendation, wages and benefits). The unlawful conduct by which benefits were obtained constituted a pattern of racketeering in violation of 1962(a).

RICO defendants J. Fabiani, L. Fabiani, S.Fabiani (and their co-defendants and co-conspirators) outrageously expect and have used others to pressure Plaintiff to return her diplomas.

CLAIM FOR RELIEF

RICO DEFENDANTS ESTATE OF LOUIS MARK DENEGRE AND JAMES E. TOLAN

RICO 1962 (C) AND (D) Tampering with a witness, victim, or an informant

18 U.S. Code § 1512

Plaintiff realleges and incorporates herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

At all relevant times Plaintiff is a person within the meaning of 18 U.S.C. §§ 16

At all relevant times, each RICO Defendant is a person within the meaning of 18 U.S.C §§ 1961(3) and 1962(c).

RICO defendant James E. Tolan conspired with M. DeNegre knowingly using intimidation, and engaging in misleading conduct toward Plaintiff with intent to— hinder, delay,

or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense (i.e., wire fraud in furtherance of scheme to defraud and wire fraud in furtherance of the cover up, concealing from Plaintiff's mother a kidnapping conspiracy. Tolan and DeNegre conspired, and solicited minor daughter Meg and M. McErlean to harass the Plaintiff pursuant to the aforementioned schemes to defraud, extort, and kidnapping conspiracies and concealing it from Plaintiff's mother to hinder, delay, prevent, Plaintiff's mother from reporting to a law enforcement officer or judge of the United States the commission or possible commission of the above noted Federal offenses of wire and other fraud linked with the cover up of a kidnapping conspiracy and conspiracies to take the property of Plaintiff's mother and father.


## CLAIM FOR RELIEF

(Violation of Wisconsin Penal Code Larceny; 18 U.S.C. § 2314 Transportation of Stolen Goods; 18 U.S.C. § 2315- . . . Receipt of Stolen Goods )

Plaintiff believes that The Estate of Louis DeNegre has in its possession Plaintiff's onyx and gold Ursuline School ring.


## CLAIM UNJUST ENRICHMENT
### New York Law

In New York, the elements of an unjust enrichment claim are that:
(1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered." Mandarin Trading Ltd. v. Wildenstein, 16 N.Y.

G. Stanco was enriched indirectly as a result of a misrepresentations about the Plaintiff that defrauded the Plaintiff. G. Stanco was enriched as a result of the use against the Plaintiff of an utterance that was unlawfully induced(extorted) when Plaintiff was eleven years old. G. Stanco was enriched as a result also of a long-term kidnapping conspiracy that was certain to

and did harm the Plaintiff (and her mother A.F. Mottola). It is against equity and good conscience to permit G. Stanco to retain benefits obtained indirectly from the kidnapping and subsequent conspiracy to defraud and extort.

Tuition paid for Plaintiff, misrepresentations about the Plaintiff, misrepresentations to the Plaintiff led to G. Stanco's introduction to those who provided entrance to the securities industry.

DAMAGES

.    Plaintiff has suffered actual damages in an amount TBD.

The damages suffered by the plaintiff consisted of deliberately depriving Plaintiff of the benefits of her education, the fruits of her efforts, initiative in seeking employment,  her property interest in her earned diplomas, wages and benefits all taken by methods set forth above. The primary method was the misrepresentations and use of a wrongfully induced reply to a query asked with criminal and tortious intent as set forth in detail herein above.

Defendants are liable to plaintiff for treble damages, together with all costs of this action.

Plaintiff was injured in her business and property by reason of defendants' violation of 18 U.S.C. § 1962  (c)and (d). Defendants deliberately caused disruptions in Plaintiff's legal career endeavors, to de-value her education by violating  18 U.S.C 1962. Defendants sought to convert plaintiff's academic degrees into little more than what is handed out by diploma mills while transferring or siphoning the benefits of contacts/connections  institutions to Ms. Fazzone, her father and Mr. Stanco. Defendant Cravath conspired with the Enterprise to cause a career setback from which the plaintiff would never recover. That was the intention, a disruption , a

setback, a termination was what the Enterprise headed by Mr. DeNegre sought and that was what Cravath delivered.

Plaintiff was injured in her business and property (her employment and her diplomas) by reason of defendants' violation of 18 USC § 1962(b)(c)and(d)   Here, as a direct and proximate result of defendants' actions, and based on R. Fazzone's employment in Cravath's New York office, plaintiff was not hired into a suitable, stable paralegal position and title that she would have otherwise been offered and accepted.  Thus, as a direct and proximate result of defendants' RICO violations, plaintiff was injured in her "business" profession and property as a direct, intended result of predicate acts involving kidnapping, scheme to defraud, extortion in violation of 18 U.S.C. § 1962(c) (d)

Defendant Cravath conspired with the enterprise identified herein whose aim was to defraud, extort, and kidnap, to cause plaintiff to suffer a career setback. Deprivation of and damage to Plaintiff and her property was the intention–what the enterprise headed by  M. DeNegre sought and Cravath delivered. Cravath ostracized the Plaintiff as the only "Floater" in the Paralegal department. The unlawful conduct before and during the exit interview was so bewildering such that Plaintiff could not even learn any lessons from the experience. There were no lessons to be learned, there was criminal and tortious conduct. There was no lawful reason to designate Plaintiff a floater. Plaintiff never had contact with R. Fazzone that was comprehensible to the Plaintiff. R. Fazzone had been, unbeknownst to Plaintiff, (but known to defendant Cravath), one of Plaintiff's chief maligners, enforcer of a wrongfully induced reply to a wrongful question, and main beneficiary of a scheme to defraud. Cravath further aided her and deprived Plaintiff, extorting from the Plaintiff,  who had been traumatized by an attempted kidnapping and further harmed by subsequent criminal and tortious conduct to state in summary terms what has

been set forth more fully above. Cravath copied the pattern: traumatize and follow up with more crimes, and torts, deprivation, extorting and wrongfully diverting and concealing as set forth more fully above.

PRAYER FOR RELIEF

A.    That plaintiff be granted judgment against defendants in the total amount of all damages suffered as a result of defendants' wrongful acts.

B.    That in accordance with 18 U.S.C. § 1964(c)  plaintiff be granted judgment against

(1) defendant Cravath for treble damages suffered by reason of injury to her business and property as a  result of defendant Cravath's violations of 18 U.S.C. § 1962(c) and (d).

(2) defendant Cravath for breach of good faith, for acting in bad faith in offering a floater paralegal position.

(3) defendants for all costs of this action and,

(4) in lieu of a reasonable attorney's fee, compensation for researching and drafting the complaint.

C.    Pursuant to 18 U.S.C.S § 1964 (a):  That plaintiff be granted an Order to the Estate of Louis DeNegre for the return to the plaintiff of her gold and onyx Ursuline school ring.

D.    Pursuant to 18 U.S.C.S § 1961 (9) and 18 U.S.C.S § 1964 (a) that Plaintiff be granted an order directing the Estate of Louis DeNegre to turn over any documents, papers, or recordings that M. DeNegre produced or that were produced and given to him by any Enterprise members, agents, and co-conspirators and that any copies or originals in the possession of the Estate or others be destroyed.

E.    Pursuant to 18 U.S.C. 1964 (a), Plaintiff prays for a court Order of Protection.

In particular, Plaintiff prays for an Order to Protect her against defendants J. Fabiani, L. Fabiani, and S. Fabiani. And Plaintiff prays for an order as to  defendant R. Fazzone; and co-conspirators M. McErlean Hunter, J. McNamara, and M. Tolan all defendants and conspirators named in this action  prohibiting them from communicating indirectly or directly with the Plaintiff, pressuring the Plaintiff in any way, advancing the informal, out of court arguments and claims to Plaintiff's diplomas.

F.      An Order to R. Fazzone to divest herself of a portion TBD of her interest in Fazzone Law and donate it to a charity designated by the Plaintiff.

G.      An Order to G. Stanco to disgorge in an amount TBD enrichment that was unjust, flowing from connections made as a result of conspiracies set forth herein.

H.      That this court grant plaintiff any other relief that it considers just and appropriate under the circumstances.


Dated: April 8, 2024                                    
**Plaintiff's Signature**:  /s/ Carol M. Mottola

.

Addresses

Cravath, Swaine, & Moore
Worldwide Plaza
825 Eighth Ave
New York, NY 10019

Rosalia A. Fazzone
1753 N Lafayette Street
Denver, CO 80218

Fazzone Law, L.L.C.
1753 N Lafayette Street
Denver, CO 81218
Rosalia Ann Fazzone, agent

Estate of Louis Mark DeNegre
Fiduciary: Diana DeNegre
Giacomo Tolomeo
31 Washington Avenue
2nd Floor
North Haven, CT 06473

Jacqueline Fabiani Spano
286 Melody Lane
Fairfield, CT 06824

Linda Fabiani *Guilianti*
470 Halstead Ave, APT 6O,
 *Harrison,* NY 10528

Susan Fabiani Brunelli
39 Church Street
Greenwich, CT 06830

Gary Stanco
97 Bellevue Ave
Rye, NY 10580

Paget Stanco (daughter)
97 Bellevue Ave
Rye, NY 10580 or
Gemini.  600 Third Ave 2nd Floor, New York City, New York, 10016,

James E. Tolan
P.O. Box 633

6 Quogo Neck Lane
Quogue, NY 11959